ROBBINS GELLER RUDMAN
  & DOWD LLP
LUKE O. BROOKS (212802)
ROBERT R. HENSSLER, JR. (216165)
CHRISTOPHER D. STEWART (270448)
HILLARY B. STAKEM (286152)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

-and-

KESSLER TOPAZ
  MELTZER & CHECK, LLP
JENNIFER L. JOOST (296164)
STACEY M. KAPLAN (241989)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: 415/400-3000
415/400-3001 (fax)

*Lead Counsel for the Class and
Lead Plaintiff Gatubhai Mistry, and Named
Plaintiffs Gerald L. Koenig, Leonard Brenner,
and Vanessa D. Washington*

[*Additional Counsel listed on signature page.*]

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE QUALCOMM/BROADCOM MERGER SECURITIES LITIGATION | Case No. 3:18-cv-01208-CAB-AHG |
| | **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| | **DEMAND FOR JURY TRIAL** |

# **TABLE OF CONTENTS**

Page

I. NATURE OF THE ACTION AND OVERVIEW ............................................ 2

II. JURISDICTION AND VENUE ........................................................ 11

III. PARTIES AND RELEVANT NON-PARTY ........................................ 12

IV. DEFENDANTS' FRAUDULENT SCHEME .................................... 15

  A. Qualcomm – A Beleaguered Technology Business Battered by Legal and Regulatory Woes ........................................ 15

  B. Broadcom – A Growing Business, Redomiciling in the United States ...................................................... 17

  C. The Press Reports on Broadcom's Interest in Acquiring Qualcomm and Qualcomm's Stock Price Jumps .................... 18

  D. Broadcom Makes a Formal Proposal to Acquire Qualcomm ............... 19

  E. Qualcomm Rejects Broadcom's Offer ........................................ 21

  F. Broadcom Launches a Proxy Fight ........................................ 22

  G. Qualcomm's Board Rejects Broadcom's Independent Nominees and Urges Shareholders to Do the Same .............................. 25

  H. Unbeknownst to Shareholders, Qualcomm Petitions CFIUS to Kill Broadcom's Takeover Attempt ........................................ 29

    1. The Committee on Foreign Investment in the United States ....... 32

    2. The Market Did Not View CFIUS as a Serious Obstacle to the Transaction ........................................ 35

  I. Qualcomm Misleads the Market into Believing Its Board Is Willing to Negotiate around a Fair Price at the Same Time It Is Affirmatively Seeking to Derail Broadcom's Bid .................... 38

    1. Qualcomm Begins Misleading Shareholders on January 29, 2018, Regarding the Affirmative Steps It Took to Lobby for CFIUS Intervention .................... 38

    2. Broadcom Ups Its Offer and Qualcomm Claims to Consider It Even Though It was Secretly Advocating to End the Bid .......... 39

    3. Defendants Continue to Mislead Investors About Qualcomm's Willingness to Negotiate with Broadcom .............. 42

    4. Following a Meeting with Broadcom, Qualcomm Falsely Maintains Its Willingness to Negotiate .................... 47

5. Broadcom Lowers Its Offer in Response to Qualcomm Action but Continues to Try to Move the Deal Forward ............49

6. The Parties Meet Once Again and Qualcomm Continues to Misrepresent Its Actual Level of Engagement ...........................51

J. The Relevant Truth Is Revealed in a Series of Disclosures ..................55

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ........................63

VI. ADDITIONAL SCIENTER ALLEGATIONS ................................................82

A. Defendants Were Each Deeply Engaged in Merger Negotiations and Qualcomm's Response to the Broadcom Proposal, Such That Each Was Aware of and Involved in Qualcomm's Unilateral Request for CFIUS Review and Its Purpose ...........................................82

1. Mollenkopf ..................................................................83

2. Rosenberg ..................................................................84

3. Jacobs ........................................................................85

4. Horton ........................................................................85

B. The Unprecedented Nature of Defendants' Actions Supports an Inference of Scienter ................................................................86

C. Defendants Were Motivated to Conceal Qualcomm's Unilateral Pre-Deal CFIUS Submission ..........................................................88

1. Defendants Knew They Would Lose a Proxy Contest to Broadcom ................................................................88

2. Defendants Knew That Initiation of CFIUS Review Would Delay a Vote on Broadcom's Director Nominations, If Not Halt the Deal Altogether ...............................................90

D. Defendants' Careful Concealment Supports an Inference of Scienter ......................................................................92

VII. LOSS CAUSATION/ECONOMIC LOSS ....................................................96

A. Information Regarding Hostile Takeover Bids and Defenses Is Important to Investors in a Target Company .......................................98

B. Defendants' Undisclosed CFIUS Hostile Takeover Defense Was Important to Qualcomm's Investors .....................................................103

C. Defendants' Fraud Caused Significant and Material Declines in Qualcomm's Stock Price .................................................................105

1.  The March 5 and March 6, 2018 Disclosures Were a Foreseeable Result of Defendants' Fraud and Caused Significant Declines in Qualcomm's Stock Price ..................... 108

2.  The March 12 and March 13, 2018 Disclosures Were a Foreseeable Result of Defendants' Fraud and Caused Significant Declines in Qualcomm's Stock Price ..................... 119

D.  Expert Opinion Confirms That the Stock Price Declines on the Corrective Disclosure Dates Were Statistically and Economically Significant ............................................................................. 125

E.  Expert Opinion Confirms That the Information Disclosed on the Corrective Dates Was Directly Related to and a Foreseeable Consequence of the Information That Defendants Misrepresented and Concealed During the Class Period ................................. 127

VIII.  THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ............................................. 130

IX.  CONTROLLING PERSON ALLEGATIONS ................................. 131

X.  CLASS ACTION ALLEGATIONS .............................................. 132

XI.  PLAINTIFFS AND CLASS MEMBERS ARE ENTITLED TO A PRESUMPTION OF RELIANCE ............................................... 134

XII.  CAUSES OF ACTION ............................................................. 137

XIII.  PRAYER FOR RELIEF ........................................................... 141

XIV.  JURY DEMAND ................................................................... 141

This is a class action for violations of the federal securities laws brought by Lead Plaintiff Gatubhai Mistry and named plaintiffs Gerald L. Koenig, Leonard Brenner, and Vanessa D. Washington (collectively, "Plaintiffs") individually and on behalf of all persons who purchased or otherwise acquired Qualcomm Incorporated ("Qualcomm" or the "Company") common stock between January 29, 2018 and March 12, 2018, inclusive (the "Class Period"). Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated by the Securities and Exchange Commission ("SEC") thereunder (17 C.F.R. § 240.10b-5), against: (i) Qualcomm; (ii) Qualcomm's Chief Executive Officer ("CEO") Steven M. Mollenkopf ("Mollenkopf"); (iii) Qualcomm's former Executive Chairman and Chairman of Qualcomm's Board of Directors (the "Board") Dr. Paul E. Jacobs ("Jacobs"); (iv) Qualcomm's General Counsel Donald J. Rosenberg ("Rosenberg"); and (v) Qualcomm's former Presiding Director of the Board Thomas W. Horton ("Horton") (collectively, "Defendants").

Plaintiffs allege the following based upon personal knowledge with respect to Plaintiffs' own acts and upon information and belief as to all other matters based on the investigation undertaken by Court-appointed Co-Lead Counsel, Kessler Topaz Meltzer & Check, LLP and Robbins Geller Rudman & Dowd LLP, and their agents. Co-Lead Counsel's investigation includes, among other things, a review and analysis of: (i) public filings by Qualcomm and Broadcom Limited ("Broadcom") with the SEC; (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analysis of securities movement and pricing data; (v) transcripts of investor calls with Qualcomm and Broadcom senior management; (vi) consultations with consultants; and (vii) other publicly available material and data identified herein. Co-Lead Counsel's investigation into the factual allegations contained herein is continuing and many of the facts supporting Plaintiffs' allegations are known only to Defendants or are exclusively within their custody or control.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This action involves Defendants' materially false and misleading Class Period statements and omissions, undertaken to frustrate Broadcom's attempt to acquire Qualcomm, entrench themselves in their director and executive positions, and ultimately, to thwart the will of the Company's shareholders.

2.    By the fall of 2017, Qualcomm – a semiconductor company based in San Diego – was under intense scrutiny after years of poor performance.  The Company was engaged in contentious litigation with one of its biggest customers, Apple Incorporated ("Apple"), over Qualcomm's alleged "illegal business practices," and Apple was threatening to discontinue use of Qualcomm's chips in its iPhones.  The Company was also facing multiple suits and investigations by the Federal Trade Commission ("FTC") and numerous antitrust agencies around the world for its alleged anti-competitive practices – which had already resulted in billions of dollars in fines.

3.    Qualcomm's net income plunged 57% in fiscal year 2017, and while its competitors rode the bull market, with the PHLX Semiconductor Sector Index rising 58% over the previous year, the Company's stock price had floundered, plummeting 18% over the same period.  By November 2017, Qualcomm's common stock was trading around $54 per share, down from a high of $81.32 in April 2014.  As a Bernstein analyst summed it up: "Qualcomm's stock has been hideous to own over the last few years."

4.    On November 3, 2017, news leaked that Broadcom was planning a bid to acquire Qualcomm at around $70 per share, almost 30% over its current market price.  Unlike Qualcomm, Broadcom – a semiconductor company domiciled in Singapore – had experienced remarkable success in recent years.  In fact, between April 2014 and October 2017, Broadcom's stock price had increased approximately 350% – from $58.53 to $263.91.  The market's response to news of Broadcom's bid was immediate

and positive – Qualcomm's common stock spiked 13% in a single trading day, closing on November 3 at $61.81.

5.     On November 6, 2017, Broadcom made its formal offer to acquire Qualcomm for $70 per share.  A week later, Qualcomm announced that it had rejected Broadcom's offer, arguing that it "dramatically undervalue[d] Qualcomm." Qualcomm also cited to unexplained "significant regulatory uncertainty."  Undeterred, Broadcom made clear that it "remain[ed] fully committed" to acquiring Qualcomm and was "encouraged by [shareholder] reaction."

6.     The market also remained bullish on the deal, with one analyst reporting: "the probability remains [Broadcom] will up the offer and acquire the asset either via constructive discussions or a proxy battle" to replace Qualcomm's Board.   An Oppenheimer analyst report similarly reported that, "we believe QCOM shareholders would be eager to accept a ~27% premium[.]"

7.     As a result, the Company's share price continued to rise throughout November, closing out the month at $66.34 – a 30.5% total increase.  As the Motley Fool explained: "Qualcomm's share price . . . continued to climb throughout November.   That could be an indicator that shareholders are eager to replace Qualcomm's board and allow this acquisition to go through."  A commentator summed up investor sentiment on CNBC's *Squawk Box* as follows: "[t]here are many shareholders, including me, who think Qualcomm is very poorly managed.  I would like adult supervision to come in from Broadcom[.]"

8.     Broadcom officially kicked off a proxy fight on December 4, 2017, announcing a slate of 11 director nominees to replace Qualcomm's beleaguered Board – with the vote to take place at Qualcomm's annual meeting on March 6, 2018 (the "Annual Meeting").  Broadcom made clear that its "strong preference" was still to negotiate a deal with the Company and that Qualcomm's shareholders were also "express[ing] their desire for Qualcomm to engage with us."  The proxy fight would

therefore "give Qualcomm stockholders an opportunity to voice their disappointment with Qualcomm's directors and their refusal to engage in discussions with us."

9.     On December 22, 2017, Qualcomm officially announced that it would oppose Broadcom's proxy fight and a few weeks later, on January 5, 2018, the two companies filed competing proxy statements soliciting shareholder votes for their respective slates.  The main thrust of Qualcomm's opposition was that Broadcom's offer "substantially undervalued" the Company and that its current Board "will deliver far more value than the Broadcom proposal."  Qualcomm also asserted that the deal involved "significant regulatory uncertainty," including from antitrust regulators and the Committee on Foreign Investment in the United States ("CFIUS" or the "Committee") – an interagency committee that reviews transactions between foreign and domestic entities for potential national security concerns.

10.     While market commentators recognized some potential antitrust risk associated with Broadcom's offer, many ultimately concluded that such risks were minimal.  For example, a Canaccord Genuity analyst report concluded that "[w]hile we believe the overlapping WiFi businesses would create some regulatory concerns that could be solved, we do not believe there are material product overlaps in other areas of the businesses."  Analyst Oppenheimer Equity Research echoed that "[w]e believe regulatory/HSR hurdles should be low[.]"  As The New York Times explained, although antitrust approval could raise some concern, "[t]he biggest issue may simply be that Qualcomm believes the current offer, worth about $70 a share, is too low."

11.     Nor did the market perceive there to be serious risk that a review by CFIUS would stymie a deal.  Indeed, just days before it debuted its bid for Qualcomm, Broadcom announced that it would redomicile to the U.S. – a move that the market understood as removing CFIUS risk, since Broadcom would no longer be a foreign entity.  As The New York Times reported, "[a]t least one deal hurdle – Washington's examination of foreign acquirers – has been pre-empted."  Likewise, analyst Morningstar Equity Research reported that "[w]e foresee U.S. approval, thanks to

Broadcom's shrewd move to redomicile in the U.S." These predictions were seemingly affirmed in mid-November 2017, when CFIUS approved Broadcom's acquisition of another U.S. company, Brocade Communications Systems, Inc. ("Brocade"), as a result of Broadcom's decision to redomicile.

12.     Thus, in an effort to manufacture doubt about CFIUS review, in December and January proxy solicitations Qualcomm seized on what it characterized as "uncertainty surrounding [Broadcom's] transition from Singapore to the United States," noting that "they have not made any further progress on their commitment to become an American company[.]"  On January 22, 2018, however, Broadcom put Qualcomm's speculations to rest, announcing that it had filed preliminary proxy materials with the SEC to approve its redomiciliation to the U.S., and expected to complete the process by May 6, 2018.

13.     With Qualcomm's disenchanted shareholder base fleeing to Broadcom's camp, and Broadcom's redomiciliation imminent, by the end of January, Defendants saw the writing on the wall.  They knew they were almost certain to lose the impending proxy contest, and that once Broadcom's slate of directors was in place, an acquisition agreement would be approved.  The Company had no poison pill to employ to deter Broadcom's advances: as a result of shareholder pressure in 2015, it had had no choice but to let its former poison pill expire.  And shortly thereafter, Qualcomm also amended its bylaws to include a shareholder proxy access right, further weakening control over the Board.

14.     With the Company's traditional takeover defenses depleted or unavailable, and Defendants' control of the Board further weakened by the proxy access right, Defendants instead engaged in a desperate and surreptitious attempt to thwart the will of the Company's shareholders and entrench themselves.  Specifically, on January 29, 2018, Defendants secretly filed a unilateral, pre-deal notice with CFIUS, arguing that the deal raised serious national security concerns and asking the regulator to kill Broadcom's bid before it had the opportunity to redomicile.  Over the next

month, Defendants continued to covertly submit additional information to CFIUS in furtherance of their plan to kill the deal.

15.    During the Class Period, Defendants withheld all of this highly material information from their shareholders.  Indeed, while behind the scenes Defendants were doing everything in their power to kill Broadcom's bid, publicly they were careful to conceal their efforts to thwart the takeover – including by repeatedly misrepresenting to investors that they were acting in shareholders' best interests by negotiating with Broadcom in good faith to reach a deal.  For example, on February 8, 2018, Qualcomm rejected Broadcom's improved offer of $82 per share – a whopping 50% premium over Qualcomm's pre-bid stock price, accompanied by significant concessions to address Qualcomm's purported concerns about regulatory risk.  But though Defendants knew that Qualcomm was actively lobbying CFIUS to block Broadcom's planned acquisition, they told shareholders that they were willing to constructively engage with Broadcom: "***Qualcomm has offered to meet with Broadcom to see if it can address the serious deficiencies in value and certainty in its proposal***." [1]

16.    Throughout the Class Period, Defendants argued against Broadcom's bid through vague statements to shareholders about potential regulatory delay, highlighting the antitrust risks associated with the deal while concealing the steps the Company had already taken to scuttle the transaction.  For example, the very same day they filed their secret CFIUS notice, Qualcomm emphasized antitrust risks associated with the deal, telling investors that Broadcom's bid involved "some questions about deal certainty and regulatory approval" and "[w]e believe that [regulatory approval] is probably going to take something in the range of 18 months or more even[.]"  While speaking directly to potential regulatory delay associated with the deal, however, Defendants purposefully withheld the fact that they had taken affirmative steps to ensure that the deal would never receive regulatory approval.

---

[1]    All emphasis herein is added unless otherwise noted.

17.     In a February 8, 2018 letter to Broadcom filed with the SEC, Defendants laid out the topics for discussion at their proposed meeting with Broadcom, which included, "***Is Broadcom willing to commit to take whatever actions are necessary to ensure the proposed transaction closes?***"  (Some emphasis in original.)  Defendants' letter explained that Broadcom's firm commitment to ensure regulatory approval "***is extremely important to value preservation for our shareholders***" and "***[i]f you are not willing to agree to do whatever is necessary to ensure a transaction closes, we will need you to be extremely clear and specific about exactly what actions you would refuse to take, so that we can properly evaluate the risk to Qualcomm's shareholders.***"  While focusing attention on Broadcom's commitment to ensure deal closure, however, Defendants failed to disclose that they had already argued to regulators that the transaction inherently posed a threat to national security and therefore should never close, regardless of any steps Broadcom agreed to take.  In so doing, Defendants deprived investors of the opportunity to "properly evaluate the risk[s] to Qualcomm shareholders."

18.     Because they were in the dark about Qualcomm's secret defensive measures, analysts reacted positively to Qualcomm's stated willingness to engage, writing, "we are encouraged to see a potential meeting between AVGO and QCOM and looking forward to incremental updates" and reaffirming a price target of $80 per share – just below Broadcom's bid.

19.     On February 14, 2018, Qualcomm met with Broadcom to discuss the latter's improved proposal.  After the meeting, Defendants again misrepresented to the market that the parties were making progress toward a negotiated deal, telling shareholders that: "***our Board found the meeting to be constructive***"; "[w]hile the current Broadcom proposal is unacceptable, ***our Board is intensely focused on maximizing value for Qualcomm stockholders***, whether through executing on its growth strategy ***or by selling the Company***"; and "***[o]ur Board is open to further discussions with Broadcom to see if a proposal that appropriately reflects the true***

*value of Qualcomm shares, and ensures an appropriate level of deal certainty, can be obtained.*"   Meanwhile, Qualcomm's shareholders had no idea that rather than trying to negotiate a deal, Defendants were instead actively working to ensure that a Broadcom deal could never happen.

20.     Over the next week, shareholder support for Broadcom's bid was further cemented when two of the top proxy advisory services recommended that Qualcomm's shareholders vote to oust the Company's Directors.   First, on February 16, 2018, Institutional Shareholder Services ("ISS") recommended that the Company's Board "should negotiate with [Broadcom] in good faith," noting that "[r]egulatory concerns from [a Broadcom/Qualcomm] merger appear manageable[.]"  If Qualcomm's Board failed to engage, however, ISS recommended that shareholders vote to oust them, explaining that "[t]he election of four Broadcom nominees to the 11-member board seems to offer a reasonable path to a negotiated deal, which is likely to be the most beneficial path for shareholders."  Four days later, Glass, Lewis & Co. ("Glass Lewis") issued a recommendation that shareholders vote "AGAINST" Qualcomm's directors and "FOR" all of Broadcom's nominees at the Annual Meeting.

21.     In response, Defendants continued to mislead investors that they were seeking a negotiated deal with Broadcom.  For instance, on February 20, 2018, the Company issued another statement about the February 14 meeting, representing that "*[w]e entered the meeting with Broadcom in a constructive manner, seeking a price increase and engagement on issues related to transaction certainty.   However, Broadcom did not engage on the topic of price . . . [and] should Broadcom present a proposal that delivers superior value and sufficiently protects downside risk to you, we will pursue a sale.*"   Yet, that very same day, Mollenkopf met privately with Treasury Secretary Steven Mnuchin, Chairman of CFIUS, to press his case for CFIUS to kill the deal.  This fact would only be revealed after the Class Period, when Secretary Mnuchin's daily calendar for the first quarter of 2018 was officially published.

22.     To further perpetuate the perception that they were pursuing a negotiated deal, on February 23, 2018, Defendants again met with Broadcom.  In a slew of statements issued on February 26, 2018, Defendants misrepresented to investors that the companies had made substantial progress addressing Qualcomm's regulatory concerns, and suggested that the only sticking point was price: "[t]he Qualcomm Board believes ***the meeting led to further progress toward a possible negotiated transaction on key issues other than price***."  Defendants also represented that they would be providing Broadcom with edits to its proposed merger agreement and a non-disclosure agreement, stating that "***the Board encourages Broadcom to enter into mutual due diligence and price negotiations" "with the goal of determining whether there is a mutually beneficial transaction to be done between our two companies***."

23.     Market reaction was positive, with commentators noting that Qualcomm "[said] the two sides had made progress on regulatory issues but were yet to agree on the deal value."

24.     Defendants' misleading statements continued unabated on March 1, 2018, when they touted their "***repeated[] and genuine[] attempt[s] to engage with Broadcom on issues including price, regulatory and other closing certainties . . . [and their] attempts to find a path to a deal[.]***"  As suggested by Broadcom, it appeared that "Qualcomm's sudden request to enter into an NDA is a result of Qualcomm finally beginning to recognize the will of its stockholders."  The reality, of course, was that Qualcomm was actively working to thwart the will of its shareholders and scuttle any chance of a Broadcom bid.

25.     Then, on March 5 and 6, 2018, the market learned that Qualcomm had secretly submitted a voluntary notice to CFIUS ***on January 29, 2018***, requesting that it review Broadcom's bid and arguing that the deal would jeopardize national security.  As a result, CFIUS ordered Qualcomm to postpone its Annual Meeting – including the vote on Broadcom's slate of nominees – while it conducted a review.  As Broadcom noted in a March 5 press release, "[t]his was a blatant, desperate act by Qualcomm to

entrench its incumbent board of directors and prevent its own stockholders from voting for Broadcom's independent director nominees." Moreover, that Defendants kept Qualcomm's exceptional, pre-deal initiation of CFIUS review hidden "can only be seen as an intentional lack of disclosure – both to Broadcom and to its own stockholders."

26. On March 6, 2018, Qualcomm published a letter from the U.S. Department of the Treasury that provided further details concerning Qualcomm's secret Class Period communications with CFIUS and made clear that CFIUS's decision was the direct result of the unilateral notice and follow-up information submitted by Qualcomm. For example, the letter disclosed that "CFIUS's assessment thus far includes its review of the information submitted by Qualcomm in its unilateral voluntary notice on January 29, 2018, the parties' responses to questions posed about the potential transaction during the interim period, and the information provided in our multiple phone calls, emails, and meetings with representatives of both Qualcomm and Broadcom." As a result of these disclosures, the market also understood that Defendants had never been willing to negotiate with Broadcom in good faith to sell the Company, as they had repeatedly represented. In response to these disclosures, the Company's stock fell 4.02%, from a closing price of $64.74 on March 2, 2018, to a closing price of $62.14 on March 6, 2018.

27. The following day, reports began circulating that, in an attempt to salvage its bid, Broadcom was accelerating its efforts to redomicile to the U.S. Then, after the close of business on March 12, 2018, President Donald J. Trump ("President Trump") issued an executive order blocking Broadcom from acquiring Qualcomm. Market commentators again noted that the decision seemed to stem directly from the information provided by Qualcomm. For example, The Deal Pipeline noted that "some of the objections publicly voiced by the committee sound like Qualcomm talking points." Similarly, Tech Crunch reported that "[t]he [Qualcomm] board's original outreach to CFIUS precipitated the sequence of events that led to Trump's block this

past week." Mondaq Business Briefing concluded that "it is possible we are seeing now for the first time the (potentially successful) use of CFIUS as a takeover defense against a hostile offer." In response, the Company's stock price declined 4.95%, to close at $59.70 per share on March 13, 2018. Controlling for market and industry factors, the disclosures on March 5, March 6, and March 12, 2018, collectively wiped out over $9 billion in shareholder equity value – or over 9% of Qualcomm's total common equity value.

28. On March 14, 2018, Broadcom announced that it had terminated its offer to acquire Qualcomm. Analysts expressed outrage that Qualcomm's actions had thwarted the will of its shareholders, with a Bernstein analyst reporting that "[b]y invalidating Broadcom's board slate, the US government has effectively revoked the rights of Qualcomm's long-suffering shareholders to vote for change (indeed, it almost feels like Qualcomm shareholders have been asked to effectively subsidize U.S. government policy)." Indeed, numerous news sources reported that, before CFIUS's intervention at Qualcomm's behest, the proxy vote count indicated that Broadcom was on track to win a majority of Qualcomm's Board seats, with defendants Mollenkopf and Jacobs as the lowest vote-getters.

## II.    JURISDICTION AND VENUE

29. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

30. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

31. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, Qualcomm's principal executive offices are located within this District.

32.     In connection with the acts, transactions, and conduct alleged in this Complaint, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III.     PARTIES AND RELEVANT NON-PARTY

33.     Lead Plaintiff Gatubhai Mistry is an individual investor who purchased Qualcomm common stock, as set forth in the certification attached hereto as Exhibit A, at artificially inflated prices during the Class Period, and suffered damages as a result of the misconduct alleged herein.

34.     Plaintiff Gerald L. Koenig is an individual investor who purchased Qualcomm common stock, as set forth in the certification attached hereto as Exhibit B, at artificially inflated prices during the Class Period, and suffered damages as a result of the misconduct alleged herein.

35.     Plaintiff Leonard Brenner is an individual investor who purchased Qualcomm common stock, as set forth in the certification attached hereto as Exhibit C, at artificially inflated prices during the Class Period, and suffered damages as a result of the misconduct alleged herein.

36.     Plaintiff Vanessa D. Washington is an individual investor who purchased Qualcomm common stock, as set forth in the certification attached hereto as Exhibit D, at artificially inflated prices during the Class Period, and suffered damages as a result of the misconduct alleged herein.

37.     Defendant Qualcomm is a Delaware corporation with its principal executive offices located at 5775 Morehouse Drive, San Diego, California 92121. Qualcomm develops and commercializes "foundational technologies and products" used in mobile devices and other wireless products.  According to the Company's Annual Report Form 10-K, filed with the SEC on November 1, 2017, Qualcomm is "a pioneer in 3G (third generation) and 4G (fourth generation) wireless technologies . . . to empower a new era of intelligent, connected devices."

38.     Defendant Steven M. Mollenkopf was, at all relevant times, the Company's CEO and a member of the Board.  Mollenkopf joined Qualcomm in 1994 as an engineer.   From November 2011 to December 2013, Mollenkopf served as President and Chief Operating Officer of the Company, and from December 2013 to March 2014, he served as CEO-elect and President.  Mollenkopf became CEO of Qualcomm in March 2014 and has been a member of the Board since December 2013. As CEO, Mollenkopf had responsibility for the "general supervision, direction and control of the business and the officers of the Corporation" pursuant to Qualcomm's bylaws.  During the Class Period, Mollenkopf made materially false and misleading statements in proxy solicitations published to investors on January 29, 2018, February 8, 2018, February 16, 2018, February 22, 2018, February 26, 2018, and March 1, 2018.

39.     Until his ouster in March 2018, Defendant Dr. Paul E. Jacobs was, at all relevant times, the Company's Executive Chairman and Chairman of the Board.  As Executive Chairman, Jacobs not only presided over Board meetings but also maintained an executive management function. From July 2005 until March 2014, Jacobs served as Qualcomm's CEO.  Jacobs' father, Irwin M. Jacobs, co-founded the Company in 1985 and, up until Jacobs' dismissal from the Board in March 2018, a member of the Jacobs family had always served in a top executive role in the Company. During the Class Period, Jacobs made materially false and misleading statements in proxy solicitations published to investors on February 8, 2018, February 16, 2018, February 22, 2018, February 26, 2018, and March 1, 2018.

40.     Defendant Donald J. Rosenberg was, at all relevant times, the Company's Executive Vice President, General Counsel, and Corporate Secretary.  Rosenberg reported directly to Mollenkopf and was a member of the Company's Executive Committee.  In his role as General Counsel, Rosenberg was responsible for overseeing Qualcomm's worldwide legal affairs including litigation, intellectual property, and corporate matters.  Qualcomm's Government Affairs, Internal Audit and Compliance organizations also reported to him.  Rosenberg has extensive experience in corporate

governance, compliance, law department management, litigation, securities regulation, intellectual property, and competition issues.  During the Class Period, Rosenberg made materially false and misleading statements in a proxy solicitation published to investors on January 29, 2018.

41.     Defendant Thomas W. Horton was, at all relevant times, a member of the Company's Board.  Horton became a Qualcomm Director in December 2008.  During the relevant period, Horton also served as the Board's Presiding Director (lead independent director) and, in that role, led Qualcomm's negotiations with Broadcom. Horton's role also required him to act as the principal liaison between the independent directors, the Chairman, and CEO, collaborate with the Chairman, CEO, and independent directors to develop agendas for Board meetings, and ensure that appropriate briefing materials were provided to the directors in advance of Board meetings.  During the Class Period, Horton made materially false and misleading statements in proxy solicitations published to investors on February 22, 2018 and March 1, 2018.

42.     Defendants Mollenkopf, Jacobs, Rosenberg, and Horton are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Qualcomm's reports to the SEC, press releases, and presentations made to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each Individual Defendant was provided with copies of the Company's reports and statements alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the representations which were being made were then materially false and misleading.

43.     Broadcom was, during the Class Period, a Singapore corporation with its headquarters located at 1 Yishun Avenue 7 in Singapore and at 1320 Ridder Park Drive in San Jose, California.  Broadcom is a designer, developer, and global supplier of a broad range of semiconductor devices with a focus on complex digital and mixed signal complementary metal oxide semiconductor ("CMOS") based devices and analog III-V based products.

## IV.    DEFENDANTS' FRAUDULENT SCHEME

### A.    Qualcomm – A Beleaguered Technology Business Battered by Legal and Regulatory Woes

44.     Qualcomm, which is headquartered in San Diego, California, sells technologies and products used in mobile devices and other wireless products, including network equipment, broadband gateway equipment, and consumer electronic devices.  Qualcomm derives the majority of its revenues from its semiconductor and patent licensing business.

45.     In the years leading up to Broadcom's offer for Qualcomm, Qualcomm's stock price had floundered, collapsing almost 50% between April 2014 (high of $81.32 per share) and February 2016 (low of $42.96 per share).

46.     By April 2015, the Company's shareholders were restless.  One of Qualcomm's largest shareholders, JANA Partners, requested the Company consider spinning off its chip unit from its licensing business, and that it undertake significant reforms.  After several months of negotiations with JANA Partners, on July 22, 2015, the Company announced that it would be replacing two Board members with JANA Partners-approved selections, that it would be cutting operating costs significantly, and that it would be analyzing whether to make larger structural and governance changes. The Company also announced that it would ***not*** be renewing its Rights Agreement, entered into on September 26, 2005, which had given the Company a poison pill – a defensive measure which would have allowed the Company to deter a hostile takeover even if the takeover was supported by shareholders.

47. By 2017, the Company was under siege on multiple fronts. In January 2017, one of Qualcomm's largest customers – Apple – sued the Company alleging that Defendants were operating an "illegal business model."

48. Meanwhile, the Company was under fire from multiple antitrust agencies around the world. In the United States, the FTC brought suit against Qualcomm in January 2017, alleging that, among other things, it used its monopoly power over cellphone chip supply and its substantial portfolio of patents to extract inflated royalties, including by threatening to withhold chips from smartphone makers who refused to agree to its unfair licensing terms.

49. In China, Qualcomm was forced to pay $975 million to end a probe into its anti-competitive practices. In late December 2016, the Korea Fair Trade Commission fined the Company a record-setting $854 million for antitrust violations. In 2017, Taiwan's Fair Trade Commission imposed a fine of $778 million on Qualcomm for refusing to sell chips to companies that would not agree to its licensing terms.

50. By the fall of 2017, Qualcomm's anti-competitive practices had taken a massive toll on both its bottom line and its stock price. As the Los Angeles Times explained, Qualcomm was fighting "a fierce legal battle with Apple over patent royalties, and it faces hefty fines and lawsuits from antimonopoly regulators in the U.S., South Korea and Taiwan. Those troubles weighed heavily on Qualcomm's [2017] full fiscal year results[.]"

51. Likewise, The Wall Street Journal reported:

> [A] string of hits by regulators, competitors and customers including Apple has left the industry titan in a vulnerable position. Qualcomm's profit in the fiscal year that ended Sept. 24 [2017] plummeted 57%, and its share price declined 18% in the 12 months through Thursday's close compared with a 58% rise in the PHLX Semiconductor Sector Index.

The New York Times echoed that "Qualcomm, the longtime leader in cellphone chip technology, has been grappling with a sagging stock price and investor wariness that the Apple fight will continue for some time."

**B.     Broadcom – A Growing Business, Redomiciling in the United States**

52.     Broadcom's semiconductor business began in 1961 as a division of Hewlett-Packard.  In 1991, Hewlett-Packard spun off its semiconductor and scientific testing and measuring business into Agilent Technologies, then the largest ever Silicon Valley IPO.  In 2005, two American private equity firms – KKR and Silver Lake Partners ("Silver Lake") – acquired the semiconductor business from Agilent for $2.6 billion and formed Avago Technologies ("Avago").  Avago went public in 2009, trading on the NASDAQ under the ticker symbol "AVGO."  As of then, Avago was a Singapore domiciled company for tax purposes, although it maintained significant operations in Silicon Valley.

53.     In the years that followed, Avago's CEO, Hock Tan ("Tan"), spearheaded a series of ever-bigger deals, expanding the company exponentially.  In May 2015, Avago announced that it was buying Broadcom Corporation, a competing chipmaker based in Irvine, California, for $37 billion.  After the deal closed in February 2016, the combined company – with a market value of $77 billion – was renamed Broadcom Limited but retained the ticker symbol AVGO.

54.     In the years leading up to its offer to acquire Qualcomm, Broadcom maintained its remarkable streak of mid-double digit growth by successfully integrating new businesses while also growing organically.  As Broadcom flourished, so did its stock price; between April 2014 and October 2017, Broadcom's stock price increased nearly five-fold, from a low of $58.53 to a high of $263.91.

55.     During the relevant time period, although Broadcom was organized under the laws of Singapore, its nerve center remained in the United States.  Broadcom was managed from San Jose, California, its U.S. headquarters, and Broadcom's board of directors and senior management team, including Broadcom CEO Tan, were nearly all

American citizens.   Broadcom's stock was also mostly American-owned; ninety percent of its shareholders are in the U.S.  As a March 14, 2018 MarketWatch article observed, "Broadcom is largely an American company that placed its legal headquarters in Singapore, . . . largely for tax purposes."

56.     On November 2, 2017, Broadcom's CEO Tan announced in a White House press conference alongside President Trump that Broadcom would redomicile as an American corporation.  President Trump hailed the announcement as a sign that the U.S. business climate was improving, explaining that changing Broadcom's parent from a Singapore company to a U.S. corporation would bring $20 billion in revenue back to the U.S.  President Trump also exalted Broadcom as "one of the really great, great companies," noting that Broadcom employs more than 7,500 workers across the U.S.

**C.      The Press Reports on Broadcom's Interest in Acquiring Qualcomm and Qualcomm's Stock Price Jumps**

57.     On November 3, 2017, numerous national media sources, including Bloomberg, The New York Times, and Reuters reported that Broadcom was planning a bid for Qualcomm.   For example, Reuters reported that "[c]ommunications chipmaker [Broadcom] is planning to unveil a bid for smartphone chip supplier [Qualcomm] by Monday, three sources familiar with the matter said on Friday, an attempt to create a roughly $200-billion company through the biggest technology acquisition ever."  The article noted that "Broadcom is considering a cash and stock offer of about $70 a share" and that "[s]hares of Broadcom have rallied this year while Qualcomm has fallen, making the target more vulnerable."

58.     In a same-day article, Bloomberg reported, "Qualcomm finds itself in a weakened state.  A legal battle with Apple is costing revenue and jeopardizing a business model that for years made Qualcomm one of the most successful chipmakers." Quoting Sanford C. Bernstein & Co. analyst Stacy Rasgon, the article noted, "[a] change of management at Qualcomm might help resolve the dispute with Apple more

1   quickly, and thereby make Qualcomm's licensing and chip businesses more
2   valuable[.]"

3       59.     In response to the news of Broadcom's bid, Qualcomm's stock price
4   jumped nearly 13% from a closing price of $54.84 on November 2, 2017, to a closing
5   price of $61.81 on November 3, 2017.  On November 5, 2017, a Wells Fargo Securities
6   analyst report noted the market excitement at the prospect of a Qualcomm/Broadcom
7   merger, explaining "we think that the news articles suggesting this possibility have
8   created substantial excitement in the investment community which we think was
9   probably a main reason why Qualcomm's stock price moved up several dollars on the
10  afternoon of Friday 11/3."  Similarly, on November 7, 2017, The Wall Street Journal
11  reported that "news of Broadcom's interest sent Qualcomm shares up nearly 13% on
12  [November 3]."

13      60.     As the increase in Qualcomm's stock price made clear, investors were
14  bidding up the price of Qualcomm stock based on the prospect of a deal with Broadcom
15  at $70 per share.

16      **D.     Broadcom Makes a Formal Proposal to Acquire Qualcomm**

17      61.     On the evening of November 5, 2017, Broadcom's CEO Tan called
18  Qualcomm's CEO Mollenkopf to officially inform him that Broadcom would be
19  making an offer to acquire Qualcomm.

20      62.     The following day, November 6, 2017, Broadcom made a formal proposal
21  to acquire all outstanding shares of Qualcomm for $70 per share ($60 in cash; $10 in
22  Broadcom shares).   Broadcom's proposal represented a 28% premium over the
23  unaffected price of Qualcomm stock on November 2, 2017, the day before news of the
24  offer leaked, and a 33% premium to the unaffected 30-day volume-weighted average
25  price ("VWAP") calculated as of November 2.

26      63.     The main regulatory concern with Broadcom's bid, according to multiple
27  news sources, involved its potential antitrust implications.   The Chicago Tribune
28  reported on November 7, 2017, that "a transaction between [Broadcom and

Qualcomm] would likely raise antitrust concerns[.]"  Reuters similarly wrote the same day, "[t]he merger [between Qualcomm and Broadcom] would face a lengthy review from the anti-monopoly unit of China's commerce ministry, due to strategic concerns, the huge size of the deal and because Qualcomm has come under fire before in the country over competition concerns."

64.     Ultimately, however, while noting that antitrust approval could be a concern, many news sources concluded that "[t]he biggest issue may simply be that Qualcomm believes the current offer, worth about $70 a share, is too low."[2]

65.     Analysts, while offering mixed opinions on whether the premium offered by Broadcom was too low, consistently concluded that the regulatory risks associated with a combination were minimal.  For example, a November 6, 2017 Canaccord Genuity analyst report stated, "[w]hile we believe Qualcomm's Board of Directors would likely reject this initial bid as too low a valuation, we do believe the combination of the two companies could generate strong synergies and create a dominant wireless business and overall powerful global semiconductor leader."  The report further explained that "[w]hile we believe the overlapping WiFi businesses would create some regulatory concerns that could be solved, we do not believe there are material product overlaps in other areas of the businesses."

66.     Similarly, while an Oppenheimer Equity Research report from November 6, 2017 took a different view on the adequacy of Broadcom's offer – stating, "we believe QCOM shareholders would be eager to accept a ~27% premium to pre-offer reports as myriad overhangs (Apple, FTC, Korea, etc.) could take years to abate," it too noted that "[w]e believe regulatory/HSR hurdles should be low given limited product overlap."  A same-day Credit Suisse analyst report explained that "[b]ased on

---

[2]     *See also* Michael J. de la Merced, *Broadcom targets fellow chipmaker in largest-ever tech deal*, Boston Herald (Nov. 7, 2017) (noting that while the deal is "expected to face tough antitrust scrutiny," for "Qualcomm and its advisers, the biggest issue is likely to be a simple matter of price").

their extensive review of portfolios, [Broadcom] expects regulatory approval in a timely manner and the transaction to be completed within 12 months."

### E.   Qualcomm Rejects Broadcom's Offer

67.   On November 12, 2017, Qualcomm's Board met and unanimously voted to reject Broadcom's proposal.  This was announced the following day in a press release which stated, "[t]he Board and Management are singularly focused on driving value for Qualcomm's shareholders.  After a comprehensive review, conducted in consultation with our financial and legal advisors, the Board has concluded that Broadcom's proposal dramatically undervalues Qualcomm and comes with significant regulatory uncertainty."

68.   Qualcomm's announcement did not provide any further detail on the "significant regulatory uncertainty," and news coverage of Qualcomm's rejection continued to focus on potential antitrust risk as the source of the regulatory uncertainty. For instance, The New York Times reported on November 13, 2017:

> **Qualcomm has rebuffed a $105 billion buyout bid from Broadcom, setting up two of the world's biggest chip makers for a potentially nasty takeover battle.**
>
> The proposal "significantly undervalues" the company, overlooking its reputation in mobile technology and potential for growth, Paul Jacobs, Qualcomm's board chairman, said in a statement on Monday.
>
> Broadcom's offer, which would amount to the largest deal in the history of the tech industry and have significant implications for smartphone production, could also run afoul of antitrust regulators, Qualcomm said.

(Emphasis in original.)

69.   Later that day, Broadcom issued a press release announcing that it "remains fully committed to pursuing its acquisition of Qualcomm[.]"  In the release, Broadcom's CEO Tan stated:

> We continue to believe our proposal represents the most attractive, value-enhancing alternative available to Qualcomm stockholders and we are encouraged by their reaction. Many have expressed to us their desire that Qualcomm meet with us to discuss our proposal. It remains our strong

preference to engage cooperatively with Qualcomm's Board of Directors and management team.

70.   That evening, Broadcom's CEO Tan reiterated to Qualcomm's CEO Mollenkopf – through a voicemail and text message – that Broadcom wanted to engage with Qualcomm regarding its offer.

71.   Notwithstanding Qualcomm's initial rejection, analysts expressed optimism that Broadcom would ultimately acquire Qualcomm – either via a negotiated deal or by replacing its directors in a proxy fight.  For example, a November 13, 2017 RBC Capital Markets analyst report stated, "we believe that while the next 3-6 months will be volatile, the probability remains [Broadcom] will up the offer and acquire the asset either via constructive discussions or a proxy battle."

72.   On November 16, 2017, Qualcomm filed a Form 8-K with the SEC scheduling its Annual Meeting.  Qualcomm reelects its Directors every year at its annual meeting.  The deadline to nominate Qualcomm directors for the March 6, 2018 Annual Meeting was set for December 8, 2017.

**F.    Broadcom Launches a Proxy Fight**

73.   On November 17, 2017, Broadcom's CEO Tan wrote a public letter to Qualcomm CEO Mollenkopf again asking him to discuss Broadcom's proposal: "In our recent conversations, many of your stockholders have expressed a clear and strong desire for us to meet in an effort to negotiate a mutually beneficial transaction.  I suspect you have heard the same, so I remain hopeful that we can begin productive discussions."  Qualcomm did not respond.

74.   On November 22, 2017, Reuters quoted sources as disclosing that "following consultation with several of Qualcomm's top shareholders," Broadcom was considering raising its offer to acquire Qualcomm by offering more Broadcom stock and that Broadcom had made "several requests for a meeting with Qualcomm since it unveiled its offer on Nov. 6," but that "Qualcomm has so far rejected these meeting requests[.]"

75. On December 4, 2017, Broadcom issued a press release announcing that it had notified Qualcomm of its intention to nominate a slate of 11 directors to replace the current Qualcomm directors. Broadcom also provided notice of its intention to nominate four alternate nominees in the event that (i) Qualcomm increased the size of the Board, (ii) Qualcomm took action to disqualify Broadcom's original designees, or (iii) any of Broadcom's original nominees were unable or unwilling to serve as a director of Qualcomm. In the press release, Broadcom also noted that "[t]o ensure continuity, Broadcom would support a decision by the 11 new directors, upon their election, to increase the size of the Board and reappoint [current Qualcomm directors] Mark D. McLaughlin, Anthony J. 'Tony' Vinciquerra and Jeffrey W. Henderson as directors."

76. In the press release, Broadcom's CEO Tan stated:

> We have heard from many Qualcomm stockholders who have expressed their desire for Qualcomm to engage with us. We also continue to receive positive feedback from customers and, having had initial meetings with certain relevant antitrust authorities, remain confident that any regulatory requirements necessary to complete a combination will be met in a timely manner. Although we are taking this step, it remains our strong preference to engage in a constructive dialogue with Qualcomm. We have repeatedly attempted to engage with Qualcomm, and despite stockholder and customer support for the transaction, Qualcomm has ignored those opportunities. The nominations give Qualcomm stockholders an opportunity to voice their disappointment with Qualcomm's directors and their refusal to engage in discussions with us. In light of the significant value our proposal provides for Qualcomm stockholders, we believe Qualcomm stockholders would be better served by new independent, highly qualified nominees who are committed to maximizing value and acting in the best interests of Qualcomm stockholders.

77. Later that day, Qualcomm issued a press release in response to Broadcom's announcement. Qualcomm again referenced nonspecific "regulatory issues" and "significant regulatory uncertainty," and without further detail argued that a Broadcom takeover "could not be completed for well over a year, if ever, given the regulatory issues, [and] the absence of commitments by Broadcom to resolve those

issues[.]"   The press release also cited to "uncertainty surrounding [Broadcom's] transition from Singapore to the United States" as a reason for shareholders to oppose the deal.

78.   Analysts, however, remained bullish on the deal.   For example, a December 4, 2017 Oppenheimer Equity Research analyst report stated, "We see obvious financial/strategic merit in combining QCOM and AVGO's leading back-end and front-end handset portfolios."   Qualcomm's stock continued to trade at a premium.

79.   On December 6, 2017, Broadcom held a conference call regarding its fourth quarter and fiscal year 2017 earnings.   During the call, Broadcom addressed Qualcomm's statement that there was "uncertainty" regarding its transition to the U.S., confirming its commitment to redomicile to the U.S.:

> On November 2, I think as everybody knows, we announced our intent to initiate a redomiciliation process to change the parent company of the Broadcom corporate group from a Singapore company to a U.S. corporation. The redomiciliation will occur whether or not there is corporate tax reform in the United States. The redomiciliation is subject to a shareholder vote and is expected to be effected in a manner intended to be tax-free to shareholders. We are confident that our shareholders will support this move.

80.   During the same call, Broadcom reiterated its "strong preference to engage in a constructive dialogue with Qualcomm," and expressed Broadcom's "confiden[ce] that any regulatory requirements necessary to complete a combination will be met in a timely manner."

81.   Analysts reacted positively to Broadcom's reassurances.   A December 7, 2017 Credit Suisse analyst report noted that "[w]hile AVGO did not address questions on the call, management stated it remains confident that any regulatory requirements necessary to complete the combination will be met in a timely manner."   On the same day, an RBC Capital Markets analyst report echoed that "AVGO and its advisors have conducted extensive analysis of the regulatory environment, and they are confident about obtaining all necessary approvals in a timely manner."

82.     Broadcom also took immediate steps to rebut Qualcomm's statements that it was not committed to resolving any regulatory uncertainty.  On December 11, 2017, Broadcom issued a press release announcing that it filed a premerger notification under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 with the U.S. Department of Justice Antitrust Division and the FTC in connection with its proposed acquisition of Qualcomm.  In the press release, Broadcom's CEO Han reiterated that:

> Our Board and management team are committed to consummating this transaction as soon as possible. We continue to receive positive feedback from stockholders and customers, and we have made clear to Qualcomm that it remains our strong preference to engage in constructive dialogue regarding the value-enhancing proposal we put forward more than a month ago.

83.     That same day, Broadcom filed a preliminary proxy statement with the SEC on Schedule 14A, again emphasizing that it did not foresee material regulatory issues with its proposed transaction:

> We and our advisors have conducted extensive analysis of the regulatory approvals that will be required in connection with the proposed transaction, and we are confident that the transaction will receive all necessary approvals in a timely manner. We would not make this offer if we were not confident that our common global customers would embrace the proposed combination, and we do not anticipate any material antitrust or other regulatory issues that would extend the normal timetable for closing a transaction of this nature.

### G.     Qualcomm's Board Rejects Broadcom's Independent Nominees and Urges Shareholders to Do the Same

84.     On December 20, 2017, Qualcomm's Board, on the same-day recommendation of its Governance Committee, unanimously voted not to nominate any of Broadcom's director nominees.

85.     On December 22, 2017, Qualcomm issued a press release announcing the Board's decision.  That same day, Qualcomm filed its annual meeting proxy statement with the SEC on Schedule 14A.

86.     A few weeks later, on January 5, 2018, Qualcomm issued its definitive proxy statement for the Annual Meeting, confirming the Annual Meeting for March 6,

2018.  That same day, Broadcom mailed a competing definitive proxy statement to Qualcomm's shareholders, a "Blue Card," soliciting them to elect Broadcom's 11 independent director nominees.  Broadcom's proxy also urged Qualcomm's shareholders to vote for its proposed amendments to Qualcomm's bylaws, which would undo any bylaw amendments adopted by Qualcomm's incumbent Board without shareholder approval up to the date of the March 6, 2018 Annual Meeting.

87.    Although Broadcom pursued its hostile proxy strategy, it continued to make clear that its preference was to negotiate a transaction with Qualcomm's Board.  According to the Blue Card:

> On November 13, 2017, Qualcomm's Board rejected our proposal. Since that time, we have spoken with many Qualcomm stockholders and customers, and we have heard their desire for Qualcomm to engage with us regarding our compelling proposal. It remains our strong preference to engage cooperatively with Qualcomm's Board and management team, and we are prepared to meet immediately to work toward a mutually acceptable definitive agreement.

88.    Qualcomm issued a slew of proxy solicitation materials on January 16, 2018 – including a press release, letter, video, investor presentation, and website postings – all urging its shareholders to oppose Broadcom's slate of directors and its attempt to acquire the Company.  Qualcomm chiefly argued that shareholders should oppose Broadcom's proposal because it substantially undervalued the Company and sought to take advantage of its recent legal troubles.  For example, in a video posted to its dedicated deal website – www.qcomvalue.com – Qualcomm's CEO Mollenkopf stated:

> In short, we will deliver far more value than the Broadcom proposal.  We recognize the impact of the Apple litigation on our business, but we would encourage you not to make a choice based on that short-term stock price reaction. We believe that we can deliver substantially more value than the Broadcom bid.

89.    As a secondary concern, Qualcomm noted Broadcom's proposal involved "significant regulatory uncertainty."  Qualcomm repeatedly highlighted the potential *antitrust* risk associated with the transaction, warning investors that it would require

"clearance from at least a dozen antitrust regulators throughout the world[.]"  In a video posted to Qualcomm's deal website, Rosenberg cautioned that "Broadcom has apparently made no effort to address what we expect will be substantial and potentially conflicting requirements imposed by antitrust regulators around the world, posing immense risk to Qualcomm stockholders."

90.     Lastly, Qualcomm mentioned, for the first time, regulatory risk associated with review by CFIUS, *if* Broadcom did not move forward with its redomiciliation.  In a video posted to Qualcomm's deal website, Mollenkopf stated, "Broadcom is still a Singapore company – CFIUS *may* be an issue again for them.  It seems strange to us that they have not made any further progress on their commitment to become an American company – an announcement that was carefully timed – just days before they announced their hostile bid for Qualcomm."   CFIUS and its process for review is discussed in more detail in *infra* Section IV.H.1.

91.     Later that day, Broadcom issued a statement directly responding to Qualcomm's statements about regulatory risk:

> Based on the highly complementary nature of the businesses of the two companies, Broadcom's extensive experience in completing complex, cross-border acquisitions and initial meetings with several relevant antitrust authorities, Broadcom remains very confident that the regulatory requirements necessary to complete a combination will be met in a timely manner and expects that the proposed transaction would be completed within approximately 12 months following the signing of a definitive agreement. It is important that Qualcomm engage with us so that Qualcomm stockholders can realize the significant value that Broadcom is offering.

92.     Then, on January 19, 2018, Broadcom issued a press release, also filed with the SEC on Form 425, indicating that the regulatory approval process was proceeding smoothly.  In particular, Broadcom announced that it received a "second request" for additional information and documentary material from the FTC in connection with its proposed acquisition of Qualcomm, but explained that this "was expected as a normal part of the regulatory approval process.  Second Requests are

common in similar transactions, and this signifies that Broadcom is moving into the next stage of the U.S. antitrust review process."

93.     On January 22, 2018 – this time responding to Qualcomm's January 16, 2018 statement concerning CFIUS review – Broadcom announced in a press release that it had filed preliminary proxy materials with the SEC to approve its redomiciliation to the U.S., and expected to complete the process by May 6, 2018.  The preliminary proxy materials explained that redomiciling to the U.S. would allow Broadcom to "continu[e] to execute [its] acquisition strategy":

> After considering various factors, the Board unanimously determined that restructuring our corporate group to cause the parent company of our group to be an entity incorporated in Delaware is in the best interests of the Company and its shareholders and will best help us accomplish our strategic objectives. Through our existing subsidiaries, we already have a substantial presence in the United States and it is important to note that a majority of Broadcom's employees and a significant portion of operating assets are in the United States. We believe that the shareholder returns we can drive by continuing to execute our acquisition strategy far outweigh the additional income taxes we would expect to pay as a result of this restructuring, and the incremental tax cost of being based in the U.S. has decreased materially as a result of corporate tax reform in the United States.

As discussed in *infra* Section IV.H.2, Broadcom's redomiciliation to the United States had already proven a successful strategy by which to gain CFIUS approval.

94.     On January 23, 2018, Qualcomm sent another letter to shareholders, again making its case that Broadcom's offer significantly undervalued the Company and that antitrust risk remained.  The letter also provided Qualcomm's most detailed statement regarding CFIUS:

> Broadcom says there will be no issue in obtaining national security clearance from the Committee on Foreign Investment in the United States (CFIUS).
>
> o   THE FACTS: Broadcom is a Singapore-domiciled company seeking to effect a hostile takeover of Qualcomm, one of the U.S.'s most critical technology companies.
>
> o   Even if Broadcom re-domiciles in the future, the national security issues raised by Broadcom's attempt to acquire Qualcomm remain.

o Broadcom encountered resistance from the U.S. government national security regulator when it sought to acquire another U.S. technology company that was far less critical to the national infrastructure than Qualcomm.

o We believe the transaction proposed by Broadcom and any divestitures that may be required by regulatory authorities will be closely scrutinized and may well result in significant national security concerns that could potentially block the transaction. Therefore, we believe approval by CFIUS is far from assured.

Qualcomm did not disclose any intention to initiate a CFIUS review or lobby for its intervention.

95.     Later that day, Broadcom issued a press release reiterating that "[w]e continue to move forward with redomiciling to the U.S. – just yesterday Broadcom filed preliminary proxy materials in connection with a shareholder meeting to approve the redomiciliation.  We expect to receive approvals by the end of our fiscal second quarter ending May 6, 2018."  Broadcom also addressed, at length, Qualcomm's arguments regarding antitrust risk.  Broadcom concluded, "[w]e remain confident in our ability to complete a transaction within approximately 12 months following the signing of a definitive agreement."

### H.     Unbeknownst to Shareholders, Qualcomm Petitions CFIUS to Kill Broadcom's Takeover Attempt

96.     On January 29, 2018, a week after Broadcom announced that it would complete its redomiciliation by May 6, 2018, Defendants secretly filed a unilateral voluntary notice requesting that CFIUS review Broadcom's takeover attempt.  Also unbeknownst to investors (and Broadcom), Defendants submitted information with their unilateral voluntary request to CFIUS designed to convince CFIUS that Broadcom's hostile takeover attempt constituted a national security risk and should not be allowed to continue.

97.     Over the next month, while publicly telling investors that they remained hopeful that a satisfactory deal would be negotiated, Defendants continued to covertly submit additional information and argument to CFIUS in an attempt to kill the deal,

including in emails, phone calls, and meetings. Defendants' actions – which they concealed from investors – constituted a brazen effort to kill Broadcom's takeover attempt, to entrench themselves in their leadership roles, and to surreptitiously disenfranchise the Company's shareholders.

98. Defendants' defensive measures were unprecedented. As a former CFIUS member later explained, "[t]his is *Halley's comet unusual*." Zack's Investment Research also later reported that "This was *quite an unprecedented move* wherein Qualcomm management approached the CFIUS to block the deal. . . . It shows that all is far from well at Qualcomm where shareholders were in favor of the deal that management and the board opposed."

99. This is because, as discussed in *infra* Section IV.H.1, CFIUS typically only reviews deals once the parties have entered into an agreement and jointly submitted a voluntary notice requesting CFIUS review. Typically, moreover, CFIUS applications are led by the buyer, not the acquisition target. As The Wall Street Journal later explained in a March 14, 2018 article entitled *Qualcomm Pursued Unusual Strategy*, Defendants' secret and unilateral request for CFIUS to review Broadcom's takeover attempt constituted "an unusual strategy. Normally both parties in a deal seek approval by making a joint filing before CFIUS, the secretive federal panel that vets foreign purchases of U.S. companies on national-security grounds. And they don't usually file until there is an actual deal on hand." Marketwatch, in a March 5, 2018 article entitled *Qualcomm was losing in takeover battle with Broadcom, then the government stepped in*, reported that CFIUS "rarely reviews mergers before companies have entered into binding agreements[.]" A DealBook article dated March 5, 2018 stated, "[CFIUS] typically works behind closed doors and reviews deals only after they are announced."

100. In other words, typically once a deal is signed, the two parties to the deal – led by the acquirer – cooperate in obtaining CFIUS clearance for their signed agreement. Here, had Qualcomm and Broadcom jointly submitted voluntary notice to

CFIUS after agreeing to a negotiated transaction, a CFIUS review likely would have occurred (if ever) only after Broadcom had redomiciled in the United States – which it did on April 4, 2018.  Instead, by secretly and unilaterally submitting a request for CFIUS to intervene in the middle of Broadcom's takeover attempt, Qualcomm accelerated the timetable, initiating CFIUS review before Broadcom was able to redomicile in the United States, and making the case for CFIUS to reject the deal.

101.   Defendants' concealment of Qualcomm's unilateral CFIUS request also provided the Company with a valuable tactical advantage – the deception allowed Defendants to keep Broadcom in the dark about the existence of the review and the content of Qualcomm's submissions and prevented Broadcom from responding to Qualcomm's arguments for intervention for more than a month while CFIUS reviewed the application.   Indeed, Broadcom stated in its March 5 press release entitled *Broadcom Disappointed Will of Qualcomm Stockholders to be Deferred*, CFIUS's March 4 Interim Order postponing Qualcomm's Annual Meeting – including the vote on Broadcom's slate of nominees – was issued on the same day Broadcom was informed of Qualcomm's unilateral request for CFIUS to initiate the investigation.  In a press release published the next day entitled *Broadcom Reiterates Qualcomm Did Not Inform Its Own Stockholders or Broadcom of Its Secret, Voluntary Unilateral Request Filed on January 29, 2018*, Broadcom reiterated that it was unaware that Qualcomm had unilaterally initiated CFIUS review, and stated that its communications with CFIUS were limited to Broadcom's nomination of directors to the Qualcomm Board:

> Broadcom reiterates that Qualcomm failed to disclose to its own stockholders and to Broadcom that it secretly filed a voluntary unilateral request for CFIUS review on January 29, 2018. Broadcom's only correspondence with CFIUS was in response to CFIUS inquiries about Broadcom's nomination of directors to the Qualcomm board of directors, and such requests did not reveal that Qualcomm filed to initiate the CFIUS review on January 29, 2018.

102.   Thus, unbeknownst to shareholders and contrary to their own public representations, Defendants were not in fact willing to negotiate with Broadcom at a price that would deliver value to shareholders; rather, they were secretly working to kill Broadcom's bid outright.  Because Defendants concealed Qualcomm's defensive move and its potential repercussions, investors were denied critical information that was necessary to properly assess the risk that Broadcom's acquisition would not be completed.

### 1.      The Committee on Foreign Investment in the United States

103.   CFIUS is a federal interagency committee with authority to review certain foreign investments in U.S. businesses to determine whether such transactions threaten to impair U.S. national security.   The Committee then makes recommendations regarding such transactions for the President's ultimate determination.[3]

104.   CFIUS is chaired by the Secretary of the Treasury.   Other CFIUS members include representatives from the "[Departments of] State, Defense, Justice, Commerce, Energy, and Homeland Security; the Office of the United States Trade Representative; and the White House Office of Science and Technology Policy.  The Office of the Director of National Intelligence is an ex-officio member, and five White House offices are observers."   Additional agencies may also participate, as appropriate.[4]

---

[3]      CFIUS was established by the Foreign Investment and National Security Act of 2007 (Pub. L. No. 110-49, 121 Stat. 246 (2007)), which amended section 721 of the Defense Production Act of 1950 (50 U.S.C. App. 2170).   On August 13, 2018, President Trump signed into law the Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA"), which expanded the scope of transactions reviewable by CFIUS.   *See* Guidance Concerning the National Security Review Conducted by CFIUS, 73 Fed. Reg. 74567 (Dec. 8, 2008), https://www.treasury.gov/resource-center/international/foreign-investment/Documents/CFIUSGuidance.pdf;   31 C.F.R. §§ 800.207 & 800.216.

[4]      *See* CFIUS Annual Report to Congress, at iii (CY 2015), https://www.treasury.gov/resource-center/international/foreign-investment/Documents/Unclassified%20CFIUS%20Annual%20Report%20-%20(report%20period%20CY%202015).pdf.

105.   Typically, a CFIUS review of a transaction begins when the parties to a transaction jointly file a "voluntary notice" notifying CFIUS of the transaction, and usually *after* the parties have come to an agreement on the terms.  *See* U.S. Dept. of the Treasury, *Process Overview- Voluntary Notice*, https://www.treasury.gov/resource-center/international/foreign-investment/Pages/cfius-overview.aspx.   CFIUS is also authorized to commence reviews on its own.

106.   Preparing a voluntary notice is a significant undertaking that requires the filing parties to provide substantial amounts of information.  *See* 31 C.F.R. § 800.402.  And once CFIUS formally accepts a filing, it has 30 days to "review" the transaction and determine whether to commence an investigation.  *See id.* § 800.502.[5]  As a result, to provide CFIUS with adequate time to review the filing and identify additional information it may need, parties are explicitly encouraged "to consult with the Committee in advance of filing a notice and, in appropriate cases, to file with the Committee a draft notice or other appropriate documents to aid the Committee's understanding of the transaction and to provide an opportunity for the Committee to request additional information."  *Id.* § 800.401.   CFIUS suggests that "pre-notice consultation . . . should be provided, at least five business days before the filing of a voluntary notice."  *Id.*

107.   CFIUS does not publicly disclose information or documentary material filed in connection with a voluntary request.  On the other hand, the rules governing a CFIUS review explicitly state that filing parties are free to disclose such information or material, as well as the fact that they filed a voluntary notice, to the public.  *See* 31 C.F.R. § 800.702.

108.   If, after review, CFIUS decides to commence an "investigation" of the transaction, it has 45 days to complete that investigation.  31 C.F.R. § 800.506.  During a review or investigation, the chairperson may invite the parties to attend a meeting

---

[5]   Beginning on October 11, 2018, the "review" period was expanded to 45 days.

with the Committee to "discuss and clarify issues pertaining to the transaction." *Id.* § 800.501.

109. The Committee's review and investigation center on whether the transaction could result in foreign control of a U.S. business, whether that foreign control could impair national security, and whether any law provides adequate and appropriate authority to protect national security. *See* 31 C.F.R. § 800.501. "CFIUS will clear the transaction to proceed if it determines that the transaction does not pose any national security concerns, that any national security concerns are adequately addressed by other laws, or that mitigation measures agreed or imposed by CFIUS resolve any national security concerns." *See* CFIUS Annual Report to Congress, *supra* at iii.

110. After the end of its investigation, CFIUS may make a formal recommendation to the President to block the transaction. Or, CFIUS may clear the transaction outright or clear it with certain conditions. *See* 31 C.F.R. § 800.506. The President has 15 days to make a determination based on CFIUS's recommendation.

111. Based on the Committee's most recent Report to Congress, 770 notices of "covered transactions" were filed with CFIUS from 2009 to 2015. Over half of the notices were resolved prior to an investigation, and approximately 3% were withdrawn during the review stage (e.g., notices may be withdrawn to resolve national security concerns or because of material changes to the transaction). Only about 40% proceeded to an investigation. Approximately 7% were withdrawn during the investigation stage.

112. Even when CFIUS determines that a transaction could threaten or impair national security, it is still very rare for CFIUS to reject a transaction outright. In many cases, CFIUS will instead negotiate with the parties to adopt mitigation measures to address the perceived risks. From 2013 to 2015, CFIUS concluded about 10% of the transactions it reviewed by adopting mitigation measures. Such measures, which are aimed at constraining the foreign control from a transaction, include:

- Ensuring that only authorized persons have access to certain technology.

- Exclusion of certain sensitive assets from the transaction.

- Providing the [U.S. Government] with the right to review certain business decisions and object if they raise national security concerns.

CFIUS Annual Report to Congress, *supra* at 21-22.

113. From 2009 to 2015, only one voluntary notice to CFIUS resulted in a Presidential decision, and Presidential action based on CFIUS's review remains extremely rare. CFIUS Annual Report to Congress, *supra* at 3. Including the proposed Qualcomm acquisition, a U.S. President has only blocked five transactions based on CFIUS objections. *See* James K. Jackson, *The Committee on Foreign Investment in the United States (CFIUS)*, Congressional Research Service (July 3, 2018), https://fas.org/sgp/crs/natsec/RL33388.pdf.

## 2. The Market Did Not View CFIUS as a Serious Obstacle to the Transaction

114. At the time that Qualcomm was secretly lobbying CFIUS to kill Broadcom's bid, the market did not perceive CFIUS's review of the transaction to be a serious risk to Broadcom's bid for Qualcomm. As discussed above, it is exceedingly rare for a merger to be blocked based on CFIUS objections. Moreover, Broadcom – which operated out of California, was run by a largely American board and senior management team, and was 90% owned by American shareholders – was seeking to redomicile in the United States and CFIUS had already approved Broadcom's acquisition of a significant U.S. company – Brocade – based on Broadcom's announced intent to redomicile.

115. More specifically, on December 20, 2016, after Broadcom and Brocade finalized their negotiated deal, they disclosed that they had filed a joint voluntary notice with CFIUS. On July 18, 2017, Broadcom and Brocade disclosed that, following discussions with CFIUS, on July 17, 2017, they had agreed to withdraw and re-file

their joint notice to CFIUS, to allow more time for review and discussion. After additional discussions with CFIUS, Broadcom and Brocade disclosed on October 3, 2017, that they had again re-filed their joint voluntary notice to allow more time for review and discussion.

116. As noted in *supra* Section IV.B, less than a month later, on November 2, 2017, Broadcom announced that it would redomicile as an American corporation, an announcement that was made at the White House and celebrated by President Trump as a success of his administration's business policies.

117. The market perceived Broadcom's redomiciliation in the United States as eliminating the risk that CFIUS might fail to ultimately approve the Brocade deal. For example, on November 4, 2017, the Boston Herald reported that "Broadcom's plan to move its home address to the U.S. from Singapore would free its $5.5 billion deal for U.S. network provider Brocade Communications Systems from a review by the Committee on Foreign Investment in the United States."

118. Similarly, with respect to Broadcom's proposed acquisition of Qualcomm, commentators consistently concluded that Broadcom's move to redomicile to the United States would likely allow it to avoid problems with a CFIUS review. For example, on November 3, 2017, Reuters reported that the "bid comes as Broadcom plans to move its headquarters to the United States from Singapore" and that Broadcom planned to complete redomiciliation "before completing any Qualcomm deal, avoiding scrutiny by the Committee on Foreign Investment in the United States[.]"

119. On November 4, 2017, a New York Times article likewise explained that Broadcom's "prime motivation" for its redomiciliation was acquiring Qualcomm: "'This [redomiciliation] is all about freeing up Broadcom to make acquisitions,' said Romit Shah, an analyst for Nomura Instinet. 'And Qualcomm has been at the top of Broadcom's wish list for a long time.'"

120.    The same day that it made its formal proposal to acquire Qualcomm, Broadcom confirmed the intent behind its redomiciliation.  In a same-day Investor Presentation regarding the proposed acquisition of Qualcomm, Broadcom stated that it "[p]reviously announced redomiciliation plan further increases deal certainty" and "[r]egulatory approvals expected in timely manner."

121.    And following Broadcom's formal offer, market commentators again highlighted that Broadcom's redomiciliation should allow any deal with Qualcomm to avoid issues related to CFIUS review.  For instance on November 7, 2017, The New York Times reported that "[a]t least one deal hurdle – Washington's examination of foreign acquirers – has been pre-empted.  The Singapore-domiciled Broadcom will move to the United States, Mr. Tan said last week in a news conference with President Trump."

122.    In addition, on November 6, 2017, The New York Times reported that neither Qualcomm nor Broadcom expected CFIUS to be an obstacle to a takeover:

> But while a deal could face such a [CFIUS] review, neither company believes that it would be the main obstacle to a transaction getting done, according to several people briefed on the bid. Broadcom's operations are largely in the United States, and its legal base is in Singapore primarily because of that country's low tax rate.

123.    On November 17, 2017, Broadcom formally announced that CFIUS had approved the Brocade acquisition, affirming the market's perception that its proposed acquisition of Qualcomm was not subject to serious CFIUS risk.  Accordingly, a November 21, 2017 Morningstar Equity Research analyst report predicted that:

> Qualcomm remains skeptical about regulatory approval, but we think there's a good chance Broadcom can get the blessing of various government agencies (especially if NXP is not a part of the mix).[6] We foresee U.S. approval, thanks to Broadcom's shrewd move to redomicile

---

[6]    On September 29, 2016, Qualcomm announced that it would be pursuing an acquisition of NXP Semiconductor N.V., a Dutch chipmaker ("NXP").  On October 27, 2016, Qualcomm announced that it had entered into an agreement to acquire NXP via a tender offer for $110 per NXP share.

in the U.S. and enter into the good graces of the U.S. Presidential administration.

## I. Qualcomm Misleads the Market into Believing Its Board Is Willing to Negotiate around a Fair Price at the Same Time It Is Affirmatively Seeking to Derail Broadcom's Bid

124. Rather than disclose that they were actively petitioning CFIUS to kill the Broadcom bid on a national security basis, Defendants instead made a series of misrepresentations and omissions that materially misled investors about: (i) Defendants' willingness to negotiate with Broadcom on price and cooperate in obtaining regulatory clearance, and (ii) the increased risk Defendants' strategy had created of the deal being blocked. Because this critical information was withheld from the public, Qualcomm's stock price did not reflect the true risk that the deal would not go through.

### 1. Qualcomm Begins Misleading Shareholders on January 29, 2018, Regarding the Affirmative Steps It Took to Lobby for CFIUS Intervention

125. On the same day that they filed their secret, unilateral voluntary notice with CFIUS, Defendants issued a vague statement to shareholders about regulatory risk that could *delay* the transaction while failing to disclose that they were taking active measures to accelerate CFIUS intervention and stop the deal. For example, in a video released on January 29, 2018, CEO Mollenkopf told investors that "there are some questions about deal certainty and regulatory approval." In the same video, General Counsel Rosenberg stated:

> The Broadcom-proposed acquisition will be subjected to very, very close scrutiny by well over a dozen potential agencies. We believe that this is probably going to take something in the range of 18 months or more even, because of the complexity of the two companies' businesses, because of the enormous overlap in the two companies' technologies and businesses, and because of the global nature of our businesses.

Having spoken about potential regulatory impediments to the merger, Defendants were obligated to disclose to investors the full and complete truth. Instead, Defendants

misled investors about the true risks associated with the deal by concealing that they had taken affirmative steps to prevent regulatory approval by filing a unilateral voluntary notice with CFIUS before Broadcom could redomicile to the U.S.

126.   Absorbing the information disclosed by Qualcomm, analysts continued to view the deal positively, with a January 31, 2018 Oppenheimer analyst report reiterating that "[w]e hold a favorable view of the potential AVGO/QCOM combination."  This sentiment was also reflected in Qualcomm's common stock price, which continued to trade at an inflated premium that did not reflect the true risk that the merger would not go through.  On February 1, 2018, analyst BMO wrote that: "QCOM reported strong December quarter results, but weaker guidance, particularly on the chip side.  Regardless, we believe investor sentiment is largely being driven by the pending takeover attempt by Broadcom . . . with the March 6 shareholder vote quickly approaching and that the 'buyout offer from [Broadcom]' was a 'key catalyst' that 'will overshadow most other catalysts.'"

### 2.   Broadcom Ups Its Offer and Qualcomm Claims to Consider It Even Though It was Secretly Advocating to End the Bid

127.   On February 2, 2018, Broadcom's representatives contacted Qualcomm's representatives to offer the terms of an improved acquisition proposal.   More specifically, a representative of Broadcom reached out to a representative of Goldman, Sachs & Co. ("Goldman Sachs"), financial advisor to Qualcomm.  Also that day, a representative of Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton"), legal counsel to Broadcom, reached out to a representative of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), legal counsel to Qualcomm, to provide details and terms of an improved proposal, including a substantial increase in the offer consideration and significant regulatory commitments.  Finally, a representative of Moelis & Company LLC ("Moelis"), financial advisor to Broadcom, also attempted to contact a representative of Goldman Sachs to provide the details and terms of the improved proposal.  The Goldman Sachs representative responded to the Moelis representative

that he had received the request and would speak to Qualcomm about it.  Qualcomm, Goldman Sachs, and Paul Weiss did not otherwise respond.

128.   Having heard nothing from Qualcomm about its improved proposal, on February 5, 2018, Broadcom sent a letter to the Qualcomm Board outlining the details and terms of its improved proposal.   The improved proposal increased the consideration Broadcom was offering to $82 per Qualcomm share ($60 in cash; $22 in Broadcom stock).   Broadcom also issued a same-day press release announcing its improved offer.

129.   The improved proposal represented a 56% premium to Qualcomm's 30-day VWAP, and a 50% premium to Qualcomm's unaffected trading price of $54.84 on November 2, 2017 (the day before media speculation on the transaction began). According to proxy advisor Glass Lewis, Broadcom's increased bid ranked among the top decile of premiums paid in announced transactions greater than $25 billion since 2001 (excluding financially distressed targets).  Indeed, Qualcomm's stock has only traded above $82 per share on three days during over 25 years as a public company.

130.   Broadcom's improved proposal also directly addressed Qualcomm's statements about regulatory risk.  First, in response to Qualcomm's statements that regulatory approval could take 18 months or more, Broadcom included a "ticking fee" that provided for an increase in the cash consideration paid to Qualcomm if the transaction was not consummated one year after executing a definitive agreement. Second, Broadcom's increased proposal included a "reverse termination fee" – a sizable fee that would be paid to Qualcomm stockholders if the transaction was not consummated because of Broadcom's inability to obtain required regulatory approvals. Broadcom also expressed its willingness to agree to a provision whereby both Qualcomm and Broadcom agreed to use their collective best efforts to obtain regulatory approval.

131.   Finally, Broadcom stated that it was open to inviting Qualcomm Chairman Jacobs and a second Qualcomm director to join the board of the post-

transaction entity.  Broadcom conditioned its proposal on (i) Qualcomm acquiring NXP on the currently disclosed terms of $110 per NXP share; and (ii) Qualcomm not delaying or adjourning its Annual Meeting past March 6, 2018.  In its letter, Broadcom wrote, "we believe any responsible board would engage with us, without further delay, to turn this proposal into an executed definitive agreement."  That same day, Broadcom issued a public letter to its employees stating: "It is clear from our discussions with investors and customers of both Broadcom and Qualcomm that there is overwhelming support for Qualcomm to engage with us immediately regarding this transaction."

132.   Analysts expressed optimism about Broadcom's improved proposal.  For example, in a February 5, 2018 analyst report, Credit Suisse wrote:

> Importantly, AVGO re-affirmed its confidence around (1) regulatory approval providing a significant "reverse termination fee" and (2) deal timing thru a "ticking fee" which would increase the cash component after 12 months. Even with the increased offer, the transaction would be >20% accretive (ex-NXPI). Most importantly, today's announcement places pressure firmly on QCOM board/shareholders, and for AVGO shareholders provides a path to an end-point and clarity to what has been a cloud of uncertainty[.]

133.   A same-day Canaccord analyst report similarly reported that "the increased bid certainly puts more pressure on Qualcomm shareholders to vote in favor of this acquisition" and "we believe Qualcomm shareholders are considering this $82 bid more seriously than the initial $70 bid, as might Qualcomm's Board of Directors given the longer-term risks in integrating NXP and uncertain outcome from the ongoing Apple disputes and potential declining QCT sales relationship."  Likewise, on CNBC's *Squawk Box*, Kevin O'Leary stated, "There are many shareholders, including me, who think Qualcomm is very poorly managed.  I would like adult supervision to come in from Broadcom."

134.   That same day, Broadcom filed a Schedule 14A with the SEC, entitled *Evaluating Qualcomm's Claims About Closing Risk, A Conversation with Daniel M. Wall, Latham & Watkins LLP, Antitrust Counsel to Broadcom Limited*, again addressing Qualcomm's purported concerns about the Proposed Transaction's antitrust

risks.  Among other things, Broadcom stated that in Qualcomm's January 16, 2018 investor presentation, Qualcomm identified:

> only one [issue] that is a clear-cut antitrust hurdle, and that's with respect to the Wi-Fi networking processors. But this is not a problem for the transaction because Broadcom has always understood that it would need to sell that part of Qualcomm, and that's Broadcom's plan. In fact, Broadcom has already begun advising the antitrust regulators that it intends to divest that business. There shouldn't be any problem selling it, because it's a valuable business and Broadcom is quite experienced in divesting businesses, so that overlap—the most serious antitrust issue in this deal—won't be a problem.

135.   Later that day, Qualcomm issued a press release confirming that it had received Broadcom's revised proposal and stating: "Consistent with its fiduciary duties, the Qualcomm Board of Directors, in consultation with its financial and legal advisors, will review the revised proposal to determine the course of action it believes is in the best interests of the Company and its stockholders."  Qualcomm also reiterated that it had rejected Broadcom's previous proposal because it "comes with significant regulatory uncertainty."  While representing to shareholders that they would review the proposal consistent with their fiduciary duties and act "in the best interests of the Company and its stockholders," however, Defendants did not disclose that they had already taken defensive measures intended to kill the deal, regardless of price or terms.

### 3.   Defendants Continue to Mislead Investors About Qualcomm's Willingness to Negotiate with Broadcom

136.   On February 8, 2018, Qualcomm issued a press release announcing that it had rejected Broadcom's improved proposal.  The press release explained that "[t]he Qualcomm Board, assisted by its financial and legal advisors, determined that the Broadcom proposal materially undervalues Qualcomm and falls well short of the firm regulatory commitment the Board would demand given the significant downside risk of a failed transaction."  The release noted, however, that "Qualcomm has offered to meet with Broadcom to see if it can address the serious deficiencies in value and certainty in its proposal."

137.   That same day, Qualcomm's Chairman Jacobs sent a letter to Broadcom, which it also filed with the SEC on Schedule 14A, stating:

> The Board has unanimously determined that your amended offer materially undervalues Qualcomm and falls well short of the firm regulatory commitment the Board would demand given the significant downside risk of a failed transaction. However, ***the Board is committed to exploring all options for maximizing shareholder value, and so we would be prepared to meet with you to allow you to explain how you would attempt to bridge these gaps in both value and deal certainty*** and to better understand the significant issues that remain unaddressed in your proposal.
>
> In the meeting, we would expect that you will be prepared to provide clear, specific and detailed answers to the questions below.
>
> o   *What is the true highest price at which you would be prepared to acquire Qualcomm? Is it $82 per share or is it higher?* Your current proposal is inadequate as it materially undervalues Qualcomm. Your proposal ascribes no value to our accretive NXP acquisition, no value for the expected resolution of our current licensing disputes and no value for the significant opportunity in 5G. Your proposal is inferior relative to our prospects as an independent company and is significantly below both trading and transaction multiples in our sector.
>
> o   Is Broadcom willing to commit to take whatever actions are necessary to ensure the proposed transaction closes? This is extremely important to value preservation for our shareholders. The differences in our business models expose the Company to significant customer and licensee risk between signing and closing an agreement. It is indisputable that there are significant regulatory hurdles in your proposed transaction. It is also indisputable that if Qualcomm entered into a merger agreement and, after an extended regulatory review period the transaction did not close, Qualcomm would be enormously and irreparably damaged. If you are not willing to agree to do whatever is necessary to ensure a transaction closes, we will need you to be extremely clear and specific about exactly what actions you would refuse to take, so that we can properly evaluate the risk to Qualcomm's shareholders.
>
> We have a number of other important questions, which we can discuss at our meeting. We will reach out to you to schedule the meeting.

(Some emphasis in original.)  These statements were highly misleading.  While telling shareholders that Qualcomm was willing to meet with Broadcom to explore a

negotiated solution, Defendants were secretly undertaking defensive measures to scuttle the deal. Moreover, while asking whether Broadcom was willing to commit to whatever actions were necessary to obtain regulatory approval, Qualcomm failed to disclose to its own shareholders that Defendants were taking actions meant to ensure that the deal never obtained CFIUS approval. As a result, shareholders were misled about the likelihood of a negotiated solution and the risks associated with a CFIUS review.

138. Analysts reacted positively to Qualcomm's stated willingness to engage. For example, a February 9, 2018 RBC analyst report stated:

> After the close today, QCOM announced that its *Board unanimously rejected AVGO's revised unsolicited proposal*. QCOM's Board believes the $82 bid significantly undervalues the company and comes with significant regulatory uncertainty. ***Positively, QCOM has offered to meet with AVGO*** to discuss two major issues: 1)*Is $82 AVGO's best and final offer?* QCOM believes $82/share is inadequate and assigns no value to the NXP acquisition, potential resolution of licensing disputes and QCOM's meaningful opportunity in 5G. 2)*Is AVGO willing to do whatever it takes to ensure the successful close of QCOM acquisition?* as QCOM believes there are significant regulatory risks associated with the proposed transaction. . . . **Net/net:** Despite the rejection from QCOM board, ***we are encouraged to see a potential meeting between AVGO and QCOM*** and looking forward to incremental updates. We are maintaining our Outperform rating on QCOM and price target of $80.

(Some emphasis in original.)

139. On February 8, 2018, Broadcom sent a letter to Qualcomm regarding its attempts to schedule a meeting regarding its improved offer. The letter stated, in part:

> Broadcom has long sought a meeting to discuss Broadcom's acquisition of Qualcomm. Following Qualcomm's announcement today that it is willing to meet with us, we offered to meet with Qualcomm on Friday, Saturday or Sunday. I was astonished to hear that Qualcomm is not willing to meet until Tuesday – only after Qualcomm's and Broadcom's respective meetings with Glass Lewis and ISS. We hope that your willingness to meet with us reflects Qualcomm's genuine intent to reach an agreement with respect to our February 5 proposal. After having met with most of your largest stockholders this past week, we have no doubt that this is their strong desire as well.

To further demonstrate its seriousness, Broadcom's letter also attached its proposed merger agreement, which provided for an $8 billion regulatory reverse termination fee and a 6% per annum regulatory ticking fee on the cash portion of the merger consideration (net of dividends).  Broadcom also publicly filed a copy of the draft merger agreement with the SEC and issued a press release regarding the same.

140.  While Broadcom was making efforts to move negotiations with Qualcomm forward, Defendants issued a series of misleading statements regarding the regulatory risk associated with Broadcom's proposal.  First, on February 9, 2018, Qualcomm filed an investor presentation with the SEC on Schedule 14A entitled *Qualcomm Sets the Record Straight on Regulatory Challenges Faced by Broadcom*, which discussed at length the regulatory risks associated with a potential transaction, including "potentially serious national security concerns."

141.  In a second investor presentation filed with the SEC on Schedule 14A on the same day, Qualcomm told shareholders that Broadcom's offer "Poses Unacceptable Regulatory Risks" and "significant regulatory uncertainty," and that "[r]egulatory approval [was] highly uncertain; at least [an] 18 month process."  The presentation also continued to mislead investors about Qualcomm's willingness to constructively engage with Broadcom, telling investors that while Broadcom's initial proposal "so dramatically undervalued the business and carried such regulatory uncertainty that engagement was not warranted," its improved February 5 proposal, "while not sufficient, . . . warranted engagement."  Nowhere in either of these lengthy presentations, however, did Qualcomm disclose that it had unilaterally filed a voluntary notice with CFIUS in an attempt to stop any Broadcom transaction from occurring and to entrench the incumbent Board and management.

142.  On February 11, 2018, to address Qualcomm's stated concerns about its lack of committed funding, Broadcom entered into a commitment letter with a group of 12 financial institutions for up to $100 billion in debt financing, including a $5 billion revolving credit facility and bridge financing.  Broadcom also secured

$6 billion of convertible note financing from investment funds affiliated with Silver Lake, Kohlberg Kravis Roberts & Co. L.P., and CVC Capital Partners Advisory (U.S.) Inc.

143.    The following day, Broadcom issued a press release entitled *Broadcom and Financing Sources Sign Binding Financing Commitments to Fund Cash Component of Qualcomm Acquisition*, announcing that it had secured financing commitments to fully fund the cash component of its $82 per share offer.

144.    That same day, Broadcom filed a Schedule 14A with a Latham & Watkins "Point of View" entitled *Qualcomm's 'Fact Sheet' About Closing Risk, A Conversation with Daniel M. Wall, Latham & Watkins LLP, Antitrust Counsel to Broadcom Limited*, which responded in detail to Qualcomm's February 9 "Fact Sheet" regarding regulatory risk.  The main message of Broadcom's presentation was that "objectively, there is no real risk that regulators refuse to approve the deal on any terms."  The document stated:

> Qualcomm's management is trying to hide behind a smokescreen of unspecified "regulatory risk." It consists mostly of general statements about antitrust risks inherent in *any* deal between competitors, not about *this* deal in *these markets*. . . . The most important point anyone needs to know about antitrust risk in this deal is that the vast majority of Broadcom's and Qualcomm's businesses do not raise any antitrust issues at all[.]

(Emphasis in original.)

145.    Broadcom also made another same-day filing intended to address Qualcomm's statements regarding antitrust risk, lodging with the SEC, on Schedule 14A, an article published on Morning Consult authored by David Balto, a former policy director of the FTC.  The article, entitled *Broadcom's Acquisition of Qualcomm: Redeeming the Unredeemable*, explained that because of Qualcomm's poor management and "record of antitrust mischief," "Broadcom's takeover bid for Qualcomm should be welcomed by all."  The article concluded:

Given Qualcomm's past bad behavior and current legal struggles, Broadcom's acquisition may be the rare deal that solves significant antitrust problems, by replacing its leadership and changing its corporate culture. Broadcom already has indicated that it does not support Qualcomm's patent licensing practices. Moreover, the operations of the two companies are largely complementary, and any routine concerns that typically arise in mergers of large companies can be satisfactorily resolved during the merger clearance process. Significantly, Broadcom has a successful track record of completing antitrust merger reviews.

Bottom line: Competition advocates, global regulators and customers around the world should all be cheering for Broadcom. Consumers deserve quality smartphones and tablets at fair prices. Broadcom's takeover should be approved, especially when the combined company would end Qualcomm's excessive price squeezes and bullying tactics that have driven consumer prices unsustainably higher.

146.   The following day, February 13, 2018, after meeting with proxy advisory firm ISS, Broadcom announced that it was scaling back its challenge to Qualcomm's Board by cutting the number of board seats it was trying to win from eleven to six. Broadcom explained in a press release that day that it reduced the number of its nominees in recognition of Qualcomm stockholders' desire "for appropriate continuity on the Qualcomm board[.]"

### 4.   Following a Meeting with Broadcom, Qualcomm Falsely Maintains Its Willingness to Negotiate

147.   On February 14, 2018, Qualcomm and Broadcom held a meeting regarding Broadcom's improved proposal.  Two days later, on February 16, 2018, Qualcomm issued a press release providing an update on the meeting.  In the press release, Qualcomm continued to mislead investors about its willingness to engage constructively with Broadcom, its commitment to resolve regulatory concerns, and the regulatory risks associated with the deal, stating:

[O]ur Board found the meeting to be constructive in that the Broadcom representatives expressed a willingness to agree to certain potential antitrust-related divestitures beyond those contained in your publicly filed merger agreement. At the same time, Broadcom continued to resist agreeing to other commitments that could be expected to be required by the FTC, the European Commission, MOFCOM and other government

> regulatory bodies. Broadcom also declined to respond to any questions about its intentions for the future of Qualcomm's licensing business, which makes it very difficult to predict the antitrust-related remedies that might be required. In addition, Broadcom insists on controlling all material decisions regarding our valuable licensing business during the extended period between signing and a potential closing, which would be problematic and not permitted under antitrust laws.
>
> Our Board is highly cognizant of the need to protect Qualcomm's stockholders from the considerable risks of agreeing to a transaction that does not close. A breakup fee in the range proposed by Broadcom does not come close to compensating for those risks.

148.   By focusing on the antitrust risks associated with the deal while again failing to disclose that Qualcomm had initiated a CFIUS review before Broadcom could redomicile to the U.S., Defendants misled investors about the regulatory risks associated with the deal.  Moreover, Qualcomm's statements misrepresented that it was willing to engage constructively with Broadcom's offer – which included an agreement to work cooperatively to obtain regulatory approval – when behind the scenes it was operating to ensure that the deal with Broadcom would never happen.

149.   That same day, ISS issued a report stating that Qualcomm "should negotiate with [Broadcom] in good faith" and that "[r]egulatory concerns from a [Broadcom/Qualcomm] merger appear manageable[.]"  On the regulatory front, ISS also agreed that Broadcom's 12-month timeline seemed reasonable:

> Broadcom's more extensive experience with regulatory proceedings would seem to provide a better reference point for timing than Qualcomm's own lengthy process with NXP. Based on the frequency and complexity of Broadcom's acquisitions, and the two companies' historical relationship with regulators, a timeline for regulatory approval of one year does not seem unreasonable.

If Qualcomm's Board did not negotiate a deal, ISS recommended that Qualcomm's shareholders vote them out: "The election of four Broadcom nominees to the 11-member board seems to offer a reasonable path to a negotiated deal, which is likely to be the most beneficial path for shareholders."

150.   In a February 16, 2018 analyst report discussing the ISS report, Credit Suisse wrote: "We would highlight . . . Regulatory Approval Achievable.  ISS noted that it appeared more likely than not that AVGO and QCOM, with their collective experience and resources, could find a reasonable path to regulatory approval."  In other words, the market's view of regulatory risk was informed by its understanding that Qualcomm and Broadcom would work cooperatively to obtain regulatory clearance once a deal was finalized.

### 5.   Broadcom Lowers Its Offer in Response to Qualcomm Action but Continues to Try to Move the Deal Forward

151.   On February 20, 2018, Defendant Mollenkopf had an in-person meeting with Treasury Secretary Steven Mnuchin, CFIUS Chairman, in Washington, D.C.  That same day, Qualcomm announced that it had entered into an amendment to its purchase agreement with NXP to increase the consideration from $110 per share to $127.50 per share and reduce the minimum number of NXP shares required to tender in order to consummate the transaction to 70% of outstanding shares.

152.   Later that day, Broadcom issued a statement criticizing Qualcomm for overpaying for NXP but confirming its commitment to the deal:

> Broadcom believes that a responsible Qualcomm board could have preserved value by following ISS's clear recommendation to work with Broadcom on the NXP transaction and negotiate the sale of Qualcomm to Broadcom. Instead Qualcomm's board acted against the best interests of its stockholders by unilaterally transferring excessive value to NXP's activist stockholders. Despite this direct value transfer, Broadcom remains committed to delivering a value-maximizing offer to Qualcomm stockholders.

153.   Also on February 20, another leading proxy advisory service, Glass Lewis, issued a recommendation that Qualcomm stockholders vote "AGAINST" the Qualcomm directors and "FOR" all of Broadcom's Independent Nominees at the Annual Meeting.  Glass Lewis explained that the Board's behavior "should concern shareholders" and that "a change in the composition of the board is warranted."  Glass

Lewis further reasoned: "Reconstituting the Qualcomm board would go a long way to ensuring shareholders have a fully informed opinion regarding the prospects of the Company as compared to the attractiveness and risks of a potential Broadcom deal, in our view."

154.   The following day, February 21, 2018, Broadcom re-affirmed its commitment to acquire Qualcomm but, in light of the new NXP terms, lowered its acquisition proposal to $79 per Qualcomm share ($57 in cash; $22 in Broadcom stock). The new proposal, however, called for an automatic increase of $3 in cash per Qualcomm share, back to $82 per Qualcomm share, if the NXP deal was not consummated.  Broadcom's other proposed terms remained the same.

155.   Broadcom also continued to take steps to obtain regulatory clearance for its proposed transaction, and on February 22, 2018, it filed a Schedule 14A with the SEC reporting that, as of that date, Broadcom (i) had committed to divest two business areas to address the potential antitrust concerns Qualcomm had raised – its WiFi Networking Processors and RF Front End (RFFE) chip businesses; (ii) had agreed to take any other actions required by regulatory agencies with respect to Qualcomm's other businesses and assets subject to the "Material Adverse Effect" standard; (iii) was working on an anticipated second request from the U.S. Federal Trade Commission; and (iv) had met with MOFCOM in China and started a pre-filing consultation process. Broadcom reiterated that it remained confident in its ability to complete the transaction within approximately twelve months following the signing of a definitive agreement.

156.   Meanwhile, Qualcomm continued to make misleading statements regarding the regulatory risk associated with the deal.  On February 22, 2018, Qualcomm shared with its stockholders its "takeaways" from an article published in the Competition Policy International on the antitrust risks posed by Broadcom's proposed takeover of Qualcomm.  For example, Qualcomm stated that "[b]ased on similar complex cross-border deals, the expected regulatory approval process is likely to take 18+ months and may require significant and material divestitures and/or

conduct remedies." While discussing what it saw as "significant" regulatory risks associated with a Broadcom transaction, however, Qualcomm did not disclose to its shareholders that it had taken affirmative steps to block regulatory approval of the deal.

### 6. The Parties Meet Once Again and Qualcomm Continues to Misrepresent Its Actual Level of Engagement

157. The following day, February 23, 2018, Qualcomm and Broadcom again met to discuss Broadcom's proposal. Following up on the parties' meeting, on February 26, 2018, Defendant Jacobs sent a letter to Broadcom's CEO Tan. Jacobs' letter represented that the parties had made progress toward a negotiated solution and that the major sticking point was price. For example, Jacobs' letter stated:

> We appreciate the movement you have made from the draft merger agreement you publicly released on February 9. We have attached our mark-up of that document, which is intended to provide a comprehensive path forward on regulatory and deal certainty issues. The path forward does not require a "hell or high water" commitment on the regulatory front, but still provides the appropriate level of protection to Qualcomm stockholders commensurate with the high degree of regulatory risk associated with this potential transaction. If acceptable to Broadcom, ***this would resolve all issues between the two companies other than price***.

158. Jacobs also represented that "[t]he Qualcomm Board and management team are committed to exploring fully with Broadcom whether a negotiated transaction that is in the best interests of Qualcomm stockholders is achievable." As a result, Jacobs proposed that the parties move forward with "the following next steps." First, Jacobs proposed that the parties "[f]inalize non-price terms" stating, "[w]e welcome your review of the mark-up of the merger agreement we have provided you and propose that we or our representatives meet to address any remaining issues and finalize the language." Qualcomm also proposed that the parties "[e]xecute [an] NDA [non-disclosure agreement] and begin bilateral due diligence." Qualcomm reasoned that "[m]utual due diligence will inform our discussions on price." It concluded that "[w]e are delivering a proposed NDA to your counsel."

159.   As a fourth and final step, Qualcomm proposed that the parties "[a]rrange [a] meeting focused on price."  More specifically, Jacobs wrote that "[h]aving now addressed the regulatory and certainty issues in principle, we propose arranging a meeting – as soon as mutually convenient for both parties – focused on price, should Broadcom be willing to engage on the topic."  The letter concluded: "Tom Horton, in his capacity as Presiding Director (lead independent Director), will continue to lead Qualcomm in negotiations with Broadcom, with the goal of determining whether there is a mutually beneficial transaction to be done between our two companies.  We look forward to your reply."

160.   In response, later that day, Broadcom issued a statement that criticized Qualcomm's "comprehensive proposal" as an effort to delay the March 6, 2018 Annual Meeting, stating that its offer:

> [H]as never been conditioned on due diligence and Broadcom continues to be prepared to move forward immediately, without diligence.  In short, there is no cause to delay the Qualcomm annual meeting. Broadcom would be happy to provide confirmatory reverse due diligence upon an agreement on all material terms, including price, as is customary.

161.   That same day, Qualcomm issued a statement in response:

> The latest statement issued by Broadcom is disingenuous and clearly intended to create a false impression about Qualcomm's level of engagement. In fact, Qualcomm has repeatedly attempted to engage with Broadcom on issues including price, including at meetings on February 14 and February 23. In each of those meetings, Broadcom has refused to engage on price.
>
> Earlier today, Qualcomm made a comprehensive proposal that addresses regulatory and other merger agreement issues in order to clear the way for a price discussion with Broadcom. The ball is in Broadcom's court to let us know whether it is willing to engage with us.

162.   Qualcomm also accused Broadcom of lying about its attempts to postpone the Annual Meeting: "Broadcom's statements about Qualcomm considering moving the date of its annual meeting are false.  Qualcomm has no intention of delaying the annual meeting and made that clear to Broadcom during our February 23 meeting."

163. Also on February 26, Qualcomm issued a statement regarding the meeting, again confirming that progress had been made toward a negotiated transaction with Broadcom: "The Qualcomm Board believes the meeting led to further progress toward a possible negotiated transaction on key issues other than price."

164. Defendants' February 26, 2018 statements created the misleading impression that Qualcomm was diligently working to resolve any regulatory concerns to reach a negotiated deal with Broadcom, when, in reality, it was secretly feeding information to and lobbying CFIUS in an attempt to thwart the will of its shareholders and prevent any Broadcom deal from ever occurring.

165. News media reported positively on Qualcomm's apparent engagement in the proposed acquisition. In a February 26, 2018 article entitled *Qualcomm Warms to Broadcom Bid, but Price Is Sticking Point; The two companies have made progress on many fronts, but are still split on a price*, The Wall Street Journal reported that "Qualcomm Inc. appeared to take a cooperative turn in its talks with Broadcom Ltd., saying the two sides made progress toward a deal during a recent sit-down and that price could remain one of the few sticking points."

166. CNBC, in a same-day article entitled *Qualcomm Proposes Further Price Talks With Broadcom*, reported that "Chipmaker Qualcomm on Monday urged Broadcom to enter into price negotiations on its $117 billion offer for the company, saying the two sides had made progress on regulatory issues but were yet to agree on the deal value."

167. After the market closed on February 26, 2018, Reuters reported that:

[CFIUS] has begun looking at Singapore-based chipmaker Broadcom Ltd's plan to take over rival Qualcomm Inc. . . . Senator John Cornyn, the No. 2 Republican in the Senate, urged Treasury Secretary Steven Mnuchin on Monday to have the Committee on Foreign Investment in the United States, or CFIUS, officially review the proposed transaction before a key shareholder vote expected on March 6, according to a letter seen by Reuters. The pre-deal discussions by CFIUS—which are extremely rare—suggest Broadcom's plans to move its headquarters to the United States before it completes its proposed purchase of Qualcomm

may not be enough to sidestep a national security review that could threaten the deal.

Although the Reuters article raised the prospect that CFIUS might be informally looking at the deal, it did not disclose that a formal review was underway or mention Qualcomm's efforts to persuade CFIUS to kill Broadcom's hostile takeover attempt before it could redomicile.

168.   Moreover, soon thereafter, contradictory reports surfaced of an internal dispute at CFIUS over whether the Committee had jurisdiction to review Broadcom's proposal.  As reported by The Wall Street Journal on March 2, 2018:

> In a meeting Tuesday [February 27, 2018], members of . . . CFIUS, debated whether the panel has the right to weigh in on Singapore-based Broadcom Ltd.'s bid of $117 billion for Qualcomm before a deal is struck, according to people briefed on the matter.
>
> . . . .
>
> **Mr. Mnuchin [Treasury Secretary and Chair of CFIUS] . . . told his colleagues he wasn't sure the panel had jurisdiction to commence a review yet because the deal hasn't happened**.

169.   Defendants' misrepresentations continued unabated on March 1, 2018, when Qualcomm sent a letter to shareholders (filed with the SEC on Schedule 14A), representing that, "Qualcomm has repeatedly and genuinely attempted to engage with Broadcom on issues including price, regulatory and other closing certainties, including most recently at meetings on February 14 and February 23."  Defendants also touted their "attempts to find a path to a deal."  The letter concluded that "[t]he Qualcomm Board of Directors remains ready to engage with Broadcom on these issues both before and after the March 6 stockholder meeting."

170.   The following day, March 2, 2018, Telecommunications Reports reported that:

> Qualcomm, Inc., has suggested to Broadcom Limited that the two companies engage in due diligence and price negotiation of Broadcom's bid for Qualcomm. . . .   In a statement, Broadcom replied that . . .

"Qualcomm's sudden request to enter into an NDA is a result of Qualcomm finally beginning to recognize the will of its stockholders."

171.   In sum, based on Qualcomm's Class Period statements, investors were misled to believe that Defendants were engaged in good faith negotiations to secure better terms in a deal with Broadcom, when, in fact, they had been engaged in a lengthy campaign to have U.S. regulators scuttle any chances for the deal.  Moreover, as a result of Defendants' misleading statements, Qualcomm's shareholders were under the impression that Qualcomm was working to address regulatory concerns, and willing to cooperate with Broadcom to obtain regulatory clearances when, in reality, they were affirmatively campaigning regulators to block the deal.

## J.     The Relevant Truth Is Revealed in a Series of Disclosures

172.   The relevant truth began to leak to the market on the evening of Sunday, March 4, 2018, when Reuters reported that CFIUS had ordered Qualcomm to postpone its annual stockholders meeting by 30 days so that CFIUS could investigate Broadcom's bid for the Company.  The following day, March 5, 2018, Broadcom issued a press release before trading hours, which disclosed that Qualcomm had "secretly filed a voluntary unilateral request for CFIUS review on January 29, 2018." Then, in another March 5, 2018 press release published before the close of trading entitled *Broadcom Disappointed Will of Qualcomm Stockholders to be Deferred*, Broadcom stated:

> Broadcom was informed on Sunday night that on January 29, 2018, ***Qualcomm secretly filed a voluntary request with CFIUS to initiate an investigation***, resulting in a delay of Qualcomm's Annual Meeting 48 hours before it was to take place. This was a ***blatant, desperate act by Qualcomm to entrench its incumbent board of directors and prevent its own stockholders from voting for Broadcom's independent director nominees***. It is critical that Qualcomm stockholders know that Qualcomm did not once mention submitting a voluntary notice to CFIUS in any of its interactions with Broadcom to date, including in the two meetings on February 14, 2018 and on February 23, 2018. This can only be seen as an ***intentional lack of disclosure - both to Broadcom and to its own stockholders***.

173.    That same day, also before the market closed, Qualcomm filed a Current Report on Form 8-K with the SEC disclosing that it had "received an Interim Order" from CFIUS (the "March 4 Interim Order").  The March 4 Interim Order, which Qualcomm attached as an exhibit to the Form 8-K, was addressed to Qualcomm's CFIUS counsel, Covington & Burling LLP ("Covington & Burling"), and directed that: (i) Qualcomm's Annual Meeting, scheduled for March 6, 2018, would be delayed by 30 days and, in the meantime, "Qualcomm shall hold in abeyance the acceptance or count of any votes or proxies for directors, and shall take no action to complete the election of directors"; and (ii) while the March 4 Interim Order was in effect, Qualcomm was prohibited from "accepting, or taking any action in furtherance of accepting, Broadcom's proposed merger agreement or any other proposed merger, acquisition, or takeover agreement with Broadcom."  The March 4 Interim Order also made clear that it could be modified in writing by CFIUS, including upon written request from Qualcomm.  In response to the March 4 Interim Order, on the evening of March 5, 2018, Qualcomm announced that it would delay its Annual Meeting to April 5, 2018.

174.    On March 6, 2018, Qualcomm filed a Current Report on Form 8-K with the SEC disclosing that it had (i) "received a letter, addressed to both Broadcom Limited and Qualcomm, from the U.S. Department of Treasury" (the "March 5 Letter"); and (ii) "received a Modification of Interim Order" from CFIUS (the "Modification Order").  Copies of the March 5 Letter and the Modification Order were attached to the Current Report on Form 8-K as exhibits.

175.    The March 5 Letter made clear that CFIUS's conclusions were driven by the voluntary notice and additional information that Qualcomm had secretly submitted during the Class Period:

> During the time between Qualcomm's unilateral filing and Treasury's agency filing, CFIUS has been communicating with both parties to obtain additional information to inform its decision on the appropriate path forward in regards to this matter. It was during this time, and *as a result*

*of these communications and additional information*, that CFIUS has come to believe that Broadcom's successful hostile takeover attempt of Qualcomm, including the related stock purchase, proxy contest for the election of six directors to Qualcomm's Board as proposed and selected by Broadcom, Proposed Agreement and Plan of Merger, and any other potential merger between Broadcom and Qualcomm, could pose a risk to the national security of the United States.

. . . .

CFIUS's assessment thus far includes its review of the information submitted by Qualcomm in its unilateral voluntary notice on January 29, 2018, the parties' responses to questions posed about the potential transaction during the interim period, and the information provided in our multiple phone calls, emails, and meetings with representatives of both Qualcomm and Broadcom. In addition, our assessment includes the review of letters to CFIUS submitted by Broadcom on February 21, 2018 and March 2, 2018.

176.   News reports captured the market's shock at Qualcomm's behind-the-scenes maneuvering in the face of its public statements.  For example, The Wall Street Journal, in a March 6, 2018 article entitled *U.S. Government Intervenes in Broadcom's Bid for Qualcomm; Move represents a highly unusual intervention by Washington*, noted that "[l]ate last month, Qualcomm appeared to be coming around to the idea of a deal.  It said the two sides had been talking and making progress."

177.   In a March 6, 2018 article entitled *Qualcomm's Appeal to CFIUS Risks Alienating Shareholders*, Dow Jones Institutional News criticized Defendants for their efforts to secretly disenfranchise Qualcomm's shareholders, writing:

As things play out, this latest gambit in Broadcom's hostile bid for Qualcomm could end up creating more votes to change directors and undermining the credibility of Qualcomm management with any new director who is ultimately elected. . . . By appearing to encourage the extraordinary order from [CFIUS], to postpone the shareholder vote on directors, Qualcomm could be seen as attacking its own investors' voting rights.

178.   Market commentators also expressed surprise about the timing of CFIUS's review, noting that Qualcomm's actions had resulted in an unprecedented

early review of a deal before it was even agreed.  For example, The New York Times in a March 6, 2018 article reported that:

> In most cases, the panel operates in secret and weighs in after a deal is announced.  In this instance, Cfius, which is made up of representatives from multiple federal agencies, is taking a proactive role and investigating before an acquisition agreement has even been signed. . . . But Qualcomm, which is based in San Diego, pushed the government to intervene.

179.   In a same-day article, The New York Times reported that "[e]xperts said they couldn't recall another instance of the committee's intervening in a transaction that hadn't been completed, much less one that is as fluid and bitterly contested as this one."  The article further explained that:

> Broadcom had sought to pave the way for its bid by changing its headquarters to the United States, an announcement that the company's chief executive, Hock Tan, made alongside Mr. Trump at the White House last year. . . .  Broadcom argued that its status as a soon-to-be-American company meant the Qualcomm deal should not be subject to review by Cfius. Qualcomm nonetheless appealed to regulators to get involved.

180.   In a March 7, 2018 article entitled *Qualcomm's Spending Buys the Right Friends*, The Wall Street Journal also noted that CFIUS's rationale was nearly identical to Qualcomm's talking points:

> Qualcomm just provided the recipe for companies trying to thwart foreign takeovers: Spend big, first on research and development, then on lawyers.  That seems the main takeaway from a letter the Committee on Foreign Investment in the U.S. sent to lawyers for Broadcom and Qualcomm on Monday. . . . In language that closely mimics Qualcomm's talking points against the deal, the committee describes the company as "well-known" and "trusted" by the U.S. government. The letter also lauded the company's "unmatched expertise and R&D expenditure" – particularly as it relates to the coming wireless technology standard known as 5G.

181.   In sum, these disclosures revealed to investors that Defendants' repeated claims that they were diligently working to negotiate a transaction in the best interest

of shareholders were materially misleading when made.  In fact, as these disclosures revealed, Defendants were furiously working to kill the deal outright.

182.   As a result of the March 5 and March 6 disclosures, the price of the Company's common stock declined 4.02%, from a closing price of $64.74 on March 2, 2018, to a closing price of $62.14 on March 6, 2018.  By contrast, the S&P 500 increased by 1.35% between March 2 and 6, 2018.

183.   On March 7, 2018, media outlets began reporting that, in an attempt to salvage its bid, Broadcom was accelerating its plans to redomicile to the United States.  For instance, a March 7, 2018 New York Post article disclosed that:

> Advisers for Singapore-based Broadcom told a Qualcomm shareholder that the company is accelerating its plans to re-domicile to the US, *The Post* has learned. . . . Broadcom, to get around a CFIUS review, had promised earlier to become a US company by mid-May. But in light of the heat this week from Washington, Broadcom is now aiming to complete the move to the US in April.

184.   On March 9, 2018, Broadcom disclosed that it had moved up its shareholder vote on redomiciliation to March 23.  As The Wall Street Journal reported in a March 10, 2018 article entitled *Broadcom Vote Plan May Set Stage for Battle With U.S. National Security Panel; If move to become U.S. firm is approved, Singapore company could argue hostile bid for Qualcomm is outside of CFIUS's jurisdiction*:

> Singapore-based Broadcom Ltd. said Friday it will ask shareholders to vote on March 23 to approve its plan to redomicile to the U.S., potentially setting the stage for a showdown with the U.S. national security panel reviewing its $117 billion hostile bid for Qualcomm Inc. The vote is now set to take place in the middle of a review of the proposed bid by [CFIUS]. If Broadcom were considered a U.S. company, it could argue that its deal falls outside of the panel's jurisdiction.

185.   Then, after market close on March 12, 2018, Defendants' secret campaign to kill Broadcom's bid by instigating government intervention culminated in President Trump's issuance of an executive order blocking Broadcom from acquiring Qualcomm.

186.    This action by CFIUS and President Trump effectively endorsed Qualcomm's position regarding the national security concerns of the proposed acquisition and, in particular, the need to intervene prior to Broadcom's redomiciliation.    News reports directly connected CFIUS's recommendation to Qualcomm's secret campaign to stymie Broadcom's bid.    For instance, The Deal Pipeline, in a March 13, 2018 article entitled *Qualcomm's PR and Lobbying Savvy May Have Helped It Fight Off Broadcom*, reported that "Qualcomm had requested a Cfius review of Broadcom's bid on Jan. 29, and ***some of the objections publicly voiced by the committee sound like Qualcomm talking points***."

187.    In a March 12, 2018 article, Mondaq Business Briefing wrote, "Although traditional takeover defenses such as the Poison Pill and White Knight have long histories in the corporate M&A world, it is possible we are seeing now for the first time the (potentially successful) use of CFIUS as a takeover defense against a hostile offer."

188.    In response to this news, the price of the Company's common stock declined an additional $3.11 per share, or 4.95%, to close at $59.70 per share on March 13, 2018.  By comparison, the S&P 500 dropped only 0.67%.

189.    Even after Qualcomm managed to kill the deal, market commentators continued to report that if Broadcom had been allowed to complete its redomiciliation, it would have avoided CFIUS review altogether.  For example, The Wall Street Journal, in an article entitled *Broadcom Affirms Plan to Assume U.S. Address*, reported that "Broadcom earlier this week said it expected to complete the process in April, about a month earlier than originally planned.  Redomiciling would have allowed Broadcom's bid for Qualcomm to skip a review by [CFIUS]."

190.    On March 14, 2018, Broadcom announced that it had withdrawn and terminated its offer to acquire Qualcomm.  As Qualcomm's CFIUS counsel, Covington & Burling, later touted, the March 13, 2018 Presidential Order had "marked ***total victory*** for Qualcomm in its bid to remain an independent company."

191.   Through their tactics and campaign of misleading shareholders regarding their true intentions, Defendants were able to effectively thwart the will of Qualcomm's shareholders and entrench themselves in their management and Board positions.   In fact, numerous news sources reported that, before CFIUS's intervention at Defendants' behest, Broadcom's nominees were on track to oust Qualcomm's incumbent directors. For example, a March 5, 2018 Bloomberg article reported that Broadcom "is on course to win all six of the seats it's seeking on Qualcomm Inc.'s board, giving it a majority to push forward with its hostile takeover even as a U.S. government panel forced a delay of the final tally amid concerns about the deal's threats to national security."   The article further explained that:

> Based on a count of more than half of the votes already cast, Broadcom would win a majority of Qualcomm's board seats, according to information obtained by *Bloomberg*.  If that result holds up when the final vote takes place, Broadcom would have a mandate to overturn Qualcomm management's opposition to the $117 billion deal.

192.   A March 7, 2018 MarketWatch article entitled *Qualcomm was losing in takeover battle with Broadcom, then the government stepped in*, similarly reported that "Early returns were reportedly in Broadcom's favor after two of the big shareholder advisory firms recommended investors vote for some or all of Broadcom's slate to gain a majority vote on the entrenched Qualcomm board."   On March 8, 2018, analyst Oppenheimer confirmed that "Recent reports . . . indicate AVGO is on track to win a majority of QCOM's board seats in a shareholder vote delayed until 4/5/18, pending CFIUS's somewhat puzzling review."   Further, TechCrunch later reported:

> The votes started to come in on Friday, March 2. By Sunday it was clear that Qualcomm's defense had failed.  Four of the six directors Broadcom had nominated were polling so far ahead of their Qualcomm peers ***that the race was effectively over***, according to data viewed by Bloomberg. The remaining two were winning by less substantial margins. Making it worse, Mollenkopf and Jacobs, the architects of Qualcomm's standalone plan, had received some of the fewest votes. Inside the Qualcomm camp, the mood was bleak; assuming the trend continued, the board would lose control of the company at the shareholder meeting. Broadcom's message

was one of quiet confidence. The company knew it had won, one person close to the discussions said. At that point, the person said, it was just a question of by how many votes, and who was going to leave the board. Broadcom was winning the battle with shareholders, so Qualcomm's board shifted to a terrain far more favorable to it: Washington bureaucrats. From the same Bloomberg report, 'Federal lobbying disclosures for 2017 showing that Qualcomm spent $8.3 million, or roughly 100 times the $85,000 Broadcom spent…" These weren't regulators; these were friends.

193.   Although Defendants were able to avoid the embarrassment of being ousted by their own shareholders, on March 9, 2018, Qualcomm announced that while Defendant Jacobs would be allowed to retain his Board seat, he would step down as Executive Chairman.   The New York Times reported that "[t]he change was widely seen as a move to placate shareholders who had been voicing their displeasure by voting for a slate of six candidates proposed by Broadcom for the 11-seat board as part of its bid to acquire the company."   A March 9, 2018 VentureBeat article entitled *Battle of Broadcom claims its first victim: Paul Jacobs out as Qualcomm's executive chair*, explained that in announcing the move:

> [t]he company hinted that the move was in part an effort [to] ensure that its handling of Broadcom's unwanted overtures is above reproach. . . . While it's unclear how much Jacobs' personal history with the company may have affected Qualcomm's stance toward Broadcom, the board clearly felt it needed to avoid any suggestion that it is putting emotions ahead of business.

194.   Meanwhile, investors and market commentators continued to voice their displeasure with Qualcomm's Board.   On March 15, 2018, The Wall Street Journal, in an article entitled *Qualcomm Investors Urged to Vote for Broadcom Board Picks in Protest*, wrote that:

> Institutional Shareholder Services Inc., an influential proxy-advisory firm, recommended Qualcomm Inc. shareholders make a symbolic vote in protest against the chip giant's moves to block Broadcom Ltd.'s $117 billion takeover bid. ISS, in a note to investors late Wednesday, stood by its original recommendation that shareholders vote for four of Broadcom's six nominees for Qualcomm's 11-person board, even though the votes won't count. . . . ISS's decision underscores the frustration of Qualcomm shareholders at how the company's board

handled the bid and earlier perceived missteps that have weighed on the stock."

On March 17, 2018, the Los Angeles Times reported that "Qualcomm's board nominees are on course to get only 16% of the votes cast at its forthcoming shareholder meeting, even though they're now unopposed."

195.   Ultimately, after all of the votes were counted, the majority of Qualcomm's unopposed incumbent directors *failed* to receive a majority of shareholders' votes.  As The Wall Street Journal reported in a March 24, 2018 article entitled *Qualcomm Investors Register Protest – Six board members get tepid support in holder vote following Broadcom ordeal*, "[s]ix of Qualcomm Inc.'s directors, including Chief Executive Steve Mollenkopf, failed to win support from a majority of the company's shares on Friday, *a significant protest vote that signals investor discontent* after the chip-making giant successfully rebuffed a hostile takeover from Broadcom Ltd."  Nevertheless, "[a]ll the directors will remain on the board since they were running unopposed after the U.S. government blocked Broadcom's bid, and by extension its six-member slate of nominees."

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

196.   The Class Period begins on January 29, 2018.  On that date, unbeknownst to its shareholders, Qualcomm secretly and unilaterally filed a request for CFIUS to initiate a review prior to Broadcom's redomiciliation, in a brazen attempt to frustrate Broadcom's attempt to acquire the Company and for the Individual Defendants to simultaneously entrench themselves in their executive leadership positions at Qualcomm.

197.   On the same date, Qualcomm filed a Schedule 14A with the SEC that included a transcript of a video entitled *Creating Stockholder Value*.  The transcript included the following statement by Defendant Mollenkopf:

We received an unsolicited bid from Broadcom that the Board evaluated carefully, concluded that it undervalues the company, ***there are some questions about deal certainty and regulatory approval***.[7] We've had some feedback from customers that have voiced some concerns. Quite frankly, the Board concluded this deal is not in the best interest of shareholders.

198.   The transcript included in the January 29, 2018 Schedule 14A also included the following statement by Defendant Rosenberg:

> ***The Broadcom-proposed acquisition will be subjected to very, very close scrutiny by well over a dozen potential agencies. We believe that this is probably going to take something in the range of 18 months or more even, because of the complexity of the two companies' businesses, because of the enormous overlap in the two companies' technologies and businesses, and because of the global nature of our businesses.***

199.   Also on January 29, 2018, Qualcomm filed with the SEC on Schedule 14A a copy of its White Proxy Card sent to shareholders. Qualcomm's White Proxy Card stated, "***Broadcom's Low-Value, High Risk Proposal Would Steal Value From You***" and listed as reasons "***High-risk regulatory process***" and "***Cannot deliver anything to you for at least 18 months, if ever***."

200.   Each of Defendants' statements set forth in ¶¶ 197-199 was materially false or misleading when made, or omitted material facts necessary to make the statements made not misleading, because: by generically referencing regulatory risks that could delay or impact the deal and alluding to antitrust concerns while withholding the fact that Qualcomm had taken affirmative steps to prevent regulatory approval by filing a unilateral voluntary notice with CFIUS before Broadcom could redomicile to the U.S., Defendants misled investors about the true risks associated with the deal.

201.   On February 5, 2018, Qualcomm issued a press release, which it filed with the SEC on Schedule 14A, confirming that it had received Broadcom's revised proposal and stating: "***Consistent with its fiduciary duties, the Qualcomm Board of Directors, in consultation with its financial and legal advisors, will review the revised***

---

[7]   Each of Defendants' statements in Section IV that is alleged to be false and misleading is highlighted in ***bold and italics***.

*proposal to determine the course of action it believes is in the best interests of the* ***Company and its stockholders***." Qualcomm also reiterated that it had rejected Broadcom's previous proposal because it "***comes with significant regulatory uncertainty***."

202.   On February 8, 2018, Qualcomm issued a press release entitled ***Proposal Materially Undervalues Qualcomm and Falls Well Short of Firm Regulatory Commitment Necessary Given Significant Downside Risk of a Failed Transaction Qualcomm Offers to Meet to See If Broadcom Can Address Serious Deficiencies in Value and Certainty***, which it filed with the SEC on Schedule 14A, which stated:

> The Qualcomm Board, assisted by its financial and legal advisors, determined that ***the Broadcom proposal materially undervalues Qualcomm and falls well short of the firm regulatory commitment the Board would demand given the significant downside risk of a failed transaction. However, Qualcomm has offered to meet with Broadcom to see if it can address the serious deficiencies in value and certainty in its proposal***.

203.   Qualcomm attached to its February 8, 2018 press release a copy of a letter from Defendant Jacobs, addressed to Broadcom CEO Tan, which stated the following:

> ***The Board has unanimously determined that your amended offer materially undervalues Qualcomm and falls well short of the firm regulatory commitment the Board would demand given the significant downside risk of a failed transaction. However, the Board is committed to exploring all options for maximizing shareholder value, and so we would be prepared to meet with you to allow you to explain how you would attempt to bridge these gaps in both value and deal certainty and to better understand the significant issues that remain unaddressed in your proposal.***
>
> ***In the meeting, we would expect that you will be prepared to provide clear, specific and detailed answers to the questions below.***
>
> o ***What is the true highest price at which you would be prepared to acquire Qualcomm? Is it $82 per share or is it higher? Your current proposal is inadequate as it materially undervalues Qualcomm. Your proposal ascribes no value to our accretive NXP acquisition, no value for the expected resolution of our current licensing disputes and no value for the significant opportunity in 5G. Your proposal is inferior relative to our***

> *prospects as an independent company and is significantly below both trading and transaction multiples in our sector.*
>
> o  *Is Broadcom willing to commit to take whatever actions are necessary to ensure the proposed transaction closes? This is extremely important to value preservation for our shareholders. The differences in our business models expose the Company to significant customer and licensee risk between signing and closing an agreement. It is indisputable that there are significant regulatory hurdles in your proposed transaction. It is also indisputable that if Qualcomm entered into a merger agreement and, after an extended regulatory review period the transaction did not close, Qualcomm would be enormously and irreparably damaged. If you are not willing to agree to do whatever is necessary to ensure a transaction closes, we will need you to be extremely clear and specific about exactly what actions you would refuse to take, so that we can properly evaluate the risk to Qualcomm's shareholders.*
>
> *We have a number of other important questions, which we can discuss at our meeting. We will reach out to you to schedule the meeting.*

204.   That same day, Qualcomm filed a Schedule 14A with the SEC, which included a copy of a letter from Mollenkopf to Qualcomm employees, discussing Qualcomm's rejection of Broadcom's February 5, 2018 improved $82 per share proposal:

> Today we issued a press release announcing that our Board of Directors unanimously rejected Broadcom's revised proposal *after determining that it materially undervalues Qualcomm. This proposal also falls well short of the regulatory commitment we would demand given the significant downside risk of a failed transaction.*
>
> *The Board has offered to meet with Broadcom to see if it can address the serious deficiencies in value and certainty in its proposal. It's important to note that this does not mean that a transaction will occur. The Board has a commitment to exploring all options for maximizing stockholder value – this is the purpose of offering to meet with Broadcom*.

205.   The following day, February 9, 2018, Qualcomm sent an email to its shareholders, which it also filed with the SEC on Schedule 14A, which stated:

Today we announced that Qualcomm's Board of Directors, *after a thorough review process with its financial and legal advisors, unanimously rejected Broadcom's revised proposal to acquire Qualcomm after determining that the proposal materially undervalues Qualcomm and falls well short of the firm regulatory commitment the Board would demand given the significant downside risk of a failed transaction. . . . The Qualcomm Board is committed to exploring all options for maximizing stockholder value and has offered to meet with Broadcom to see if it can address the serious deficiencies in value and certainty in its proposal.*

206.   That same day, Qualcomm filed an Investor Presentation with the SEC on Schedule 14A, wherein it represented to shareholders that Broadcom's offer "*Poses Unacceptable Regulatory Risks*" and "*Significant regulatory uncertainty,*" and that "*Regulatory approval [was] highly uncertain; at least [an] 18 month process.*"  The presentation also continued to mislead investors about Qualcomm's willingness to constructively engage with Broadcom, telling investors that while Broadcom's initial proposal "*so dramatically undervalued the business and carried such regulatory uncertainty that engagement was not warranted,*" its improved February 5 proposal, "*while not sufficient, . . . warranted engagement.*"

207.   Each of Defendants' statements set forth in ¶¶ 201-206 was materially false or misleading when made, or omitted material facts necessary to make the statements made not misleading, because:

- Defendants' statements misled investors to believe that Qualcomm was willing to engage constructively with Broadcom's offer, and that Broadcom's actions (or lack thereof) were the main reason a negotiated solution had not been reached, when behind the scenes it was working to ensure that the deal with Broadcom would never happen.

- Defendants' statements that price was a major barrier to a negotiated transaction misled investors to believe that the Company was willing to engage at the right price when, in fact, it was actively attempting to kill the deal regardless of price.

- • By generically referencing regulatory risks that could delay or impact the deal and alluding to antitrust concerns while withholding the fact that Qualcomm had taken affirmative steps to prevent regulatory approval by filing a unilateral voluntary notice with CFIUS before Broadcom could redomicile to the U.S., Defendants misled investors about the true risks associated with the deal.

- • Qualcomm's request that Broadcom "agree to do whatever is necessary to ensure a transaction closes" or "be extremely clear and specific about exactly what actions you would refuse to take, so that we can properly evaluate the risk to Qualcomm's shareholders" was misleading given that Qualcomm itself was secretly taking action to ensure that the deal never closed. By failing to disclose the Company's actions to its shareholders, it deprived them of the opportunity to "properly evaluate the risks."

208.   On February 9, 2018, Qualcomm filed an investor presentation with the SEC on Schedule 14A entitled ***Qualcomm Sets the Record Straight on Regulatory Challenges Faced by Broadcom***, which discussed at length the purported regulatory risks associated with the potential Broadcom transaction. While the majority of the presentation focused on antitrust concerns, the presentation noted "***potentially serious national security concerns***," and, in the context of potential divestitures to address antitrust concerns, stated that:

> ***Adding to the uncertainty, Broadcom would have to identify a suitable buyer that could compete in the market with equal strength to Qualcomm – a challenging and potentially impossible task. In addition, any divestiture to a non-U.S. buyer must be approved by the Committee on Foreign Investment in the United States (CFIUS). The universe of companies that can satisfy the concerns of both antitrust regulators and CFIUS is small, if it exists at all.  Broadcom's list of potential buyers excludes Chinese firms in an attempt to address CFIUS obstacles. However, even with assets divested elsewhere, China may require licensing commitments that will raise CFIUS concerns.***

209.   That same day, Defendants posted material to Qualcomm's dedicated deal website, www.qcomvalue.com, stating: "Broadcom's opportunistic proposal

dramatically undervalues Qualcomm and *there is significant doubt about whether it can ever be completed*."

210.   Each of Defendants' statements set forth in ¶¶ 208-209 was materially false or misleading when made, or omitted material facts necessary to make the statements made not misleading, because: by generically referencing regulatory risks that could delay or impact the deal, focusing on antitrust concerns, generally referring to national security concerns, and addressing CFIUS risk in the context of antitrust divestitures – all while withholding the fact that Qualcomm had taken affirmative steps to prevent regulatory approval by filing a unilateral voluntary notice with CFIUS before Broadcom could redomicile to the U.S. – Defendants misled investors about the true risks associated with the deal.

211.   On February 14, 2018, Qualcomm issued a press release entitled *Qualcomm Issues Statement on Meeting with Broadcom*, which it also filed with the SEC on Schedule 14A, which stated:

> Qualcomm Incorporated (NASDAQ: QCOM) issued the following statement after members of Qualcomm's Board and its senior management team met today with Broadcom Limited (NASDAQ: AVGO) to discuss Broadcom's proposal to acquire Qualcomm: "*We met with representatives of Broadcom for two hours earlier today, and listened carefully to what they had to say. The Qualcomm Board will promptly meet to discuss the meeting and to determine next steps*."

212.   On February 16, 2018, Qualcomm issued a press release entitled *Qualcomm Provides Update on Meeting with Broadcom*, which it filed with the SEC on Schedule 14A, including a February 16, 2018 letter that Defendant Jacobs sent to Broadcom's CEO Tan following up on Qualcomm's February 14, 2018 meeting with Broadcom.  In the letter, Jacobs stated:

> *The Board remains unanimously of the view that this proposal materially undervalues Qualcomm and has an unacceptably high level of risk, and therefore is not in the best interests of Qualcomm stockholders.*

*That said, our Board found the meeting to be constructive in that the Broadcom representatives expressed a willingness to agree to certain potential antitrust-related divestitures beyond those contained in your publicly filed merger agreement. At the same time, Broadcom continued to resist agreeing to other commitments that could be expected to be required by the FTC, the European Commission, MOFCOM and other government regulatory bodies. Broadcom also declined to respond to any questions about its intentions for the future of Qualcomm's licensing business, which makes it very difficult to predict the antitrust-related remedies that might be required. In addition, Broadcom insists on controlling all material decisions regarding our valuable licensing business during the extended period between signing and a potential closing, which would be problematic and not permitted under antitrust laws.*

*Our Board is highly cognizant of the need to protect Qualcomm's stockholders from the considerable risks of agreeing to a transaction that does not close. A breakup fee in the range proposed by Broadcom does not come close to compensating for those risks.*

*While the current Broadcom proposal is unacceptable, our Board is intensely focused on maximizing value for Qualcomm stockholders, whether through executing on its growth strategy or by selling the Company. Our Board is open to further discussions with Broadcom to see if a proposal that appropriately reflects the true value of Qualcomm shares, and ensures an appropriate level of deal certainty, can be obtained. If such a proposal cannot be obtained from Broadcom, our Board is highly confident in Qualcomm's ability to deliver superior near- and long-term value to its stockholders by continuing to execute its growth strategy.*

213.   That same day, Qualcomm sent an email to its shareholders, which it filed with the SEC on Schedule 14A, which stated, "*Consistent with its commitment to explore all options to maximize stockholder value, members of Qualcomm's Board and senior management team met with Broadcom on February 14, 2018, to discuss whether Broadcom could address the serious deficiencies in its proposal to acquire Qualcomm*."

214.   Also on February 16, Defendant Mollenkopf sent an email to Qualcomm employees, which the Company filed with the SEC on Schedule 14A, stating:

*As you know, last week our Board unanimously rejected Broadcom's revised proposal, but agreed to meet with members of their senior management team to see if they could address the proposal's serious deficiencies – both in terms of value and deal certainty. During the meeting, which took place on Wednesday, Broadcom addressed some of our regulatory concerns, but would not agree to certain commitments that could be required to satisfy regulators around the world. Broadcom also reiterated that $82.00 per share is its best and final proposal, which our Board continues to believe materially undervalues Qualcomm and presents unacceptable risk for our stockholders. We sent a letter to Broadcom earlier today articulating that position and that our Board is open to further discussions to address our ongoing and legitimate concerns.*

215.   Each of Defendants' statements set forth in ¶¶ 211-214 was materially false or misleading when made, or omitted material facts necessary to make the statements made not misleading, because:

- Defendants' statements misled investors to believe that Qualcomm was willing to engage constructively with Broadcom's offer, and that Broadcom's actions (or lack thereof) were the main reason a negotiated solution had not been reached, when behind the scenes it was working to ensure that the deal with Broadcom would never happen.

- Defendants' statements that price was a major barrier to a negotiated transaction misled investors to believe that the Company was willing to engage at the right price when, in fact, it was actively attempting to kill the deal regardless of price.

- By generically referencing regulatory risks that could delay or impact the deal and focusing on antitrust concerns while withholding the fact that Qualcomm had taken affirmative steps to prevent regulatory approval by filing a unilateral voluntary notice with CFIUS before Broadcom could redomicile to the U.S., Defendants misled investors about the true risks associated with the deal.

216.   On February 21, 2018, Qualcomm issued a press release entitled *Qualcomm Issues Statement On Reduced Broadcom Proposal*, which it filed with the SEC on Schedule 14A, which stated:

> Qualcomm Incorporated (NASDAQ: QCOM) today issued the following statement in response to today's reduced proposal by Broadcom Limited (NASDAQ: AVGO) to acquire all outstanding shares of Qualcomm for $79.00 per share ($57.00 in cash and $22.00 in Broadcom stock): "***Broadcom's reduced proposal has made an inadequate offer even worse despite the clear increase in value to Qualcomm stockholders from providing certainty around the NXP acquisition. Broadcom has refused and continues to refuse to engage with Qualcomm on price. . . . The Qualcomm Board is committed to maximizing value for Qualcomm stockholders, whether that be through executing its growth strategy or selling the company. Broadcom's revised $79.00 per share proposal materially undervalues Qualcomm, fails to take into account the strategic and financial benefits of acquiring NXP, and continues to face a long and highly uncertain path to regulatory approvals***."

217.   On February 22, 2018, Qualcomm issued a press release, filed with the SEC on Schedule 14A, including a February 22, 2018 letter that the Board sent to its shareholders.  The letter stated:

> ***The members of the Qualcomm Board of Directors are firmly committed to maximizing value for Qualcomm stockholders***. We are highly confident in Qualcomm's strategic plan and its multiple value drivers. At the same time, ***we have seriously evaluated Broadcom's proposals and explained to Broadcom – including during our meeting with them on February 14 – why their proposals are inadequate. We remain open to continued discussions if a suitable proposal is presented. To date, no such proposal has been made.***
>
> . . . .
>
> ***By lowering its proposal to $79.00 per share, Broadcom has made an inadequate proposal even worse despite the indisputable increase in value and certainty that Qualcomm stockholders will receive from the compelling and highly accretive acquisition of NXP. Importantly, Broadcom has refused and continues to refuse to engage with Qualcomm on price.***
>
> ***The Board unanimously believes that Broadcom's current $79.00 per share proposal undervalues Qualcomm, fails to take into account the strategic and financial benefits of acquiring NXP, and continues to face a long and highly uncertain path to regulatory approvals.***

*Members of this Board and management met with Broadcom earlier this month to discuss a path to a transaction that both appropriately valued Qualcomm and provided a sufficient level of certainty around the regulatory issues. We entered the meeting with Broadcom in a constructive manner, seeking a price increase and engagement on issues related to transaction certainty. However, Broadcom did not engage on the topic of price – repeatedly stating that $82 per share was "best-and-final."*

*Broadcom also insisted it had to control all material decisions regarding our licensing business, one that has realized annual revenues exceeding $7 billion, during a lengthy regulatory process, despite the fact that this is not permitted under antitrust laws. Additionally, Broadcom was unwilling to agree to commitments that could be expected to be required by the FTC, European Commission, MOFCOM and other government regulatory bodies. Their proposed $8 billion reverse termination fee – which equates to only $5.40 per share – does not come close to compensating our stockholders for the substantial value destruction likely to result if the transaction were to fail to close due to regulatory issues.*

*. . . .*

**THE QUALCOMM BOARD IS SQUARELY FOCUSED ON MAXIMIZING THE VALUE OF YOUR INVESTMENT**

*Qualcomm is well positioned to create value for stockholders over the near- and long-term, particularly with a clear path to completing the NXP transaction. At the same time, should Broadcom present a proposal that delivers superior value and sufficiently protects downside risk to you, we will pursue a sale. Thus far, Broadcom has done neither.*

218.   Each of Defendants' statements set forth in ¶¶ 216-217 was materially false or misleading when made, or omitted material facts necessary to make the statements made not misleading, because:

- Defendants' statements misled investors to believe that Qualcomm was willing to engage constructively with Broadcom's offer, and that Broadcom's actions (or lack thereof) were the main reason a negotiated solution had not been reached, when behind the scenes it was working to ensure that the deal with Broadcom would never happen.

- Defendants' statements that price was a major barrier to a negotiated transaction and that "should Broadcom present a proposal that delivers superior

value and sufficiently protects downside risk to you, we will pursue a sale," misled investors to believe that the Company was willing to engage at the right price when, in fact, it was actively attempting to kill the deal regardless of price.

- By generically referencing regulatory risks that could delay or impact the deal and focusing on antitrust concerns while withholding the fact that Qualcomm had taken affirmative steps to prevent regulatory approval by filing a unilateral voluntary notice with CFIUS before Broadcom could redomicile to the U.S., Defendants misled investors about the true risks associated with the deal.

219. On February 22, 2018, Qualcomm shared with its stockholders an article published in the Competition Policy International by former senior antitrust enforcers and leading antitrust experts from China, Korea, the European Union, and the United States on the significant antitrust risks posed by Broadcom's proposed takeover of Qualcomm.

220. On February 22, 2018, Qualcomm issued a press release entitled ***FORMER SENIOR GOVERNMENT OFFICIALS AND LEADING ANTITRUST EXPERTS FROM AROUND THE WORLD DESCRIBE THE 'MATERIAL RISKS' ASSOCIATED WITH BROADCOM'S EFFORT TO ACQUIRE QUALCOMM***, filed with the SEC on Schedule 14A, which stated,

> ***Qualcomm Incorporated (NASDAQ: QCOM) ("Qualcomm") today shared with its stockholders an article published in the Competition Policy International by former senior antitrust enforcers and leading antitrust experts from China, Korea, the European Union, and the United States ("the experts") on the significant antitrust risks posed by Broadcom's proposed takeover of Qualcomm.***

The press release went on to highlight Qualcomm's key "***takeaways***" from the article, including:

> o ***Any combination between Broadcom and Qualcomm faces significant antitrust risks due to their competitive positions in WiFi and RFFE products (among others), the potential complex and difficult divestiture process with regards to separating the***

*businesses and finding an acceptable buyer, and the potential for anti-trust agencies demanding significant restrictions on Broadcom's post-merger licensing and distribution practices.*

o *There are countless examples of regulators imposing substantial conduct remedies and the real risk posed by these conduct remedies generally requires deal protection for the target and its shareholders – such as a "hell-or-high-water clause" – to ensure that "a buyer cannot walk away from the deal at any point during or after a protracted regulatory review period, particularly given the likely disruption caused to targets (here, Qualcomm) during such a review period."*

o *Based on similar complex cross-border deals, the expected regulatory approval process is likely to take 18+ months and may require significant and material divestitures and/or conduct remedies.*

o *The proposed limitations on Qualcomm by Broadcom on how Qualcomm can operate its business during a potential regulatory review period likely violates antitrust "gun-jumping" rules, and could be subject to an investigation by the U.S. FTC.*

221.   Each of Defendants' statements set forth in ¶ 220 was materially false or misleading when made, or omitted material facts necessary to make the statements made not misleading, because: by generically referencing regulatory risks that could delay or impact the deal and focusing on antitrust concerns, all while withholding the fact that Qualcomm had taken affirmative steps to prevent regulatory approval by filing a unilateral voluntary notice with CFIUS before Broadcom could redomicile to the U.S., Defendants misled investors about the true risks associated with the deal.

222.   The following day, February 23, 2018, Qualcomm and Broadcom again met to discuss Broadcom's proposal.

223.   On February 26, 2018, Qualcomm issued a press release entitled *Qualcomm Proposes Further Engagement with Broadcom on Price and Terms of Possible Transaction Delivers Revised Merger Agreement That Would Provide Comprehensive Path Forward on Regulatory and Closing Certainty for Qualcomm Stockholders Suggests Path for Continued Engagement and Calls on Broadcom to*

*Engage in Mutual Due Diligence and Price Negotiation*, filed with the SEC on Schedule 14A, which stated:

> *Qualcomm Incorporated (NASDAQ: QCOM) today announced that Chairman of the Board Dr. Paul E. Jacobs sent a letter on behalf of the Qualcomm Board of Directors to Hock Tan, Chief Executive Officer of Broadcom Limited (NASDAQ: AVGO), providing Qualcomm's response to the second meeting between the two companies, which was held on February 23.*
>
> *The Qualcomm Board believes the meeting led to further progress toward a possible negotiated transaction on key issues other than price. The Board authorized providing Broadcom with a mark-up of Broadcom's previously released draft merger agreement that, if agreed to by Broadcom, would resolve all issues between the two companies other than price.*
>
> *Broadcom reiterated in the February 23 meeting that its reduced $79.00 per share proposal is its best and final proposal. The Qualcomm Board is unanimous in its view that each of Broadcom's proposals, including its prior $82.00 per share proposal, materially undervalues Qualcomm, and the Board encourages Broadcom to enter into mutual due diligence and price negotiations.*

224.  The press release included a copy of Defendant Jacobs' letter to Broadcom CEO Tan.  In the letter, Jacobs wrote:

> *As we are all aware, a combination of Broadcom and Qualcomm would represent the largest technology transaction in history and one of the largest M&A transactions overall. This represents uncharted territory and our Board and management are taking great care to incorporate an appropriate level of protections for Qualcomm stockholders in a potential transaction with Broadcom.*
>
> *We have briefed the full Board on the meeting and the current state of our discussions. As they have done at previous Board meetings, our independent directors also met separately in an executive session, along with the Board's financial and legal advisors.*
>
> *We appreciate the movement you have made from the draft merger agreement you publicly released on February 9. We have attached our mark-up of that document, which is intended to provide a comprehensive path forward on regulatory and deal certainty issues. The path forward does not require a "hell or high water" commitment on the regulatory front, but still provides the appropriate level of protection to Qualcomm stockholders commensurate with the high degree of regulatory risk associated with this potential transaction. If*

*acceptable to Broadcom, this would resolve all issues between the two companies other than price.*

*While we have made progress on regulatory and other deal certainty issues, you have continued to insist that your current $79.00 per share proposal is your best and final proposal. For the reasons we have stated publicly to our stockholders, and privately to you in our meetings, the Qualcomm Board continues to be of the unanimous belief that each of your proposals, including your prior $82.00 per share proposal, materially undervalues Qualcomm. This conclusion is based on substantial and thorough analysis.*

. . . .

*It is the Board's responsibility to critically analyze all of the external and internal information available to us, challenge assumptions and utilize our collective experience to arrive at thoughtful and independent conclusions on the future value of Qualcomm. With the support of management and our external advisors, we have concluded unanimously that an acquisition price materially higher than any of Broadcom's proposals is warranted based upon our evaluation of Qualcomm's near-term prospects and the risk-adjusted present value of our long-term forecasts.*

. . . .

*In our previous meeting on February 14, you agreed to drop your prior objection to divesting any Broadcom (as opposed to only Qualcomm) businesses and assets as a way to facilitate regulatory approval.*

*However, to reduce regulatory risk to an appropriate level, we made two additional proposals in our February 23 meeting:*

- *We asked Broadcom to agree to any conduct remedies and other remedies that may be imposed by regulators that would not have a material adverse effect on the combined company (after divestitures).*

- *We proposed a reverse termination fee of 9% of enterprise value, payable if a potential transaction is terminated other than due to a breach of the agreement by Qualcomm or our failure to obtain stockholder approval. . . .*

*We believe these commitments and our other changes to the merger agreement would provide acceptable risk protection to Qualcomm stockholders, and we therefore would no longer ask Broadcom to make a "hell or high water" commitment."*

. . . .

*The Qualcomm Board and management team are committed to exploring fully with Broadcom whether a negotiated transaction that is in the best interests of Qualcomm stockholders is achievable. Accordingly, we propose the following next steps:*

*1.     Finalize non-price terms: We welcome your review of the mark-up of the merger agreement we have provided you and propose that we or our representatives meet to address any remaining issues and finalize the language.*

*2.     Execute NDA and begin bilateral due diligence: Mutual due diligence will inform our discussions on price. We appreciate that we have differences in our views on value and that ours is based upon significantly more information than the public data you now have at your disposal. Therefore, we propose entering into a non-disclosure agreement and beginning bilateral due diligence, given the large amount of Broadcom stock included in your proposal and to provide more granular details on our views on value. We are delivering a proposed NDA to your counsel.*

*3.     Agree on approach to provide information on licensing business: You have repeatedly declined to disclose your plan to change Qualcomm's licensing business because you think such disclosure could pose issues under antitrust laws. Although we believe Broadcom is free to disclose this information, we are willing to jointly select a law firm with antitrust expertise that you would fully brief on your licensing plans. This firm would then provide Qualcomm the information which it considers permissible under antitrust law.*

*4.     Arrange meeting focused on price: Having now addressed the regulatory and certainty issues in principle, we propose arranging a meeting – as soon as mutually convenient for both parties – focused on price, should Broadcom be willing to engage on the topic.*

*Tom Horton, in his capacity as Presiding Director (lead independent Director), will continue to lead Qualcomm in negotiations with Broadcom, with the goal of determining whether there is a mutually beneficial transaction to be done between our two companies. We look forward to your reply.*

Qualcomm also attached to the press release its proposed markup of Broadcom's proposed agreement and plan of merger.

225. Qualcomm filed a same-day Schedule 14A with the SEC including an email from Defendant Mollenkopf to Qualcomm's employees. In the email, Mollenkopf stated:

1
2
3
4

> *Last Friday, members of Qualcomm's Board and management team met again with representatives from Broadcom to discuss Broadcom's takeover proposal.   After Friday's meeting, Qualcomm's Board, consistent with its commitment and obligation to explore all opportunities to maximize value for stockholders, discussed the meeting and the current state of our engagement with Broadcom.*

5
6
7
8

226.   Also on February 26, Qualcomm issued a press release entitled ***Qualcomm Calls on Broadcom to Stop Misleading Stockholders and Negotiate in Good Faith***, filed with the SEC on Schedule 14A, which responded to a same-day Broadcom press release as follows:

9
10
11

> *Qualcomm Incorporated (NASDAQ: QCOM) today responded to Broadcom Limited's (NASDAQ: AVGO) misleading comments regarding Qualcomm's engagement with Broadcom in connection with its proposal to acquire Qualcomm:*

12
13
14
15

> *"The latest statement issued by Broadcom is disingenuous and clearly intended to create a false impression about Qualcomm's level of engagement. In fact, Qualcomm has repeatedly attempted to engage with Broadcom on issues including price, including at meetings on February 14 and February 23. In each of those meetings, Broadcom has refused to engage on price.*

16
17
18
19

> *Earlier today, Qualcomm made a comprehensive proposal that addresses regulatory and other merger agreement issues in order to clear the way for a price discussion with Broadcom. The ball is in Broadcom's court to let us know whether it is willing to engage with us. Qualcomm's Board remains unanimous in its view that Broadcom's current offer of $79.00 per share, as well as the previous offer of $82.00 per share, materially undervalues the company.*

20
21
22

> *Broadcom's statements about Qualcomm considering moving the date of its annual meeting are false. Qualcomm has no intention of delaying the annual meeting and made that clear to Broadcom during our February 23 meeting."*

23
24

227.   The following day, February 27, 2018, Qualcomm provided Broadcom a proposed non-disclosure agreement, which it filed with the SEC on Schedule 14A.

25
26
27
28

228.   That same day, Qualcomm filed with the SEC on Schedule 14A a White Proxy Card vote reminder, which stated, "***Qualcomm's Board of Directors is committed to evaluating ALL opportunities to maximize value for stockholders – whether through continued execution of our growth strategy or by selling the***

*Company.  To that end, we are open to constructively engaging with Broadcom and will continue to act in your best interests.*"

229.   Each of Defendants' statements set forth in ¶¶ 223-226 and 228 was materially false or misleading when made, or omitted material facts necessary to make the statements made not misleading, because:

- Defendants' statements misled investors to believe that Qualcomm was willing to engage constructively with Broadcom's offer, and that Broadcom's actions (or lack thereof) were the main reason a negotiated solution had not been reached, when behind the scenes it was working to ensure that the deal with Broadcom would never happen.

- Defendants' statements that price was a major barrier to a negotiated transaction misled investors to believe that the Company was willing to engage at the right price when, in fact, it was actively attempting to kill the deal regardless of price.

- By generically referencing regulatory risks that could delay or impact the deal and focusing on antitrust concerns while withholding the fact that Qualcomm had taken affirmative steps to prevent regulatory approval by filing a unilateral voluntary notice with CFIUS before Broadcom could redomicile to the U.S., Defendants misled investors about the true risks associated with the deal.

- Qualcomm's statement that it "has no intention of delaying the annual meeting" was misleading, given that it had asked CFIUS to stop the vote from occurring altogether.

230.   In a Schedule 14A filed with the SEC on March 1, 2018, Qualcomm included a same-day letter from the Board to the Company's shareholders.  The letter included the following statements:

*Qualcomm's Board remains unanimous in its view that Broadcom's current offer of $79.00 per share, as well as the previous offer of $82.00 per share, materially undervalues the company. Similarly, Broadcom's initial offer of $70.00 per share was so low that it did not merit engagement. We determined it was in the best interests of stockholders to wait for a substantially improved offer – which after several months did eventually come on February 5. The Board undertook a thorough and in-depth process in reviewing the offers and did so through the lens of maximizing long-term stockholder value. . . . Since evaluating and subsequently rejecting the $82 per share offer on February 8, Qualcomm has repeatedly and genuinely attempted to engage with Broadcom on issues including price, regulatory and other closing certainties, including most recently at meetings on February 14 and February 23. In each of those meetings, Broadcom refused to engage in good faith. It instead reiterated its "best and final" stance which it established prior to our first meeting, despite our attempts to find a path to a deal that makes sense for Qualcomm stockholders. Broadcom's refusal to outline its proposal and the future direction of Qualcomm's licensing business also raises significant issues from a value and regulatory perspective.*

*All three items – price, closing certainty and the licensing business – are critical to the Board's evaluation of Broadcom's proposal, and without a meaningful discussion or an agreement on these items, the Qualcomm Board believes it is <u>not</u> in the best interest of Qualcomm's stockholders to elect Broadcom's nominees. The Qualcomm Board of Directors remains ready to engage with Broadcom on these issues both before and after the March 6 stockholder meeting.*

231.   Each of Defendants' statements set forth in ¶ 230 was materially false or misleading when made, or omitted material facts necessary to make the statements made not misleading, because:

- Defendants' statements misled investors to believe that Qualcomm was willing to engage constructively with Broadcom's offer, and that Broadcom's actions (or lack thereof) were the main reason a negotiated solution had not been reached, when behind the scenes it was working to ensure that the deal with Broadcom would never happen.

- Defendants' statements that price was a major barrier to a negotiated transaction misled investors to believe that the Company was willing to engage

at the right price when, in fact, it was actively attempting to kill the deal regardless of price.

• By generically referencing regulatory risks that could delay or impact the deal and focusing on antitrust concerns while withholding the fact that Qualcomm had taken affirmative steps to prevent regulatory approval by filing a unilateral voluntary notice with CFIUS before Broadcom could redomicile to the U.S., Defendants misled investors about the true risks associated with the deal.

## VI.   ADDITIONAL SCIENTER ALLEGATIONS

232.   As alleged herein, Defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading and that such statements or documents would be issued or disseminated to the investing public.  Defendants, by virtue of: (i) their receipt of information reflecting the true facts regarding Qualcomm's intentions to block Broadcom's bid through CFIUS; (ii) their control over, and/or receipt and/or modification of Qualcomm's allegedly materially misleading statements and omissions; and (iii) their senior leadership roles at the Company, which made them privy to confidential information concerning Qualcomm and its intentions and efforts with regard to the Broadcom proposal, each participated in the fraudulent scheme alleged herein.

**A.   Defendants Were Each Deeply Engaged in Merger Negotiations and Qualcomm's Response to the Broadcom Proposal, Such That Each Was Aware of and Involved in Qualcomm's Unilateral Request for CFIUS Review and Its Purpose**

233.   As set forth in ¶¶ 38-42, and as further detailed below, each Individual Defendant was a senior member of leadership at Qualcomm and was intimately familiar with the details of Broadcom's merger proposals as well as a participant in Qualcomm's discussions regarding actions taken in response to that proposal.  Indeed, not only was the proposed takeover of fundamental importance to the Company during

the Class Period, it was also set to be the "biggest technology acquisition ever" (¶ 57). Due to the importance of the potential acquisition to the very existence of Qualcomm, as well as each Individual Defendant's integral involvement in the Company's purportedly "extensive" discussion and "rigorous and thorough" review of Broadcom's proposals – including with its external legal and financial advisors – it can readily be inferred that each knew of Qualcomm's January 2018 decision to unilaterally contact CFIUS about Broadcom's proxy contest and to seek CFIUS review of the deal.

234.   As set forth below, based on their central involvement in the evaluation, negotiation, and rejection of Broadcom's proposals, it is reasonable to infer each Individual Defendant was aware of (1) Qualcomm's decision to lobby for CFIUS review and rejection of Broadcom's proposed takeover, and (2) that they had not told investors the entire truth in making the public statements alleged in *supra* Section V. If the Individual Defendants were not direct participants in Qualcomm's secret, unilateral, and pre-deal submission to CFIUS on January 29, 2018, as well as in the numerous follow-up phone calls, emails, and meetings with Qualcomm representatives over the course of the following month, then at a minimum, they directly supervised the employees who were.  As direct supervisors of the employees who participated in Qualcomm's secret, unilateral, and pre-deal submission to CFIUS, the Individual Defendants either knew about Qualcomm's aggressive attempts to obtain CFIUS review of Broadcom's proxy contest, or were deliberately reckless in not knowing those efforts.

### 1.    Mollenkopf

235.   As the Company's CEO, Qualcomm's bylaws conferred Mollenkopf with responsibility for the "general supervision, direction and control of the business and the officers of the Corporation."  It is thus not surprising that Mollenkopf was one of the first individuals approached by Broadcom's representative about a potential combination between Broadcom and Qualcomm, attending meetings with Broadcom CEO Tan and director Kenneth Hao on August 4, 2016 and again on September 6,

2016.  In early 2017, Tan called Mollenkopf directly to again express Broadcom's interest in merging with Qualcomm, a matter Mollenkopf initially dismissed but later stated he would consider.  On November 5, 2017, Tan reached out to Mollenkopf to inform Qualcomm of Broadcom's intent to make a bid for Qualcomm.  Tan called and left a voicemail and texted Mollenkopf on November 13, 2017, to further discuss Broadcom's proposal.  Mollenkopf received additional correspondence regarding the merger proposal directly from Tan on December 4, 2017, and again met with Broadcom's representatives on February 14, 2018, and February 23, 2018, for further discussion of Broadcom's proposal.

236.   Further, as a member of the Board of Directors, Mollenkopf received each of Broadcom's official communications concerning its attempt to acquire Qualcomm, was present at the Board meetings in which Qualcomm's response was discussed (there were at least nine such by February 9, 2018), and voted to reject each of Broadcom's offers.  As such, Qualcomm could not have unilaterally initiated the secret CFIUS review – designed to operate as a "poison pill" to prevent the merger – without Mollenkopf's knowledge and approval.

237.  Mollenkopf was also directly involved in discussions with CFIUS members.  For example, on February 20, 2018, the same day that Qualcomm's Board told investors that "[w]e remain open to continued discussions if a suitable proposal is presented," Mollenkopf met with CFIUS Chair and Treasury Secretary Steven Mnuchin.

238.   In fiscal year 2017, Mollenkopf received approximately $11.6 million in his role as CEO.

### 2. Rosenberg

239.   Defendant Rosenberg was Qualcomm's Executive Vice President-General Counsel during the Class Period.  In that role, Rosenberg was "responsible for overseeing Qualcomm's worldwide legal affairs including litigation, intellectual property and corporate matters.  Qualcomm's Government Affairs, Internal Audit and

Compliance organizations also report[ed] to him." Rosenberg would thus have had direct insight into – if not ultimate approval over – the Company's hiring of external legal counsel to assist with the Broadcom proposal and on CFIUS issues and knowledge of the information provided to CFIUS about the Broadcom proposal.

240. Rosenberg was also the Corporate Secretary, and in such capacity attended the Company's Board meetings, including those during which the Broadcom proposals were discussed. In addition to attending relevant Board meetings, Rosenberg was also a Qualcomm representative at a meeting with Broadcom to discuss a potential transaction on February 14, 2018. Accordingly, Qualcomm could not have unilaterally initiated the secret CFIUS review – designed to operate as a "poison pill" to prevent the merger – without Rosenberg's knowledge and approval.

### 3. Jacobs

241. Defendant Jacobs was Qualcomm's Executive Chairman and Chairman of the Board during the Class Period, as well as the Company's former CEO and the son of its co-founder, Irwin Jacobs. As Executive Chairman, Jacobs presided over Board meetings but also served in an executive management capacity. During fiscal year 2017, Jacobs received approximately $9.3 million in compensation from Qualcomm.

242. Not only did Jacobs speak for the Board in communications with Broadcom and Hock Tan about a potential acquisition (*e.g.*, ¶¶ 137, 157-159), he also was one of the Qualcomm representatives at the in-person meetings with Broadcom on February 14, 2018, and February 23, 2018. Given Jacobs' role at the Company in general and in the merger negotiations in particular, Qualcomm could not have unilaterally initiated the secret CFIUS review – designed to operate as a "poison pill" to prevent the merger – without his knowledge and approval.

### 4. Horton

243. Defendant Horton was the Presiding/Lead Independent Director at Qualcomm during the Class Period, as well as a member of the Board's Governance

Committee.  In addition to attending the Board meetings at which Broadcom's proposals were discussed and responses evaluated, Horton's role as Presiding Director required him to act as the principal liaison between the independent directors, the Chairman, and the Chief Executive Officer; collaborate with the Chairman and the Chief Executive Officer, as well as independent directors, in developing agendas for Board meetings; and coordinate with independent directors and management to affirm that appropriate briefing materials were provided to directors sufficiently in advance of Board meetings to allow for proper preparation and participation in meetings.

244.  As stated in Defendant Jacobs' February 26, 2018 letter to Hock Tan, Horton was responsible for leading Qualcomm in negotiations with Broadcom.  For example, Horton represented Qualcomm at meetings with Broadcom to discuss a potential transaction on February 14, 2018, and February 23, 2018, in addition to attending at least nine Board meetings addressing Broadcom's proposals prior to that point.  The following week, on February 20, 2018, Horton held himself out as fully knowledgeable about the deal, speaking publicly about Broadcom's proposals on an episode of CNBC's "Squawk on the Street" and asserting that "regulatory certainty has not been sufficiently met."  Given Horton's role position as lead negotiator in negotiations with Broadcom, Qualcomm could not have unilaterally initiated the secret CFIUS review – designed to operate as a "poison pill" to prevent the merger – without his knowledge and approval.

## B.    The Unprecedented Nature of Defendants' Actions Supports an Inference of Scienter

245.  Defendants understood that secret, unilateral, pre-deal requests for CFIUS review of a proposed transaction were, as a former CFIUS member later put it, "Halley's Comet unusual."  As explained in ¶¶ 103-113, typically both parties to a deal seek CFIUS approval jointly, and only after they have reached a binding agreement. In Qualcomm's case, not only did it covertly file for CFIUS review and argue *against* approval of any transaction, but it also hid that fact from Broadcom *throughout the*

*companies' negotiations*.   It was not until CFIUS revealed that Qualcomm had initiated the review in its March 5, 2018 Interim Order that an outraged Broadcom became aware that Qualcomm intended to use CFIUS review as a *de facto* poison pill.

246.   Qualcomm's unilateral initiation of CFIUS review was also highly unusual in that it was done before the parties even had a deal agreement for the Committee to review.   The move was so unprecedented, in fact, that The Wall Street Journal reported on March 1, 2018, that members of CFIUS were debating internally whether or not they even had the ***right*** to subject the proposed transaction to scrutiny before a deal was officially reached.[8]   Further highlighting the rarity of such actions, Covington & Burling's website now touts media coverage identifying Qualcomm's early and defensive CFIUS filing as "an 'extraordinary intervention' using 'an unusual strategy.'"

247.   Because of the novelty of Qualcomm's use of CFIUS review as a takeover defense, investors had no expectation that Defendants would take such an action, and Defendants knew as much when making their materially misleading statements alleged in *supra* Section IV.   Defendants knew, for example, when repeatedly making statements suggesting that they were "open" to reaching an agreement with Broadcom (¶¶ 212, 214, 217, 228), that they had in fact lobbied politicians and submitted detailed argument to CFIUS urging it to halt the deal on national security grounds.   Such actions directly contradicted Defendants' repeated affirmations to Qualcomm shareholders throughout the Class Period that they were negotiating in good faith with Broadcom to determine if a deal could be reached at a fair price.

---

[8]   *See* Kate O'Keefe, Ted Greenwald, Stu Woo, *Broadcom's Bid for Qualcomm Ignites Debate Within Administration*, The Wall Street Journal (Mar. 1, 2018, 4:12 PM), https://www.wsj.com/articles/broadcoms-bid-for-qualcomm-ignites-debate-within-administration-1519938656.

**C.** **Defendants Were Motivated to Conceal Qualcomm's Unilateral Pre-Deal CFIUS Submission**

**1.** **Defendants Knew They Would Lose a Proxy Contest to Broadcom**

248. Defendants desperately did not want Broadcom to acquire Qualcomm, but with no other poison pill to bring to bear, knew that they would lose control of the Company if the Broadcom proxy contest were allowed to proceed to a vote. The Company had performed poorly over the past several years, with net income plunging 57% in fiscal year 2017, high-profile lawsuits with Apple, Samsung, and government investigations in several countries regarding its allegedly illegal business practices and antitrust violations driving up costs and generating negative publicity and billions of dollars in fines. ¶¶ 2-3, 45-51. Media and market analysts reported concerns with current Qualcomm performance and leadership[9] and skepticism that Qualcomm management could fend off a slate of qualified Broadcom directors, *e.g.*:

- ***Morningstar Equity Research, November 3, 2017***: "We view Qualcomm's stewardship of shareholder capital as Standard. . . . Qualcomm's ability to navigate the numerous regulatory challenges has had its share of ups and downs under Mollenkopf. . . . Additional inquiries, especially in South Korea and the U.S., also lead us to question whether management can appropriately steer Qualcomm through troubled waters."

- ***Bloomberg, November 3, 2017 (quoting Sanford Bernstein & Co.)***: "A change of management at Qualcomm might help resolve the dispute with Apple more quickly, and thereby make Qualcomm's licensing and chip businesses more valuable[.]"

- ***RBC Capital Markets, November 13, 2017:*** "[C]an QCOM management that has overseen severe underperformance and been unable to resolve key disputes turn the ship or do shareholders put faith in Hock and take the exit? At the right price ($80?) we think investors would choose the AVGO option."

---

[9] As reported by The New York Times, Defendant Jacobs in particular was associated with some of Qualcomm's largest failures, "including a plan for broadcast cellular technology called Mediaflo and a technology for mobile-device displays called Mirasol." Don Clark, *Qualcomm's Ex-Chairman to Leave Amid Plans to Buy Company*, The New York Times (Mar. 16, 2018), https://www.nytimes.com/2018/03/16/technology/qualcomm-taking-company-private.html.

- **_William Blair, December 11, 2017_:** "In our opinion, Broadcom is winning the battle to get shareholders on its side by controlling the narrative and portraying Qualcomm as unwilling to negotiate. . . . We reiterate our belief that Broadcom will ultimately be successful in its pursuit of Qualcomm."

249. At the same time, Broadcom's proposal was attractive to many investors, as demonstrated by the 12.71% bump in Qualcomm's stock price when Bloomberg reported rumors of a potential Broadcom bid on November 3, 2017. Indeed, Broadcom's original proposal represented a price premium for shareholders of almost 30%, an amount that increased to 44% by the time Broadcom issued its final proposal for $79 per share. Broadcom had also been extremely successful over the preceding years, increasing its stock price approximately 350%; it thus presented an attractive alternative to Qualcomm's continued lackluster performance.

250. Then, as the March 6, 2018 shareholder meeting approached, Defendants received still further indication that Broadcom's bid was likely to succeed. Shareholder advisory services Glass Lewis and ISS recommended that investors elect the majority, if not all, of Broadcom's slate of directors. Early shareholder vote totals indicated that stockholders were likely to vote for a majority of Broadcom's nominees, and TechCrunch reported that Mollenkopf and Jacobs received the _fewest_ early votes of any of the director nominees. ¶¶ 191-193.

251. Still, Defendants knew that if shareholders found out they were attempting to shut down the popular and potentially lucrative deal, the proxy contest would be even more likely to go Broadcom's way. Management sponsorship (or initiation) of takeover defenses is important to and disfavored by investors, as such defenses are often designed to entrench current management at the expense of investors' preferences. And as discussed in _infra_ Section VII.A, research has shown that the existence of management-sponsored takeover defenses at a company is correlated with lower shareholder value. Defendants knew the issue was important to investors from their experience at Qualcomm and other publicly-traded companies: first, Qualcomm's

1
2
3
4
5

previous takeover defense mechanism – its Rights Agreement – was not renewed in 2015 as part of shareholder-negotiated reforms, while all of the Defendants held prominent management roles; and second, the SEC and Delaware law (under which Qualcomm is incorporated) have also long recognized that full disclosure of the purposes and effects of defensive measures is of actual significance to shareholders.

6
7
8
9
10
11
12
13

252.   As Dow Jones Institutional News explained on March 6, 2018, upon discovery that Qualcomm had filed for CFIUS review, "this latest gambit in Broadcom's hostile bid for Qualcomm could end up creating more votes to change directors and undermining the credibility of Qualcomm management[.]" (¶ 177).[10]   In sum, Defendants understood that with no traditional "poison pill" available to Qualcomm to prevent a takeover, they needed a creative approach to ensure the imminent proxy contest did not happen – and they could not let shareholders find out about their maneuvering behind closed doors.

14
15

**2.   Defendants Knew That Initiation of CFIUS Review Would Delay a Vote on Broadcom's Director Nominations, If Not Halt the Deal Altogether**

16
17
18
19
20
21
22

253.   Defendants understood that initiating a pre-acquisition agreement CFIUS review presented their best opportunity to prevent Broadcom's takeover via proxy contest.  Broadcom had announced an intention to redomicile to the United States in November 2017, and announced on January 22, 2018, that it expected to complete the redomiciliation process by May 6, 2018.   Once Broadcom completed its redomiciliation to the United States, there was no guarantee that it would be subject to CFIUS review at all, as it would no longer be a foreign company.  Indeed, Defendants

23
24

25
26
27
28

[10]      Of course, this is ultimately what happened when it was revealed that Qualcomm had filed for CFIUS review.  On March 15, 2018, ISS recommended that Qualcomm shareholders still vote for Broadcom's slate of directors – even though the deal was blocked – as a symbolic vote of protest against Qualcomm management's actions. ¶ 194.  Ultimately, the majority of Qualcomm's unopposed incumbent directors failed to receive a majority of shareholders' votes, including Mollenkopf.  ¶ 195.

knew that the market did not believe that CFIUS was a real risk for this reason; both financial analysts and media outlets were reporting as much.  ¶¶ 11-12, 117-123.

254.  By filing unilaterally and heavily lobbying for CFIUS review, Defendants were able to draw the attention of CFIUS, the Trump administration, and members of Congress to the transaction and ultimately persuade them to block the deal.  Defendants were desperate to obtain CFIUS review because they understood that even if CFIUS review did not result in the deal being blocked altogether (their ideal result), CFIUS review could still prevent the Company's stockholder meeting scheduled for March 6, 2018 – at which stockholders would decide Broadcom's proxy contest – from going forward.  Defendants hoped that with the extra time they might be able to turn shareholder sentiment against a Broadcom deal.

255.  Further supporting an inference that Defendants purposely sought to use early CFIUS review to block Broadcom's takeover bid is that, less than a day after Qualcomm received CFIUS's March 5 Interim Order delaying the March 6, 2018 meeting by 30 days, CFIUS modified its order.  Rather than simply postponing the meeting, which would have required Qualcomm to stop accepting and counting proxies and change the date of record for voting shareholders, CFIUS's new order permitted Qualcomm's meeting to be opened, and then adjourned – an alteration that meant that the shareholders permitted to vote would remain the same (*i.e.*, stockholders of record as of January 8, 2018) despite the delayed meeting.  This in turn meant that, rather than starting over with additional voters, Qualcomm's incumbent directors would be able to continue their efforts to persuade the same group of shareholders to vote against Broadcom's proposal – effectively buying themselves more time.

256.  Finally, Covington & Burling LLP, Qualcomm's legal counsel in its CFIUS petition, has ***admitted*** that Qualcomm hired it to prevent Broadcom's hostile takeover.  In an article entitled "Covington Secures Presidential Order Protecting Qualcomm From Hostile Takeover" on the firm's website, the firm touts the fact that "Covington secured a U.S. Presidential order compelling Broadcom Limited to

1   'immediately and permanently abandon' its proposed hostile takeover of its client

2   Qualcomm, Inc."  Covington & Burling also admits that preventing the Broadcom

3   takeover had been Qualcomm's goal in seeking CFIUS review all along, describing the

4   March 13, 2018 Presidential Order ending Broadcom's proxy contest as "mark[ing]

5   ***total victory*** for Qualcomm ***in its bid to remain an independent company***."

6        257.   Covington & Burling's unqualified admission that Qualcomm intended to

7   kill the deal from the start stands in dramatic contrast with Defendants' public

8   representations during the Class Period that it was, *e.g.*: "committed to exploring all

9   options for maximizing shareholder value," including a Broadcom transaction (¶¶ 137,

10  203); that Broadcom's February 5, 2018 proposal "warranted engagement" and was in

11  fact being considered (*e.g.*, ¶ 206); that as of February 26, 2018, Qualcomm was

12  willing to propose a draft merger agreement that, "if acceptable to Broadcom . . . would

13  resolve all issues between the two companies other than price" (¶¶ 157, 224); and that

14  Defendants had made "repeated[] and genuine[] attempt[s] to engage with Broadcom

15  on issues including price, regulatory and other closing certainties . . . [and their]

16  attempts to find a path to a deal" (¶¶ 169, 230).

17      **D.   Defendants' Careful Concealment Supports an Inference of Scienter**

18       258.   Defendants knew from their experience with Qualcomm's previous

19  Rights Agreement shortly before the Class Period – when each of the Individual

20  Defendants already held a key position of authority at Qualcomm – what a "poison

21  pill" was, and that the availability and use of takeover defenses, like their secret,

22  unilateral, and pre-deal negotiations with CFIUS, would be material to investors.  ¶ 46.

23  Defendants were also aware, given their extensive business experience and history with

24  acquisitions (*see* ¶¶ 38-41, 123 n.6), that once a credible takeover bid is announced,

25  the target company's stock price is primarily a function of investors' assessment of the

26  likelihood of the deal closing.  As discussed further in *infra* Section VII.A, actions like

27  Defendants' that lower the probability of deal completion (and thus lower the

28  probability of receiving a takeover offer premium) are critical to stock price and

investor decision making.  Defendants' careful concealment of Qualcomm's initiation of CFIUS review from the market and its deal counterparty, despite that knowledge, supports a reasonable inference that Defendants acted with scienter.

259.  First, as mentioned above, Defendants failed to inform Broadcom or Qualcomm's investors at any stage of the parties' negotiations that it had initiated a pre-deal CFIUS review – a decision presenting a stark contrast to Defendants' repeated professions that they were negotiating with Broadcom in good faith to see if a fair deal was achievable.  As described in *supra* ¶¶ 25 and 172, Broadcom was stunned by the revelation of Qualcomm's secret, unilateral, and pre-deal submission to CFIUS, stating in a March 5, 2018 press release:

> Broadcom was informed on Sunday night that on January 29, 2018, Qualcomm secretly filed a voluntary request with CFIUS to initiate an investigation, resulting in a delay of Qualcomm's Annual Meeting 48 hours before it was to take place.  This was a ***blatant, desperate act by Qualcomm to entrench its incumbent board of directors*** and prevent its own stockholders from voting for Broadcom's independent director nominees.

260.  Broadcom's press release further emphasized that "[it] is ***critical*** that Qualcomm stockholders know that Qualcomm ***did not once mention*** submitting a voluntary notice to CFIUS in any of its interactions with Broadcom to date . . . ***an intentional lack of disclosure – both to Broadcom and to its own stockholders***."  It is notable that in response to Broadcom's condemnation of Defendants' secret initiation of CFIUS review, Qualcomm ***did not even attempt*** to refute the allegation.  Instead, Qualcomm's March 5, 2018 press release responding to Broadcom's statement contained only further misdirection, mischaracterizing Broadcom's reaction as pretended "surprise" at the existence of CFIUS review (which Broadcom had known about for several weeks) rather than addressing Qualcomm's concealment of its role in bringing that review about in the first place.

261.   Second, it is highly suspicious that although Qualcomm reached out to preeminent CFIUS-navigation lawyers Covington & Burling[11] in early January 2018, and though Qualcomm prominently disclosed in numerous press releases and proxy solicitation materials[12] that it had consulted with three other nationally-recognized law firms (DLA Piper, Cravath, Swaine & Moore, and Paul Weiss) in connection with the Broadcom proposal, Qualcomm notably did ***not*** publicly disclose that it was working with Covington & Burling until a firm partner appeared on the CFIUS's March 5, 2018 Interim Order.

262.   Third, throughout the Class Period, as described in *supra* Section IV, most of Defendants' statements about the "material" regulatory risks that Broadcom would face in closing an acquisition of Qualcomm were deliberately generic, half-truth statements about the possibility that there ***could*** be difficulty obtaining regulatory approval of a Broadcom-Qualcomm transaction.   The ***same day*** that Qualcomm submitted a request for CFIUS review, for example, Qualcomm released a video in which Defendants attempted to persuade shareholders to vote against Broadcom's slate of directors (and by proxy, Broadcom's hostile takeover) by highlighting the claimed uncertainty that the deal would be permitted to close.   ¶¶ 196-199.  Mollenkopf told investors that "there are some questions about deal certainty and regulatory approval," and Rosenberg stated "[t]he Broadcom-proposed acquisition will be subjected to very, very close scrutiny by well over a dozen potential agencies. . . . because of the complexity of the two companies' businesses, because of the enormous overlap in the two companies' technologies and businesses, and because of the global nature of our businesses." *Id.*  In a February 9, 2018 investor presentation that Qualcomm filed with

---

[11]    The firm had received numerous accolades for its CFIUS practice at the time that Qualcomm obtained their services in January 2018. *See* https://www.cov.com/en/practices-and-industries/practices/regulatory-and-public-policy/cfius (last visited May 6, 2020).

[12]    *See, e.g.*, Qualcomm press releases dated February 5, 2018, February 8, 2018; Schedule 14(A) filed with the SEC on February 9, 2018, at 19.

the SEC, Qualcomm told investors that though "[r]egulatory approval [was] highly uncertain; at least [an] 18 month process" and Broadcom's initial proposal had "so dramatically undervalued the business and carried such regulatory uncertainty that engagement was not warranted," its February 5 proposal "while not sufficient, . . . warranted engagement." ¶¶ 141, 206. These statements gave the market the deliberate impression that Qualcomm was approaching negotiations with open minds and that the improved Broadcom proposal had reduced prior regulatory risk. Nowhere did Qualcomm disclose it was currently engaging in secret, concerted efforts to block the deal through CFIUS.

263. Fourth, when Defendants did make specific statements regarding the regulatory risks prophesied, they consistently misdirected investors (and Broadcom) to antitrust concerns, *not* CFIUS approval. In a February 6, 2018 release filed on Schedule 14A with the SEC entitled "*Qualcomm Sets the Record Straight on Regulatory Challenges Faced By Broadcom*," Qualcomm discussed the regulatory risks associated with the potential transaction at length. The release gave only a passing mention to "potentially serious national security concerns," and addressed CFIUS solely in the context of what Qualcomm presented as the real regulatory hurdle – antitrust laws. According to Qualcomm, Broadcom would likely not be able to satisfy antitrust regulators by divesting assets from a combined Qualcomm-Broadcom because likely buyers would be foreign, and CFIUS would need to approve the entity that Broadcom was selling to. Qualcomm notably omitted any mention that CFIUS was already reviewing the potential transaction in its release – which even included a section tailor-made for such a disclosure titled, "What is next from a regulatory standpoint?" This was just one of many times Qualcomm emphasized antitrust

concerns as the basis for its assertion that a Broadcom acquisition would be unable to timely obtain the necessary approvals, if at all.[13]

264.   In sum, Defendants made a series of carefully calculated decisions to present **some** aspects of the regulatory risk a Broadcom acquisition faced in arguing to shareholders that they should vote for Qualcomm's slate of incumbent directors, all the while knowing that regulatory approval and possible takeover defenses were material considerations in shareholders' evaluation of the proposed deal.   They deliberately disclosed **some** participants in its response to Broadcom's proposals – all the while knowing that Qualcomm had in fact sought out highly experienced CFIUS counsel and taken affirmative steps to ensure that stringent national security review **would** be undertaken.   Defendants, while insisting they were open to reaching a deal with Broadcom, withheld from both investors and Broadcom's negotiation partner that Qualcomm had in fact taken an unprecedented step to shut the door on the possibility of any transaction with Broadcom closing.   Accordingly, Defendants knew, or were at a minimum deliberately reckless to the fact, that they were misleading investors when they spoke of their openness to the transaction under the right price and conditions or the **possibility** that any deal could be reviewed or delayed, and that they had not provided material facts necessary for investors to understand the actual likelihood a deal would be able to obtain regulatory approvals.

## VII.   LOSS CAUSATION/ECONOMIC LOSS

265.   Defendants' alleged unlawful conduct caused the losses incurred by Plaintiffs and the Class.   The market for Qualcomm's common stock was open, well-developed, and efficient at all relevant times.   Throughout the Class Period, Qualcomm's common stock traded at artificially inflated prices as a direct result of

---

[13]   On February 22, 2018, for example, Qualcomm issued a press release titled, "*Former Senior Government Officials and Leading Antitrust Experts from Around the World Describe the 'Material Risks' Associated with Broadcom's Effort to Acquire Qualcomm*," which stated that "[b]ased on similar complex cross-border deals, the expected regulatory approval process is likely to take 18+ months[.]"

Defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiffs and other members of the Class purchased or otherwise acquired Qualcomm common stock relying upon the integrity of the market price for Qualcomm's common stock and market information relating to Qualcomm, and have been damaged thereby.

266. When the relevant truth became known and/or the materialization of the risk that had been concealed by Defendants occurred, the price of Qualcomm's common stock declined immediately and precipitously as the artificial inflation was removed from the market price of the stock, causing substantial damage to Plaintiffs and the Class. The economic loss, i.e., damage, suffered by Plaintiffs and other members of the Class was a direct result of: (i) Defendants' misleading statements regarding the regulatory risk associated with the Broadcom deal and Qualcomm's willingness to negotiate with Broadcom, as well as their concealment of the affirmative efforts Qualcomm had undertaken to prevent regulatory approval for the deal; and (ii) the subsequent decline in the value of Qualcomm's common stock price as the relevant truth was revealed and/or the concealed risks materialized in a series of partial adverse disclosures on March 5, March 6, and March 12, 2018.

267. As detailed below, the information disclosed on March 5, 2018, March 6, 2018, and March 12, 2018, was both related to and the foreseeable consequence of the relevant truth that Defendants misrepresented and concealed from investors during the Class Period – namely, that they had undertaken a secret, highly unusual defensive measure in an attempt to get CFIUS to kill the Broadcom deal. The stock price declines immediately following the March 5, 2018, March 6, 2018, and March 12, 2018 disclosures were substantially, if not wholly, caused by the revelation of the relevant truth and/or the materializations of the risks that had been concealed by Defendants' fraud. Indeed, each was statistically significant at a 95% or greater confidence level, after controlling for market and industry factors.

**A.     Information Regarding Hostile Takeover Bids and Defenses Is Important to Investors in a Target Company**

268.   The facts surrounding Defendants' secret Class Period defensive measure were highly material and significantly likely to alter the total mix of information available to Qualcomm investors when deciding to purchase or sell Qualcomm common stock.

269.   It is well-established in academic literature that a takeover bid is highly material to investors in the target company and significantly affects a target company's stock price.  This is because an acquiring company in an acquisition or hostile takeover generally offers a significant premium, or a price above the market price, for a target company's shares.   For example, Robert F. Bruner, in APPLIED MERGERS & ACQUISITIONS, wrote that "[t]arget firm shareholders enjoy returns that are significantly and materially positive."   Bruner further summarized findings from 25 academic studies, concluding that they "reveal returns that are material and significant, despite variations in time period, type of deal (merger vs. tender offer), and observation period.   In short, the typical M&A deal or successful hostile takeover delivers a premium return to target firm shareholders."  Likewise, in their 2013 article in the JOURNAL OF LAW AND ECONOMICS, Matthew D. Cain and David J. Denis reported an average initial takeover premium of 36.2%.

270.   After a takeover offer for a target company has been announced, the principal factors influencing the target company's stock price are: (i) the offer price; (ii) the probability that the target will actually be acquired (or get derailed by a rejection from the target or a regulator); and (iii) the probability that the bid will be increased or a better bid will emerge.  With a credible bid on the table, "non-deal" information about the target company becomes less important.  This is because if the offer is ultimately successful, investors will receive the bid price, rather than whatever future value would be achieved under incumbent management based on the target company's fundamentals.  As a result, "non-deal" information is only relevant to the extent the

outstanding bid is expected to fail (or could cause the deal to become less likely to close).

271.   D'Angelo formalized these concepts in the following formula for valuing target companies once a credible takeover offer has been made:

> [C]onsider the post-offer market price as a probability-weighted average of the values expected to accrue to target stockholders under different outcomes:

$$P_M = \pi_A P_A + (1 - \pi_A)P_S \qquad (1)$$

> where:

> $P_M$ = the open-market stock price after an offer is announced, but before it expires,

> $\pi_A$ = the market-assessed probability the target will ultimately be acquired (by the current or another bidder),

> $P_A$ = the market's expectation of the ultimate acquisition price conditional on the current bid, and

> $P_S$ = the post-offer expiration market price expected to obtain if the target remains independent, which capitalizes target stockholders' expected values under all other perceived outcomes.[14]

272.   In other words, once a takeover offer has been made for a target company, that company's stock price is a function of investor expectations about the offer premium and the probability or likelihood that the takeover bid will be successfully completed.  For that reason, while a takeover bid is outstanding, information that sheds light on the likelihood that a takeover bid will be successfully completed is highly material to investors in the target company.

273.   Here, information about Broadcom's takeover bid for Qualcomm, and the likelihood of the deal closing, were unquestionably material to Qualcomm's shareholders.  News of Broadcom's intention to bid $70 per share for Qualcomm

---

[14]   Linda Elizabeth DeAngelo, *Equity Valuation and Corporate Control*, 65 THE ACCOUNTING REVIEW, at p. 97 (1990) (footnote omitted).

leaked publicly on November 3, 2017.  At that time, Broadcom's $70 bid represented a premium of more than 27% on Qualcomm's $54.84 November 2, 2017 closing share price.  In response to this news, Qualcomm's stock price increased by $6.97, or 12.71%, to close at $61.81 on November 3, 2017.

274.   In addition, after controlling for market and industry factors, Qualcomm's November 3, 2017 stock price increase was statistically significant at the 99% level, with a company-specific abnormal return of 12.32% and an abnormal dollar change of $6.76 per share.  Qualcomm's abnormal stock price increase following the news of Broadcom's bid equated to a common equity market capitalization gain of approximately $9.96 billion.

275.   Market analysts also confirmed after Broadcom's bid became public that Qualcomm's stock price was primarily being driven by information regarding Broadcom's offer.  For example, on February 1, 2018, analyst BMO wrote that: "QCOM reported strong December quarter results, but weaker guidance, particularly on the chip side.  Regardless, we believe investor sentiment is largely being driven by the pending takeover attempt by Broadcom . . . with the March 6 shareholder vote quickly approaching and that the 'buyout offer from [Broadcom]' was a 'key catalyst' that 'will overshadow most other catalysts.'"

276.   Given that a target company's stock price is a function of the likelihood of the deal closing, if a target company takes actions that lower the probability of deal completion (and thus lower the probability of receiving a takeover offer premium), then those actions would be expected to lower the stock price of the target company.  To the extent that those actions are concealed from the investing public – as here – the target company's stock price becomes artificially inflated because investors are unable to properly assess the probability that the deal will be completed.

277.   One of the ways that hostile takeover targets can lower the probability of being acquired is through the use of hostile takeover defenses, such as poison pills or staggered boards.  These hostile takeover defenses can alter the likelihood of a target

company being acquired, and as a result, the availability and use of these hostile takeover devices is highly material information to investors. For this reason, the SEC explicitly requires companies to disclose in proxy statements "when management sponsors anti-takeover proposals and other devices to insulate management from removal." *In Re Disclosure in Proxy & Info. Statements*, SEC Release No. 15230, 1978 WL 186739, at *2 (Oct. 13, 1978).

278. Academic research likewise indicates that companies' valuations are impacted by their use of hostile takeover defenses (and their resulting susceptibility to a hostile takeover attempt). This is because inefficient management can be replaced via hostile takeover, thus increasing the overall value of a poorly-run company. As an article in the Journal of Political Economy explained: "Share price, or that part reflecting managerial efficiency, also measures the potential capital gain inherent in the corporate stock. The lower the stock price, relative to what it could be with more efficient management, the more attractive the take-over becomes to those who believe that they can manage the company more efficiently. And the potential return from the successful take-over and revitalization of a poorly run company can be enormous." Likewise, an article in the Stanford Law Review documented that when managers resist hostile takeover attempts through a staggered board takeover defense strategy, companies are able to remain independent, but at the expense of managerial entrenchment and ultimately lower value for shareholders: "Remaining independent makes shareholders worse off compared with the scenario in which the hostile bid is accepted. Furthermore, we find that [effective staggered boards] do not provide sufficient countervailing benefits in terms of increased premiums and may even provide no such benefits at all."

279. A 2017 study published in the Journal of Financial Economics similarly determined that:

> [F]irm value is positively associated with susceptibility to hostile takeovers . . . . Shareholders thus appear to value the disciplinary market for corporate control, and the secular decline in hostile takeover rates in

recent years could perpetuate agency problems related to entrenchment…To the extent that firms deploy similar defenses to thwart shareholder activism, this trend underscores the relation between takeover defenses and corporate governance.

Further, the article concluded that "[t]he external threat of takeover is an important corporate governance mechanism[,]" which is "consistent with studies that show that legal environments in which managers are insulated from takeovers are associated with a negative impact on shareholder value." As a result, firms may leverage the legal and regulatory environment to resist hostile takeovers, and these actions would be expected to have value-relevant impacts on shareholder value." Similarly, a 2003 article in the Journal of Political Economy reported that "Corporate governance mechanisms—such as takeover threats, large shareholders, or effective boards—may reduce this moral hazard problem. For example, if managers fear a hostile takeover and the resulting job loss, they may more closely pursue shareholder interests."

280. Here, Defendants were well aware of the importance Qualcomm's investors placed on information regarding hostile takeover defense mechanisms. For example, when the Company amended and restated its Rights Agreement which contained a poison pill hostile takeover defense on September 26, 2005, it disclosed the same to investors in a Form 8-K filed with the SEC on September 30, 2005. And in 2015, facing shareholder pressure, the Company let its shareholder Rights Agreement expire, which had until then provided Qualcomm's directors with a poison pill to fend off hostile takeovers. Defendants contemporaneously disclosed these facts in a Form 8-K filed with the SEC on July 22, 2015.

281. In addition, Defendants understood the importance shareholders placed on having control over the Board. Shortly after its poison pill expired in 2015, Qualcomm adopted a shareholder "proxy access" right, which enabled shareholders to nominate up to 20% of the Board's directors. However, in early January 2016, shareholders further proposed expanding proxy access to 25%. Qualcomm barely managed to defeat this proposal during the 2016 annual shareholder meeting,

1  prevailing on a narrow vote only after assuring its shareholders that the 20% access

2  right was "meaningful," "well-considered," and "str[uck] the appropriate balance

3  between promoting stockholder rights and adequately protecting the best interests of

4  all of our stockholders."

5      282.   In sum, it is clear that information regarding Broadcom's takeover offer

6  for Qualcomm, and any defenses thereto, were highly material to Qualcomm's

7  shareholders.

8   **B.   Defendants' Undisclosed CFIUS Hostile Takeover Defense Was**
9        **Important to Qualcomm's Investors**

10     283.   Historically, CFIUS review was not viewed as a hostile takeover defense

11  routinely available to firms.  Over the years, however, a handful of researchers have

12  noted the potential for CFIUS review to be abused for this purpose.  For example, a

13  1993 article in The International Lawyer noted explained:

14  ABUSE OF EXON-FLORIO AS A HOSTILE TAKEOVER DEFENSE

15      Targets of a hostile takeover by a foreign company have attempted to
16      invoke Exon-Florio as a defense against the takeover, an action
        sometimes referred to as the "Pentagon Ploy." If successful in invoking
17      Exon-Florio, the target will cause a minimum delay of thirty days and
        possibly up to ninety days if the CFIUS undertakes an investigation. Of
18      course, if the President decides to block the takeover, the target will have
19      succeeded definitively in defending against the acquisition.

20     284.   Researchers have also documented how, in 1990, the Norton Company

21  engaged in a political campaign to lobby members of Congress and manipulate the

22  CFIUS process in the face of a hostile takeover threat:

23      In 1990, only two years after Exon-Florio became law, 119 members of
24      Congress wrote to the president asking for an investigation of the UK
        firm British Tire and Rubber's (BTR) proposed hostile acquisition of the
25      Norton Company, based in Massachusetts. The letter stated that "we do
        not believe that any take over of Norton would be in our economic
26      security or national security interest" (Karim 1995). These members of
        Congress, encouraged by Norton, suddenly changed their tune when a
27      French company, Compagnie de Saint Gobain, offered Norton $15 more
28      per share.  Clearly, Norton manipulated the CFIUS process to its

> advantage, because no one raised any national security concerns over the French acquisition. It is hard to imagine how a British acquisition did not. There were no national security issues with the proposed British acquisition; Norton simply did not want to be acquired by BTR, and used a political campaign toward CFIUS to prevent it.

Nevertheless, the use of CFIUS review as a hostile takeover defense is exceedingly rare.

285.   At the time that Broadcom's bid for Qualcomm was launched, however, Defendants had been stripped of the Company's poison pill defense.  Defendants thus had to resort to more creative solutions to ensure their entrenchment.  The result was Defendants' January 29 unilateral CFIUS notice, as well as their continued lobbying of CFIUS and the Trump administration throughout the Class Period.  In fact, news reports following the deal's blockage indicate that Qualcomm had engaged in multiple political efforts in conjunction with its notice to CFIUS.  For example, Bloomberg reported:

> As Broadcom's team scrambled to get up to speed in Washington, one thing became quickly apparent: Qualcomm had beaten them to it. Many of the people that the company tried to hire there were already working for Qualcomm, according to two people close to Broadcom's efforts. Another person familiar with the matter said that Tan [Broadcom's CEO] had refused to spend on lobbying until it was too late. Federal lobbying disclosures for 2017 showing that Qualcomm spent $8.3 million, or roughly 100 times the $85,000 Broadcom spent, appear to support this theory.

286.   Defendants' secret attempts to persuade CFIUS to block Broadcom's bid constituted an undisclosed takeover defense measure akin to a poison pill.  Indeed, as discussed in *infra* ¶ 333, once Defendants' tactics were finally revealed, market commentators and academic researchers repeatedly described Qualcomm as having used CFIUS as an undisclosed "super poison pill," an "antitakeover device," and a "takeover defense against a hostile offer."

287.   Defendants' concealed CFIUS takeover defense strategy negatively impacted the probability that Broadcom's bid for Qualcomm would be successful.  This

information was critical to Qualcomm's investors in evaluating the probability of Broadcom's bid succeeding, the probability that shareholders would ultimately receive the takeover premium offered by Broadcom and, accordingly, the value of Qualcomm's stock.

### C. Defendants' Fraud Caused Significant and Material Declines in Qualcomm's Stock Price

288. The statistically significant stock price declines and negative market reactions to the revelations of relevant truth concealed by Defendants' fraud on March 5, 2018, March 6, 2018, and March 12, 2018, further demonstrate the importance of this information to investors in deciding whether to buy or sell Qualcomm common stock. Indeed, following the alleged corrective disclosures, Qualcomm's market capitalization declined by approximately $9.22 billion. *See infra* ¶ 338.

289. Plaintiffs' expert – Dr. Matthew D. Cain – evaluated the economic importance of Defendants' concealed CFIUS hostile takeover defense. Dr. Cain is a Senior Fellow at the Berkeley Center for Law and Business and a Senior Visiting Scholar at Berkeley Law School, University of California. Dr. Cain delivers guest lectures, participates in academic seminars, and conducts research in various topic areas related to finance, economics, accounting, law, and business. Dr. Cain's research focuses on a variety of topics such as empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and shareholder activism. Dr. Cain also previously held a fellowship with the Harvard Law School Program on Corporate Governance, where he participated in research seminars and related activities. Ex. E, Declaration of Matthew D. Cain, Ph.D. ("Cain Dec."), ¶ 1.

290. Dr. Cain worked at the SEC between 2014 and 2018. During that time, Dr. Cain provided economic analysis and expert witness testimony on behalf of the

SEC in a wide variety of enforcement investigations, settlement negotiations, and litigated cases, including cases alleging accounting fraud, revenue recognition practices, and disclosure violations.  Dr. Cain also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time he assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics including securities violations, revenue recognition practices, and corporate governance issues.  Additionally, while employed at the SEC as a Financial Economist, Dr. Cain continued to work on and publish academic research, and was awarded the Chairman's Award for Economic Research.  Cain Dec. ¶ 2.

291.   Prior to working at the SEC, Dr. Cain was an Assistant Professor of Finance at the University of Notre Dame.  Dr. Cain taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and also conducted empirical research on various finance, legal, accounting, and economic topics. Cain Dec. ¶ 3.

292.   Prior to working at Notre Dame, Dr. Cain received a Ph.D. in Finance from Purdue University in 2007.  Prior to those studies, Dr. Cain worked as an analyst in Debt Capital Markets at National City Bank, where he assisted companies in raising syndicated loans and private placements of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes.  Cain Dec. ¶ 4.

293.   In addition to teaching at Notre Dame and Purdue, Dr. Cain has delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law. Dr. Cain has also presented his research at numerous academic, governmental, and professional institutions.  Cain Dec. ¶ 5.

294.   In forming his opinion regarding the economic impact of the information that Defendants misrepresented and concealed, Dr. Cain relied upon his professional experience as a capital markets analyst who assisted companies in raising financing for acquisitions, as a financial economist and advisor at the SEC who evaluated

companies' disclosures of information to investors, as an academic who has taught M&A courses and published peer-reviewed research on topics including M&A, hostile takeover defenses, and investors' reactions to new information, and as a financial economist who has testified on event studies and the impact of information on stock prices.  Cain Dec. ¶ 37.

295.   After a thorough review of evidence from news stories, analyst reports, academic research studies, and applying his own professional experience in evaluating the importance of information in M&A negotiations and hostile takeover battles, Dr. Cain concluded that:

> It is my professional opinion, informed through my own academic research, teaching experience, industry experience, government regulatory experience, and review of the materials described throughout this declaration, that Qualcomm's takeover defense strategy involving the unilateral request to CFIUS would represent value-relevant information to investors. This information would be expected to affect the probability of deal completion, the takeover premium being offered to Qualcomm's shareholders, and the likelihood of those shareholders receiving such premium. Thus, it was foreseeable that the disclosure of this information would cause Qualcomm's stock price to decline.

Cain Dec. ¶ 52.

296.   In reaching his conclusion, Dr. Cain explained, *inter alia*, that "when a company adopts a hostile takeover defense during a takeover battle, this defense would be expected to reduce the likelihood of deal success.  Given the anticipated takeover premium available to the target company's shareholders, a hostile takeover defense strategy would thus represent value-relevant information to those shareholders."  Cain Dec. ¶ 52.  Likewise, that a company was leveraging CFIUS review as a hostile takeover defense strategy "would be expected to have an impact on the probability of deal completion, and thus the takeover premium to be received by target shareholders.  As a result, this hostile takeover defense strategy would be important to investors in a target company, as it would be expected to impact the value of the target company's stock price."  Cain Dec. ¶ 41.  Dr. Cain concluded that here, "Qualcomm utilized the

CFIUS review process as a hostile takeover defense strategy," and that this information "would have been important to Qualcomm's investors at the time that Qualcomm first requested CFIUS review of Broadcom's proxy solicitation process in connection with its hostile bid."  Cain Dec. ¶¶ 43-44.

**1.    The March 5 and March 6, 2018 Disclosures Were a Foreseeable Result of Defendants' Fraud and Caused Significant Declines in Qualcomm's Stock Price**

297.   On the evening of Sunday, March 4, 2018, Reuters reported that CFIUS had ordered Qualcomm to postpone its annual stockholders meeting by 30 days so that CFIUS could investigate Broadcom's bid for the Company.  On March 5, 2018, before trading hours, Broadcom issued a press release which disclosed that Qualcomm had "secretly filed a voluntary unilateral request for CFIUS review on January 29, 2018." Then, during trading hours on March 5, 2018, Broadcom issued another press release which disclosed:

> Broadcom was informed on Sunday night that on January 29, 2018, *Qualcomm secretly filed a voluntary request with CFIUS to initiate an investigation, resulting in a delay of Qualcomm's Annual Meeting 48 hours before it was to take place. This was a blatant, desperate act by Qualcomm to entrench its incumbent board of directors and prevent its own stockholders from voting for Broadcom's independent director nominees.*

> It is critical that Qualcomm stockholders know that *Qualcomm did not once mention submitting a voluntary notice to CFIUS in any of its interactions with Broadcom to date*, including in the two meetings on February 14, 2018 and on February 23, 2018.

> . . . .

> *Broadcom reiterates that Qualcomm failed to disclose to its own stockholders and to Broadcom that it secretly filed a voluntary unilateral request for CFIUS review on January 29, 2018*. Broadcom's only correspondence with CFIUS was in response to CFIUS inquiries about Broadcom's nomination of directors to the Qualcomm board of directors, and such requests *did not reveal that Qualcomm filed to initiate the CFIUS review on January 29, 2018*.

298.   The revelation of the fact that Qualcomm had requested on January 29, 2018, that CFIUS investigate Broadcom's bid lay bare to the market that Qualcomm was actively seeking to terminate any potential transaction.  On March 5, 2018, also before the market closed, Qualcomm sent a communication to its shareholders, which it included in a Schedule 14A filed with the SEC, advising that:

> Last night we received an Interim Order from the Committee on Foreign Investment in the United States (CFIUS) – an independent governmental body charged with protecting U.S. national security – requiring Qualcomm to delay our Annual Meeting of Stockholders, originally scheduled for tomorrow, March 6.

> CFIUS has instructed Qualcomm to delay our meeting and the election of directors to our Board to allow the agency "the ability to investigate fully Broadcom's proposed acquisition of Qualcomm."

More specifically, Qualcomm announced that to implement the March 4, 2018 Order: "the 2018 Annual Meeting of Stockholders will be opened on March 6, 2018 at 8:00 a.m. Pacific Time and immediately adjourned to April 5, 2018.  There will be no voting or other matters conducted at the meeting."

299.   Qualcomm also filed a same-day Current Report on Form 8-K, disclosing that it had "received an Interim Order" from CFIUS and attaching the March 4 Interim Order.  The March 4 Interim Order confirmed Broadcom's statement that Qualcomm had secretly filed a voluntary notice with CFIUS on January 29, 2018, and thus was seeking a way to terminate the transaction rather than negotiate for a fair price with Broadcom:

### INTERIM ORDER

### Regarding the Proposed Acquisition of Qualcomm, Inc. by Broadcom Limited

**WHEREAS *the Committee on Foreign Investment in the United States ("CFIUS") has received written notification and has initiated a review*** and investigation, pursuant to section 721 of the Defense Production Act of 1950, as amended, 50 U.S.C. § 4565 ("section 721"), of a transaction ("Transaction") involving the takeover of Qualcomm, Inc. ("Qualcomm"), a company organized under the laws of Delaware, by Broadcom Limited ("Broadcom"), a company organized under the laws of Singapore;

**WHEREAS** Broadcom, pursuant to the Transaction, is engaged in a concerted effort to complete a hostile takeover of Qualcomm, including acquiring proxies to elect six new Directors (a majority) to the Board of Qualcomm in order to approve a Proposed Agreement and Plan of Merger (the "Proposed Agreement") that Broadcom filed with the Securities and Exchange Commission (the "SEC") on February 9, 2018, between Broadcom and Qualcomm;

**WHEREAS** CFIUS has determined that the Transaction, ***as described in the notice that Qualcomm submitted to CFIUS dated January 29, 2018***, and the agency notice submitted by the Department of the Treasury dated March 4, 2018 (together, the "Notice"), including the Proposed Agreement or any other potential merger, acquisition, or takeover agreement between Broadcom and Qualcomm constitutes a "covered transaction" for purposes of section 721;

**WHEREAS** CFIUS is undertaking a review and investigation of the effects of the Transaction on the national security interests of the United States, as required by section 721;

***CFIUS has determined, based on information provided to, and analyses by CFIUS agencies to date, that there are national security risks to the United States that arise as a result of, and in connection with the Transaction***, and CFIUS seeks to take necessary actions to provide interim protection and impose conditions that mitigate those risks pending any further action by the President, or by CFIUS, 50 U.S.C. §§ 4565(b)(2)(A), (*l*)(1)(A)[.]

(Some emphasis in original.)

300.   Among other things, the March 4 Interim Order directed that:

1.1 Qualcomm's annual stockholder meeting, including the election of its Board of Directors, shall be delayed from its current scheduled date of March 6, 2018, for a period of 30 (thirty) days. Qualcomm shall hold in abeyance the acceptance or count of any votes or proxies for directors, and shall take no action to complete the election of directors.

1.2 Qualcomm and Qualcomm's Board of Directors, executives, and agents are, while this Order is in effect, hereby prohibited from accepting, or taking any action in furtherance of accepting, Broadcom's proposed merger agreement or any other proposed merger, acquisition, or takeover agreement with Broadcom.

301.   Section 2.4 of the Interim Order provided that the Order could be modified in writing by CFIUS, including upon written request from Qualcomm.  The Interim Order also required Broadcom to provide CFIUS with "five business days' notice

before taking any action toward redomiciliation[.]"  This provision partially revealed the risk that CFIUS could render a decision on Broadcom's bid before it could redomicile and take the transaction out of CFIUS's jurisdiction.

302.   On March 6, 2018, Qualcomm filed a Current Report on Form 8-K, which disclosed the March 5 Letter that Broadcom and Qualcomm had received from the U.S. Department of the Treasury.  The March 5 Letter provided additional information about Qualcomm's involvement in CFIUS's investigation, as well as CFIUS's rationale for delaying the shareholder vote:

> On January 29, 2018, **Qualcomm Incorporated ("Qualcomm") filed a unilateral notice with the Committee on Foreign Investment in the United States ("CFIUS")**, seeking review of Broadcom Limited's ("Broadcom") solicitation of proxies for the purposes of electing a majority of the directors of Qualcomm.
>
> . . . .
>
> **During the time between Qualcomm's unilateral filing and Treasury's agency filing, CFIUS has been communicating with both parties to obtain additional information to inform its decision** on the appropriate path forward in regards to this matter. **It was during this time, and as a result of these communications and additional information, that CFIUS has come to believe that Broadcom's successful hostile takeover** attempt of Qualcomm, including the related stock purchase, proxy contest for the election of six directors to Qualcomm's Board as proposed and selected by Broadcom, Proposed Agreement and Plan of Merger, and any other potential merger between Broadcom and Qualcomm, **could pose a risk to the national security of the United States**.
>
> **CFIUS's assessment thus far includes its review of the information submitted by Qualcomm in its unilateral voluntary notice on January 29, 2018, the parties' responses to questions posed about the potential transaction during the interim period, and the information provided in our multiple phone calls, emails, and meetings with representatives of both Qualcomm and Broadcom**. In addition, our assessment includes the review of letters to CFIUS submitted by Broadcom on February 21, 2018, and March 2, 2018.

303.   The March 5 Letter also discussed Qualcomm in glowing terms that, market commentators later noted, "closely mimics Qualcomm's talking points against the deal[.]"

304.   Further demonstrating how closely CFIUS was hewing to Qualcomm's interests, on March 5, 2018, CFIUS issued the Modification Order that altered its March 4 Interim Order to conform to Qualcomm's disclosures.   Specifically, the March 4 Interim Order required Qualcomm's Annual Meeting to be delayed by 30 days.   Qualcomm, however, announced that in contravention of the March 4 Initial Order it would still open its March 6 meeting, but then would immediately adjourn the meeting until April 5, 2018, without any action.   By doing so, Qualcomm was able to maintain the current record date, thus preventing turnover in the shareholders permitted to vote.   CFIUS promptly modified the March 4 Interim Order to require that the March 6, 2018 Annual Meeting be opened but then adjourned for 30 days without any substantive action.   In doing so, CFIUS provided Qualcomm's incumbent directors – who, as discussed below, were significantly behind in the voting count – with 30 additional days to solicit proxies from additional shareholders and to change the minds of shareholders who had already entered votes against them.

305.   The information disclosed on March 5, 2018, and March 6, 2018, was both directly related to and a foreseeable consequence of Defendants' concealed efforts to get CFIUS to kill Broadcom's bid for Qualcomm.   As an initial matter, the revelation of Defendants' concealed efforts to block Broadcom's bid was directly related to and a foreseeable consequence of Defendants' concealment of that same information during the Class Period.   Moreover, Defendants' voluntary notice to CFIUS requested that CFIUS review Broadcom's bid.   The disclosure that CFIUS was in fact undertaking the very review Defendants requested was, thus, directly related to and a foreseeable consequence of the information misrepresented and concealed by Defendants during the Class Period.   Indeed, CFIUS cited to Defendants' unilateral request and subsequent communications in explaining its decision.   Moreover, Defendants' undisclosed defensive measures and CFIUS's decision to undertake a review of Broadcom's bid would also be expected to affect the probability of deal completion and, thus, the likelihood of shareholders receiving a share price premium.

Thus, it was also foreseeable that the disclosure of this information would cause Qualcomm's stock price to decline.

306. Market commentators recognized that CFIUS's actions were directly related to Defendants' actions. For example, The New York Times indicated that Qualcomm's secret request was responsible for CFIUS's involvement: "[i]n this instance, [CFIUS] . . . is taking a proactive role and investigating before an acquisition agreement has even been signed. *But Qualcomm, which is based in San Diego, pushed the government to intervene*."

307. In another article, The New York Times reported that:

Experts said they couldn't recall another instance of the committee's intervening in a transaction that hadn't been completed, much less one that is as fluid and bitterly contested as this one.

. . . .

Broadcom had sought to pave the way for its bid by changing its headquarters to the United States . . . [and that] Broadcom argued that its status as a soon-to-be-American company meant the Qualcomm deal should not be subject to review by [CFIUS].

*Qualcomm nonetheless appealed to regulators to get involved*.

308. Similarly, on March 6, 2018, The Wall Street Journal reported that, "Broadcom has criticized Qualcomm for spending too much on R&D when its licensing business could be endangered. Such could ultimately prove to be the case, but *as the letter from CFIUS shows, Qualcomm's spending has at least bought some friends in the right places*." On March 7, 2018, MarketWatch reported that:

While it seems like a fortuitous bit of timing for Qualcomm, *it may not have been pure luck. In the latest volley of angry statements between the two companies, Broadcom accused Qualcomm of instigating the review on its own*.

"Broadcom reiterates that Qualcomm failed to disclose to its own stockholders and to Broadcom that it secretly filed a voluntary unilateral request for CFIUS review on January 29, 2018," the company said in a statement.

309.   Dow Jones Institutional News, in a March 6, 2018 article, focused on Qualcomm's actions and the potential backlash:

> As things play out, this latest gambit in Broadcom's hostile bid for Qualcomm could end up creating more votes to change directors and undermining the credibility of Qualcomm management with any new director who is ultimately elected.
>
> The problem is that this action undercuts Qualcomm's best argument to shareholders in the proxy contest: The $79 per Qualcomm share offered by Broadcom is inadequate, the current board has done a good job pressuring Broadcom to improve its terms and current directors are in the best position to negotiate a deal if Broadcom can be convinced to make a better offer.
>
> ***By appearing to encourage the extraordinary order from the Committee on Foreign Investment in the United States, known as CFIUS, to postpone the shareholder vote on directors, Qualcomm could be seen as attacking its own investors' voting rights***. Among other things, that implies the company doesn't have confidence that its arguments will win the day.

310.   Media coverage from March 6, 2018, also expressed surprise at the unexpected nature of CFIUS's actions and the resulting delay.  The Deal Pipeline referred to the intervention as "quite unprecedented, given that no deal has been inked yet between Broadcom and Qualcomm . . . and the fact that Broadcom [would] soon be a U.S.-based company."  Bloomberg also reported that the "order for a delay by the government panel is unusual, since CFIUS doesn't usually investigate before a merger is agreed upon."  The New York Times reported that "[i]t appears to be the first time the committee has intervened on a deal before it has been finalized[.]"

311.   Several news sources additionally reported statements from experts on CFIUS review, who agreed that the review was highly unusual.  The Wall Street Journal quoted a former CFIUS member, Mario Mancuso, who called it "Halley's comet unusual."   The New York Times reported it spoke to experts who had "acknowledged that the national security panel's review of Broadcom's bid for Qualcomm was extraordinary."  The Deal Pipeline reported that "the move was met by lawyers specializing in CFIUS issues with shock and surprise . . ." and quoted

Clif Burns, an attorney at Bryan Cave in Washington, that he had "never seen [CFIUS] ask a company to postpone an annual meeting to conduct a review."

312.   A report by The Wall Street Journal also addressed the unexpected nature of this news given Defendants' misleading statements over the past month that they were diligently negotiating with Qualcomm: in late February, "Qualcomm appeared to be coming around to the idea of a deal.  It said the two sides had been talking and making progress."   Indeed, in addition to revealing to the market the steps that Qualcomm had taken to scuttle the deal, these disclosures also made clear that Defendants' repeated statements that they were negotiating in good faith with Broadcom were highly misleading.

313.  Many market commentators concluded that the disclosures of Qualcomm's defensive measures and CFIUS's resulting actions lowered the probability of a Broadcom deal being completed.  For example, a March 7, 2018 RBC Capital Markets analyst report wrote, "[w]hile there has been constant back and forth between AVGO & QCOM, we think the CFIUS investigation and specifically details in the letter lower the probability of an AVGO/QCOM merger."  On March 6, 2018, The Wall Street Journal reported that, "Qualcomm just provided the recipe for companies trying to thwart foreign takeovers: Spend big, first on research and development, then on lawyers. . . .  The letter appears to put an end to Broadcom's chances of acquiring Qualcomm."

314.   Likewise, on March 6, 2018, Macquarie Research wrote, "our base case is that either CFIUS will decline the approval or will require significant remedies that could force AVGO to walk."  The same day, The New York Times reported, "[t]he move complicates an already contentious deal and increases the likelihood that Broadcom, which is based in Singapore, will end its pursuit of Qualcomm.  Such an investigation is often a death knell for a corporate acquisition."

315.   As a direct and proximate result of the March 5, 2018 partial corrective disclosures and/or materialization of the foreseeable risks concealed by Defendants'

fraud, shares of the Company's stock fell 1.13%, from a closing price of $64.74 on March 2, 2018, to a closing price of $64.01 on March 5, 2018. By contrast, the S&P 500 actually increased by 1.1% between March 2 and 5, 2018.

316.   In fact, after controlling for market and industry factors, the company-specific abnormal return in Qualcomm's stock price on March 5, 2018, was -2.49% and was statistically significant at the 95% level. In other words, the price decline in Qualcomm's stock price on March 5, 2018, was not the result of randomness but, instead, was caused by the disclosure of Defendant's unilateral request to CFIUS and CFIUS's resulting actions.

317.   As a direct and proximate result of the March 6, 2018 partial corrective disclosures and/or materialization of the foreseeable risks concealed by Defendants' fraud, shares of the Company's stock fell an additional 2.92% on March 6, 2018, from a closing price of $64.01 on March 5, 2018, to a closing price of $62.14 on March 6, 2018. Meanwhile, the S&P 500 increased by 0.27% on March 6, 2018.

318.   After controlling for market and industry factors, the company-specific abnormal return in Qualcomm's stock price on March 6, 2018, was -3.46% and was statistically significant at the 99% level. As a result, the price decline in Qualcomm's stock price on March 6, 2018, was not the result of randomness but, instead, was caused by the disclosure of Defendant's unilateral request to CFIUS and CFIUS's resulting actions. Cain Dec. ¶ 76.

319.   After controlling for market and industry factors, the company-specific abnormal return in Qualcomm's stock price over the two-day period of March 5-6, 2018, was -$3.83, or -5.95%, and was significantly significant at the 99% level. As a result, the price decline in Qualcomm's stock over the two-day period of March 5-6, 2018 was not the result of randomness but, instead, was caused by the disclosure of Defendant's unilateral request to CFIUS and CFIUS' resulting actions. Cain Dec. ¶ 77.

320.   Despite these disclosures, the price of Qualcomm's shares remained artificially inflated, as it was still not yet clear how Qualcomm's acceleration of the

CFIUS review would ultimately undermine Broadcom's bid and the risks concealed by Defendants' misleading statements and omissions had not fully materialized. Moreover, shareholders continued to believe that they would be given an opportunity to exercise their right to vote on the board nominees.

321.   Some analysts still believed that the proposed merger could proceed.  On March 8, 2018, Oppenheimer wrote:

> We believe the potential QCOM acquisition remains in play, a significant upside call option with combined EPS power approaching $25 on conservative assumptions.
>
> . . . .
>
> We continue to see obvious financial/strategic merit in combining QCOM/AVGO's leading back-end and front-end handset portfolios. Recent reports (Bloomberg 3/5/18) indicate AVGO is on track to win a majority of QCOM's board seats in a shareholder vote delayed until 4/5/18, pending CFIUS'[s] somewhat puzzling review.

322.   A March 7, 2018 RBC Capital Markets analyst report concluded that, "[w]hile we don't anticipate AVGO walking away from QCOM it does create a high hurdle.  Our expectation is AVGO would spend the next 30 days addressing CFIUS concerns."

323.   Dow Jones Institutional News, in the same article in which it criticized Qualcomm's actions as risking the alienation of its shareholders, did not anticipate this being the end of the deal:

> Meanwhile, it seems unlikely CFIUS will prevent shareholders from voting for long. A deal with Broadcom isn't on the ballot and no agreement to sell the company has been signed.
>
> It is hard to argue that shareholders replacing existing Qualcomm directors with independent businessmen – and who, with one exception (a Canadian), are U.S. citizens – would threaten the U.S., even if a combined Broadcom-Qualcomm would.
>
> CFIUS investigations generally focus on whether acquisitions should be completed, not director elections.
>
> Plus CFIUS regulates foreign investment in the U.S. For months Broadcom, which moved its incorporation to Singapore from the U.S. in

a 2015 "tax inversion," has been working on moving back to this country. Broadcom predicts that will be done in May.

Once completed, it is hard to see how Broadcom – whose chief executive and most of its directors are also U.S. citizens – would be viewed as foreign.

324.   A March 7, 2018 MarketWatch article similarly reported,

Ultimately, this deal does not seem to merit the attention of CFIUS, especially with Broadcom's intention to base itself in the U.S., instead of Singapore. Both companies now have some breathing room, with Qualcomm's new annual meeting a month away. But it's also likely that it could lead to another month of he-said she-said statements. It would behoove the two companies to try to mend their differences over the next month, because if this deal is as inevitable as it seems, it would be better to start out as partners instead of enemies slinging mud.

325.   And statements issued by Broadcom at the time of the March 5 Letter, also continued to tout Broadcom's imminent redomiciliation from Singapore to the United States.  In a Form 8-K filed on March 6, 2018, Broadcom described the process by which it was "restructur[ing] its corporate group to cause the parent company of the group to be a Delaware corporation."  The next day, on March 7, Broadcom released the following statement:

*Our Pledge to Creating a Stronger Combined American Company*

Broadcom is in every important respect an American company, with a lineage of great American technology icons like Hewlett-Packard, AT&T, Broadcom Corp., and Brocade Communications Systems, Inc. ***We are now in the final stages of redomiciling to the United States, and that process will be complete no later than May 6, 2018. When we complete our acquisition of Qualcomm, we expect to have more than 25,000 employees in the U.S., working to make Broadcom the leading communication semiconductor company in the world***.

(Some emphasis in original.)

326.   News reports also confirmed that Broadcom was speeding up its efforts to redomicile to the U.S. and that CFIUS intervention may yet be avoided.  On March 7, 2018, the New York Post reported that Broadcom "in light of the heat this week from Washington," was "aiming to complete its move to the US in April," rather than the

originally-announced mid-May, "to get around a CFIUS review." On March 10, 2018, The Wall Street Journal reported that if it redomiciled as a U.S. company, Broadcom "could argue that its deal falls outside of [CFIUS's] jurisdiction. CFIUS, though, could say it still has jurisdiction to review the bid since it began the review while Broadcom was a Singapore company," and this speed-up was "potentially setting the stage for a showdown[.]"

### 2. The March 12 and March 13, 2018 Disclosures Were a Foreseeable Result of Defendants' Fraud and Caused Significant Declines in Qualcomm's Stock Price

327.   On March 12, 2018, after the market had closed, President Trump issued an Order blocking Broadcom from taking further action regarding its proposed acquisition of Qualcomm. The Order found, "[t]here is credible evidence that leads me to believe that Broadcom . . . through exercising control of Qualcomm . . . might take action that threatens to impair the national security of the United States[.]" Thus, per the Order, "[t]he proposed takeover of Qualcomm by [Broadcom] is prohibited, and any substantially equivalent merger, acquisition, or takeover, whether effected directly or indirectly, is also prohibited."

328.   A CFIUS letter released earlier that same day made clear that both the Committee and the administration had adopted Qualcomm's position regarding the national security concerns of the proposed acquisition and the need to expedite intervention prior to Broadcom's redomiciliation. More specifically, on March 12, 2018, Qualcomm filed a Current Report on Form 8-K with the SEC disclosing that it had "received a letter, addressed to both Broadcom Limited and Qualcomm, from the U.S. Department of Treasury" the previous day. This letter from March 11, 2018, was attached to the Form 8-K filing as Exhibit No. 99.1, and stated, in relevant part:

> The purpose of this letter is to inform the parties of the status of the investigation being conducted by [CFIUS] . . . .
>
> Through [the] March 5, 2018 letter, CFIUS informed you that it had identified potential national security concerns that warrant a full

investigation of the attempted hostile takeover by Broadcom Limited ("Broadcom") of Qualcomm Incorporated ("Qualcomm"), through a stock purchase, proxy contest, and Proposed Agreement and Plan of Merger (the "Proposed Agreement") or other merger. ***That determination was based on CFIUS's review of the information submitted by Qualcomm in its unilateral voluntary notice on January 29, 2018, the parties' responses to questions posed about the potential transaction during the interim period, and the information provided in our multiple phone calls, emails, and meetings with representatives of both Qualcomm and Broadcom***.

. . . .

Since transmitting the letter to you on March 5, 2018, CFIUS has conducted an investigation of the transaction and its associated national security risk. That investigation has so far ***confirmed the national security concerns that CFIUS identified to you in its letter on March 5, 2018***. That investigation is expected to close soon. In light of the actions that Broadcom has taken in violation of the Interim Order to shorten the time period for CFIUS investigation, CFIUS requests that Broadcom provide any information responsive to the March 5, 2018 letter as soon as possible. ***In the absence of information that changes CFIUS's assessment of the national security risks posed by this transaction, CFIUS would consider taking further action, including but not limited to referring the transaction to the President for decision***.

329.   The information disclosed on March 12, 2018, was both directly related to and a foreseeable consequence of Defendants' concealed efforts to get CFIUS to kill Broadcom's bid for Qualcomm.  The entire purpose of Defendants' secret lobbying of CFIUS during the Class Period was to convince CFIUS to issue a recommendation that the President block Broadcom's bid.  In fact, Defendants' own lawyers – Covington & Burling – have admitted as much.  In an article entitled ***Covington Secures Presidential Order Protecting Qualcomm From Hostile Takeover*** on the firm's website, the firm touts the fact that "Covington secured a U.S. Presidential order compelling Broadcom Limited to 'immediately and permanently abandon' its proposed hostile takeover of its client Qualcomm, Inc."   Covington & Burling also admits that preventing the Broadcom takeover had been Qualcomm's goal in seeking CFIUS review all along, describing the March 13, 2018 Presidential order ending Broadcom's proxy contest as "mark[ing] ***total victory for Qualcomm in its bid to remain an independent company***."

President Trump's blockage of the deal was thus unquestionably both directly related to and a foreseeable consequence of Qualcomm's unilateral request for CFIUS review of Broadcom's hostile takeover attempt. Moreover, given that an order blocking Broadcom's bid would significantly impact the likelihood of deal completion and effectively end Qualcomm shareholders' hopes of receiving any deal premium from the Broadcom bid, it was a foreseeable that the disclosure of this information would cause Qualcomm's stock price to decline.

330. Market commentators understood that President Trump's decision to block the deal was directly related to Defendants' undisclosed actions. For example, a March 17, 2018 TechCrunch article concluded that the deal's blockage was a direct result of the Company's unilateral request to CFIUS: "***The board's original outreach to CFIUS precipitated the sequence of events that led to Trump's block this past week***." The article further explained that:

> ***Qualcomm's board of directors took extraordinary steps to block the Broadcom acquisition. They unilaterally went to Washington to get an injunction not on a deal*** – which had never been consummated between the two companies – but to block Broadcom from replacing its board of directors in a standard shareholder vote. This is a very important distinction: Qualcomm's board saw the direction shareholders wanted to go, and essentially decided to just ignore the election process entirely.

A March 14, 2018 Wall Street Journal article entitled *Qualcomm Pursued Unusual Strategy* reported that, "***Qualcomm's Jan. 29 filing to CFIUS helped trigger a chain of events that culminated in President Donald Trump's decision Monday to block the deal***. . . . The company also got help from sympathetic senators and representatives who pressed the administration."

331. Similarly, on March 15, 2018, Dow Jones Institutional News wrote, "[t]he effort fell apart this week when President Donald Trump blocked it on national security grounds ***at the behest of Qualcomm***." On March 13, 2018, The Deal Pipeline concluded that, "All of this makes it look as if ***Qualcomm's longtime government ties and lobbying efforts played a role in scuttling the deal. That's particularly true since***

***Qualcomm had requested a Cfius review of Broadcom's bid on Jan. 29***, and some of the objections publicly voiced by the committee sound like Qualcomm talking points." A March 24, 2018 Wall Street Journal article likewise reported that, "Qualcomm investors had raised concerns about the company's performance and how the board handled Broadcom's $117 billion takeover offer, especially following the revelation that ***Qualcomm had prompted the government review that led to the order from President Donald Trump blocking the deal***."

332.   Indeed, news coverage following the March 12, 2018 disclosures described Qualcomm as having used CFIUS as an ***undisclosed*** "***poison pill***" to kill the deal.   For example, Mondaq Business Briefing reported that "it is possible we are seeing now for the first time the (potentially successful) ***use of CFIUS as a takeover defense against a hostile offer***," comparing it to "traditional takeover defenses such as the Poison Pill and White Knight [which] have long histories in the corporate M&A world."   Additional reporting on March 13, 2018, in Computerworld Australia agreed with this characterization, quoting Jim Lewis, a CFIUS expert at the Center for Strategic and International Studies, describing Qualcomm's actions as "***obviously a poison pill***."

333.   Similarly, academic research studies have since characterized Qualcomm's concealed actions as a "super poison pill" that ultimately resulted in President Trump's blockage of the deal.   For example, a 2020 article in the Boston College Law Review directly characterized Qualcomm's actions as a hostile takeover defense:   Qualcomm "***was in effect turning national security review into an antitakeover defense***."   A 2019 study in the Marquette Law Review entitled *Securing the Nation or Entrenching the Board? The Evolution of CFIUS Review of Corporate Acquisitions*, concluded that "***CFIUS review gained widespread recognition as a kind of 'super poison pill' with Qualcomm's successful effort to fend off acquisition by Broadcom in 2018***."   The study further explained that:

The actions of CFIUS and the President in connection with Broadcom's attempted Qualcomm acquisition, however, demonstrated an even more aggressive approach. The Broadcom block established that CFIUS reviews can be used for more than the government's defense-related foreign policy or national security purposes. ***The CFIUS process was clearly available to target companies as an antitakeover device in the global M&A marketplace***.

Without CFIUS, the Broadcom-Qualcomm situation was simple: two large high-technology companies, both publicly traded in the U.S. markets, engaged in the familiar M&A ritual of the hostile takeover attempt. Hostile takeovers and proxy fights have long been a part of the U.S. economy, and we have developed extensive legal doctrines to manage such struggles for control in ways that are both fair to the participants and in society's interest. ***The deployment of CFIUS review as an antitakeover device by Qualcomm constituted a new weapon in merger battles***, and with the passage of FIRRMA that weapon became very powerful.

334. In an article published on March 12, 2018, The New York Times made clear that President Trump's Order was not fully expected prior to its issuance. Quoting attorney John P. Kabealo, who specializes in foreign investment matters, the article called it "'extraordinary' that Mr. Trump would intervene in the transaction before a full investigation by the government panel was complete." The article further reported that according to law firm Ropes & Gray, "[a] presidential action against foreign investment in an American company is rare and ha[d] only taken place four times in the past 30 years."

335. As a direct and proximate result of these disclosures and/or materialization of the foreseeable risks concealed by Defendants' fraud, the Company's share price fell an additional 4.95%, from a closing price of $62.81 on March 12, 2018, to a closing price of $59.70 on March 13, 2018. By comparison, the S&P 500 dropped only 0.67%.

336. In fact, after controlling for market and industry factors, the company-specific abnormal return in Qualcomm's stock price on March 13, 2018, was -3.82%, and was statistically significant at the 99% level. As a result, the price decline in Qualcomm's stock price on March 13, 2018, was not the result of randomness but,

instead, was caused by President Trump's blockage of Broadcom's bid for Qualcomm following Defendants' unilateral request to CFIUS. Cain Dec. ¶ 78.

337. In sum, from January 29, 2018, to March 13, 2018, the price of Qualcomm's common stock fell from $67.32 per share to $59.70 per share as the relevant truth and undisclosed risks relating to Qualcomm's lobbying for Broadcom's bid to be terminated were revealed. Each of Qualcomm's stock price declines on March 5, 2018, March 6, 2018, and March 13, 2018 was statistically significant at least at the 95% level, and was caused by the revelation of information that was directly related to and a foreseeable result of the information that Defendants' misrepresented and concealed during the Class Period.

338. Moreover, Qualcomm's abnormal stock price declines on these three corrective disclosure dates were economically significant to its investors – wiping out approximately $9.22 billion in shareholder value – or over 9% of Qualcomm's shareholder value.

339. Nor is it surprising that the stock price declines on March 5, 6, and 13, 2018, were both statistically and economically significant. Rather, abnormal returns of those amounts would be expected to be economically significant for a large company with a multi-billion dollar equity market capitalization that trades in a liquid market with significant daily trading volume. This is because companies of this nature tend to have lower daily volatility and returns. As a result, even a single-digit stock price decline represents a significant reduction in shareholder value.

340. It was foreseeable that issuing false and misleading statements and/or omissions of material fact concerning the Company's willingness to negotiate with Broadcom and the regulatory risks associated with Broadcom's proposal, while failing to disclose the efforts Defendants had taken to frustrate the deal by seeking CFIUS's intervention, would artificially inflate the price of Qualcomm common stock during the Class Period. It was similarly foreseeable that the ultimate disclosure of the concealed information and/or the materialization of the risks concealed by Defendants'

false and misleading statements and omissions would cause the price of Qualcomm common stock to drop significantly as the inflation caused by earlier misleading statements and omissions was removed from the stock by the corrective disclosures and/or materialization of the risk set forth herein.  Accordingly, the conduct of these Defendants as alleged herein proximately caused foreseeable losses under the Exchange Act to Plaintiffs and members of the Class.

**D.    Expert Opinion Confirms That the Stock Price Declines on the Corrective Disclosure Dates Were Statistically and Economically Significant**

341.   Plaintiffs' expert Dr. Cain, after engaging in a thorough analysis of the record, concluded that "Qualcomm's common stock price declines following the corrective disclosures were statistically significant.   Furthermore, they were economically significant and represented aggregate abnormal equity market value losses of over $9 billion, which constituted over 9% of Qualcomm's common equity value."  Cain Dec. ¶ 27.

342.   To reach his conclusions, Dr. Cain performed a thorough event study analysis to evaluate the statistical significance of Qualcomm's common stock price declines on March 5, March 6, and March 13, 2018, following the corrective disclosures.  An event study is an established and generally-accepted statistical method that assesses the impact of new information on securities prices.  Event studies have been utilized in numerous academic research studies to provide scientific evidence of the linkage between new information and securities prices.

343.   To conduct his event study, Dr. Cain first established the relationship between the daily return of the Company stock, the daily return on an overall market index, and the daily return on an industry index over the 120-day period ending November 2, 2017, the day prior to the first news about Broadcom's intent to bid for Qualcomm.  This allowed Dr. Cain to predict the expected daily return of the Company on a date, once he controlled for that day's market and industry returns.  Dr. Cain then

subtracted the predicted return from the actual return to get the "abnormal" return, which represented the company-specific return that is not attributable to market-wide or industry-wide movements. Cain Dec. ¶ 71.

344.   Finally, Dr. Cain calculated the statistical significance of the abnormal company-wide return by comparing it to the usual volatility in the Company stock price return.   In particular, Dr. Cain calculated the t-statistic in order to test whether randomness could be rejected as the explanation for any given price movement. Dr. Cain explained that probability theory suggests that under the standard assumption that abnormal returns will be normally distributed with a mean of zero in the absence of new value-relevant company-specific news, based purely on randomness, using a 95% confidence level and a sufficiently large sample size, the abnormal return should have a t-statistic greater than 1.96 (or less than -1.96) only 5% of the time.   In other words, there is a 95% chance that, barring some non-random explanation, the actual observed return will fall within 1.96 standard deviations of the predicted return.  Cain Dec. ¶ 74.  If the observed abnormal return had a t-statistic of an absolute magnitude greater than 1.96 and new value-relevant company-specific information were observed, randomness can be rejected as the explanation with 95% confidence and it can be inferred that the new information caused the stock price movement.  Cain Dec. ¶ 75.

345.   Applying those principles here, Dr. Cain concluded that if the new information revealed on the alleged corrective disclosure date had a statistically significant abnormal return and there was no other important company-specific news released on that date, the stock price movement was caused by the newly-available public information.  Dr. Cain could then conclude that the alleged corrective disclosure provided new information in the market that was important to investors, causing them to change their valuation of the Company's stock.  Cain Dec. ¶ 72.

346.   After undertaking his event study and thoroughly analyzing the results, Dr. Cain concluded that each of the stock price declines following the corrective disclosures was statistically significant at the 95% level.  Dr. Cain determined that the

abnormal return on March 5, 2018, was -2.49% and was statistically significant at the 95% level.  The abnormal return on March 6, 2018, was -3.46% and was statistically significant at the 99% level.  As these abnormal price movements are statistically significant at or above the 90% confidence level, Dr. Cain could reject randomness as the cause of the abnormal movements in stock price and could infer that the new information regarding CFIUS's involvement at Qualcomm's behest in the hostile takeover battle between Broadcom and Qualcomm was the ultimate cause of the observed price declines.  Cain Dec. ¶ 76.

347.   Dr. Cain also determined that the abnormal return on March 13, 2018, was -3.82% and was statistically significant at the 99% level.  The abnormal dollar change in Qualcomm's stock price on this date was -$2.40.  As this abnormal price movement was statistically significant at or above the 90% confidence level, Dr. Cain could reject randomness as the cause of the abnormal movement in stock price and could infer that the new information regarding the President's blockage of Broadcom's bid for Qualcomm following Qualcomm's unilateral request to CFIUS was the ultimate cause of the observed price decline.  Cain Dec. ¶ 78.

348.   Finally, Dr. Cain also determined that Qualcomm's abnormal stock price declines on the three corrective dates were economically significant.  In particular, based on the event study abnormal returns, Dr. Cain determined that Qualcomm's common equity market value declined by approximately $9.22 billion following the alleged corrective disclosures.  Dr. Cain concluded that this massive reduction in shareholder value following the corrective disclosures was economically significant.  Cain Dec. ¶ 79.

### E.   Expert Opinion Confirms That the Information Disclosed on the Corrective Dates Was Directly Related to and a Foreseeable Consequence of the Information That Defendants Misrepresented and Concealed During the Class Period

349.   Dr. Cain reviewed news, company press releases, SEC filings by Qualcomm, and research analyst reports regarding Qualcomm and Broadcom to assess

the extent to which the information disclosed on March 5, 2018, March 6, 2018, and March 12, 2018, was related to and a foreseeable consequence of the information that Defendants misrepresented and concealed during the Class Period – namely, that rather than working to negotiate a deal with Broadcom, as they represented, Defendants were engaged in secret efforts to convince CFIUS to block the deal.  Cain Dec. ¶ 45.

350.  In reaching his conclusions, Dr. Cain was informed by his own professional experience as a capital markets analyst who assisted companies in raising financing for acquisitions, as a financial economist and advisor at the SEC who evaluated companies' disclosures of information to investors, as an academic who has taught M&A courses and published academic research studies on topics including M&A, hostile takeover defenses, and investors' reactions to new information, and as a financial economist who has testified on the connections among the information environment, new disclosures, and company stock prices.  Cain Dec. ¶ 42.

351.  After conducting a thorough analysis, Dr. Cain ultimately determined that the information disclosed on the corrective disclosure dates was both related to and a foreseeable consequence of the information that Defendants misrepresented and concealed during the Class Period: "I find that: (i) Qualcomm's common stock price declines following the Corrective Disclosures were, from an economic perspective, related to and foreseeable based on the alleged misrepresented and omitted information; and (ii) Qualcomm's stock price declined by statistically significant and economically meaningful amounts following Corrective Disclosures on March 5, March 6, and March 12, 2018."  Cain Dec. ¶ 81.

352.  Dr. Cain first analyzed the corrective information released on March 5 and 6, 2018.  In particular, Dr. Cain noted that on those dates, investors first became aware that Qualcomm had secretly filed a voluntary request with CFIUS in January 2018 to initiate an investigation into Broadcom's bid, that CFIUS had ordered Qualcomm to postpone its annual stockholders meeting by 30 days so that CFIUS could conduct such an investigation.  Cain Dec. ¶ 46.  Dr. Cain then "reviewed news

stories, analyst reports, and academic studies to assess the extent to which the disclosure of Qualcomm's request that CFIUS review Broadcom's bid, as well as CFIUS's decision to undertake that review and delay Qualcomm's Annual Meeting, were, from an economic perspective, related to and a foreseeable consequence of the information that Defendants allegedly misrepresented and omitted." Cain Dec. ¶ 48. Dr. Cain determined that, from an economic perspective, "the revelation of Defendants' concealed efforts to block Broadcom's bid was directly related to and a foreseeable consequence of Defendants' concealment of those same efforts during the Class Period." Cain Dec. ¶ 49. Moreover, "[t]his information would be expected to affect the probability of deal completion, the takeover premium being offered to Qualcomm's shareholders, and the likelihood of those shareholders receiving such premium. Thus, it was foreseeable that the disclosure of this information would cause Qualcomm's stock price to decline." Cain Dec. ¶ 52. Dr. Cain also observed that:

> [O]ne purpose and foreseeable consequence of Qualcomm's unilateral request for CFIUS review was that CFIUS would decide to undertake that review. In my professional opinion, this outcome was, from an economic perspective, both related to and a foreseeable consequence of the information that Defendants allegedly misrepresented and omitted during the Class Period. CFIUS's decision to undertake a review of Broadcom's bid would also be expected to affect the probability of deal completion and, thus, the likelihood of those shareholders receiving a share price premium. Thus, it was also foreseeable that the disclosure of this information would cause Qualcomm's stock price to decline.

Dr. Cain concluded that the new information disclosed on March 5 and 6, 2018, was both related to and a foreseeable consequence of the information that Defendants misrepresented and concealed during the Class Period. Cain Dec. ¶ 53.

353. Dr. Cain next analyzed the corrective information released on March 13, 2018, when investors learned that President Trump had blocked Broadcom's bid for Qualcomm. More specifically, Dr. Cain "reviewed news stories, analyst reports, and academic studies to assess the extent to which the President's blocking of the deal was, from an economic perspective, related to and a foreseeable consequence of the

information that Defendants allegedly misrepresented and omitted." Cain Dec. ¶ 54. Dr. Cain's "review provided consistent evidence that the logical endgame of Qualcomm's unilateral request for CFIUS review could include blockage of Broadcom's hostile takeover bid by the President." As a result, Dr. Cain determined, "that the logical endgame of Qualcomm's unilateral request for CFIUS review could include blockage of Broadcom's hostile takeover bid by the President. Thus, the bid's blockage was clearly connected to Qualcomm's actions." Cain Dec. ¶ 65. Dr. Cain concluded that the new information disclosed on March 13, 2018, was both related to and a foreseeable consequence of the information that Defendants misrepresented and concealed during the Class Period.

## VIII. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

354. The statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under the Private Securities Litigation Reform Act of 1995 do not apply to the misleading statements and omissions alleged in this Complaint.

355. None of Defendants' historic or present-tense statements alleged herein was a forward-looking statement because none was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present-tense statements when made.

356. To the extent that any of the materially false or misleading statements alleged herein, or any portions thereof, can be construed as forward-looking, these statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not

sufficient to insulate Defendants from liability for their materially false and misleading statements.

357.   Defendants are also liable for any false or misleading forward-looking statement alleged herein, or portion thereof, because at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading, or the forward-looking statement was authorized and approved by an executive officer of Qualcomm who knew that the forward-looking statement was false or misleading.

## IX.   CONTROLLING PERSON ALLEGATIONS

358.   By virtue of the Individual Defendants' positions of management and control within the Company, they had access to undisclosed adverse information about Qualcomm's response to Broadcom's takeover bid, including information regarding Qualcomm's undisclosed, unilateral voluntary notice to CFIUS and other communications with and other information provided to CFIUS, as particularized herein.  The Individual Defendants ascertained such information through Qualcomm's internal corporate documents, conversations, and connections with each other and with corporate officers and employees, attendance at Board of Directors meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as Qualcomm officers, directors, and managers.

359.   The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein, and knew or recklessly disregarded that there were materially misleading statements and omissions contained therein.  Because of their Board, executive, or managerial positions with Qualcomm, each of the Individual Defendants had access to the adverse undisclosed information about Qualcomm's response to Broadcom's takeover bid, as particularized herein, and knew (or were deliberately reckless in not knowing) that this information rendered the representations

made by or about Qualcomm and its business, or adopted by the Company, materially false and misleading.

360.   The Individual Defendants, because of their positions of control and authority as officers or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein, and is therefore primarily liable for the representations therein.

361.   As officers, directors, and controlling persons of a publicly held company whose common stock is registered with the SEC pursuant to the Exchange Act, and is traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's response to Broadcom's takeover bid, as particularized herein, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based on truthful and accurate information.  The Individual Defendants' materially misleading statements and omissions during the Class Period violated these specific requirements and obligations.

## X.   CLASS ACTION ALLEGATIONS

362.   Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities that, during the Class Period, purchased or otherwise acquired the publicly traded common stock of Qualcomm and were damaged thereby.  Excluded from the Class are Defendants, members of Defendants' immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and

(1)(b)(ii)), any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

363.   The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members of the proposed Class.  At the end of the Class Period, Qualcomm had more than 1.48 billion shares of common stock issued and outstanding, owned by thousands of persons, and actively traded on the NASDAQ.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Record owners and other members of the Class may be identified from records maintained by Qualcomm or its transfer agent, and may be notified of the pendency of this action by a combination of published notice and first-class mail, using the techniques and form of notice similar to that customarily used in class actions arising under the federal securities laws.

364.   There is a well-defined commonality of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)    whether Defendants' actions as alleged herein violated the federal securities laws;

(b)    whether Defendants' statements and/or omissions issued during the Class Period were materially false and misleading;

(c)    whether Defendants knew or were deliberately reckless in not knowing that their statements were false and misleading;

(d)    whether and to what extent the market prices of Qualcomm publicly traded common stock were artificially inflated and/or distorted before and/or

during the Class Period due to the misrepresentations and/or omissions of material fact alleged herein; and

(e)     whether and to what extent Class members sustained damages as a result of the conduct alleged herein, and the appropriate measure of damages.

365.   Plaintiffs' claims are typical of the claims of the other members of the Class, as all members of the Class, including Plaintiffs, purchased or otherwise acquired Qualcomm publicly traded securities during the Class Period and similarly sustained damages as a result of Defendants' wrongful conduct as alleged herein.

366.   Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel competent and experienced in class action securities litigation to further ensure such protection, and intends to prosecute this action vigorously. Plaintiffs have no interests that are adverse or antagonistic to those of the Class.

367.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members to seek redress for the wrongful conduct alleged herein. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## XI.   PLAINTIFFS AND CLASS MEMBERS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

368.   Plaintiffs and members of the Class are entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations and failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     Qualcomm common stock traded in efficient markets;

(d)     the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Qualcomm common stock; and

(e)     without knowledge of the misrepresented or omitted facts, Plaintiffs and other members of the Class purchased or otherwise acquired Qualcomm common stock between the time that Defendants made material misrepresentation and omissions and the time the concealed risks materialized or the true facts were disclosed.

369.   At all relevant times, the market for Qualcomm common stock was open and efficient for the following reasons, among others:

(a)     as a registered and regulated issuer of securities, Qualcomm filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

(b)     Qualcomm regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     Qualcomm was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; and

(d)     Qualcomm common stock met the requirements for listing, and was listed and actively traded on highly efficient markets, including NASDAQ, where the Company's common stock trades under the ticker symbol "QCOM."

370.   As a result of the foregoing, the market for Qualcomm common stock promptly digested current information regarding Qualcomm from all publicly available sources, and the prices of Qualcomm's stock reflected such information.

371.   Based upon the materially false and misleading statements and omissions of material fact alleged herein, Qualcomm common stock traded at artificially inflated prices during the Class Period.  Plaintiffs and the other members of the Class purchased Qualcomm common stock relying upon the integrity of the market price of Qualcomm common stock and other market information relating to Qualcomm.

372.   Under these circumstances, all purchasers of Qualcomm common stock during the Class Period suffered similar injuries through their purchases at artificially inflated prices, and a presumption of reliance applies.

373.   Further, at all relevant times, Plaintiffs and other members of the Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings.  Plaintiffs and the other members of the Class would not have purchased or otherwise acquired Qualcomm common stock at artificially inflated prices if Defendants had disclosed all material information as required.  Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XII.   CAUSES OF ACTION

### COUNT I

**Asserted Against All Defendants for
Violations of Section 10(b) of the Securities Exchange
Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder**

374.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Plaintiffs and all other members of the Class against Qualcomm and the Individual Defendants.

375.   During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate the price of Qualcomm common stock; and (iii) cause Plaintiffs and other members of the Class to purchase Qualcomm common stock at artificially inflated prices that did not reflect their true value.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

376.   Defendants directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain the artificially inflated price of Qualcomm common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

377.   Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Qualcomm's value and performance, which included the making of untrue statements of material facts and omitting material facts necessary in order to make their statements, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein.  Defendants did not have a reasonable basis for their alleged false statements and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Qualcomm common stock during the Class Period.

378.   Defendants are liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements and omissions included in press releases, conference calls, SEC filings, news media, blogs, and Qualcomm's websites.

379.   Defendants are further liable for the false and misleading statements made by Qualcomm's officers, management, and agents in press releases, conference calls, conferences with investors and analysts, news media, blog reports, and Qualcomm's websites, as alleged above, as they either made or controlled such statements and had ultimate authority and responsibility for the contents thereof.

380.   Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing from the investing public the relevant truth.   By concealing material facts from investors, Defendants maintained the Company's artificially inflated common stock prices throughout the Class Period.

381.   Without knowledge of the fact that the price of Qualcomm common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements and omissions made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information

that was known to or recklessly disregarded by Qualcomm but not disclosed in public statements by Qualcomm during the Class Period, Plaintiffs and the other members of the Class purchased or acquired Qualcomm common stock during the Class Period at artificially high prices and were damaged when that artificial inflation was removed from the price of Qualcomm common stock.

382.   At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity.  Had Plaintiffs, the other members of the Class, and the marketplace known of the truth concerning the Company's conduct and the true value of Qualcomm's common stock, Plaintiffs and other members of the Class would not have purchased or acquired their Qualcomm common stock, or, if they had purchased or acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices they paid.

383.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

384.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and/or acquisitions of Qualcomm common stock during the Class Period.

### COUNT II

**Asserted Against the Individual Defendants for Violations
of Section 20(a) of the Securities Exchange Act of 1934**

385.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Plaintiffs and all other members of the Class against the Individual Defendants.

386.   At all relevant times during the Class Period, as set forth in *supra* ¶¶ 38-41, Mollenkopf was the Company's CEO and a member of the Company's Board; Jacobs was the Company's Executive Chairman and Chairman of the Board;

Rosenberg was the Company's General Counsel; and Horton was Qualcomm's Presiding Director of the Board. As such, the Individual Defendants had regular access to non-public information about Qualcomm's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board and committees thereof, as well as reports and other information provided to them in connection therewith.

387. The Individual Defendants acted as controlling persons of Qualcomm and the other Individual Defendants within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of Qualcomm's day-to-day operations, and/or knowledge of statements filed by the Company with the SEC and/or disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company and its executives, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.

388. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

389. In particular, each of these Individual Defendants had direct and supervisory involvement in and control of the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular conduct and transactions giving rise to the securities violations as alleged herein, and exercised the same.

390.  As set forth above, Qualcomm and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts, statements, and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Qualcomm common stock during the Class Period.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding Plaintiffs and the members of the Class damages and interest thereon;

C.    Awarding Plaintiffs' and the Class's reasonable costs, including attorneys' and experts' fees; and

D.    Awarding such equitable, injunctive or other relief that the Court may deem just and proper.

## XIV.  JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: May 11, 2020

**KESSLER TOPAZ**
 **MELTZER & CHECK, LLP**

s/Sharan Nirmul
Sharan Nirmul (*Pro Hac Vice*)
Mark Franek (*Pro Hac Vice Forthcoming*)
Raphael Janove (*Pro Hac Vice Forthcoming*)
snirmul@ktmc.com
mfranek@ktmc.com
rjanove@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: 610/667-7706
610/667-7056 (fax)

- and –

| | |
|---|---|
| 1 | **KESSLER TOPAZ**<br>  **MELTZER & CHECK, LLP** |
| 2 | Jennifer L. Joost (296164)<br>Stacey M. Kaplan (241989) |
| 3 | Peng Shao (319624; *admission pending*)<br>jjoost@ktmc.com |
| 4 | skaplan@ktmc.com<br>pshao@ktmc.com |
| 5 | One Sansome Street, Suite 1850<br>San Francisco, CA 94104 |
| 6 | Telephone: 415/400-3000<br>415/400-3001 (fax) |
| 7 | |
| 8 | *Lead Counsel for the Class and*<br>*Lead Plaintiff Gatubhai Mistry and Named* |
| 9 | *Plaintiffs Gerald L. Koenig, Leonard Brenner,*<br>*and Vanessa D. Washington* |

DATED: May 11, 2020          **ROBBINS GELLER RUDMAN**
                                              **& DOWD LLP**

s/Luke O. Brooks
Luke O. Brooks (212802)
Robert R. Henssler, Jr. (216165)
Christopher D. Stewart (270448)
Hillary B. Stakem (286152)
lukeb@rgrdlaw.com
bhenssler@rgrdlaw.com
cstewart@rgrdlaw.com
hstakem@rgrdlaw.com
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

*Lead Counsel for the Class and*
*Lead Plaintiff Gatubhai Mistry and Named*
*Plaintiffs Gerald L. Koenig, Leonard Brenner,*
*and Vanessa D. Washington*

## SIGNATURE CERTIFICATION

Pursuant to Section 2(f)(4) of the Electronic Case Filing Administrative Policies and Procedures Manual, I hereby certify that the content of this document is acceptable and I have obtained authorization of all signatories to affix the above-electronic signature(s).

s/Sharan Nirmul
Sharan Nirmul