# EXHIBIT E

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **IN RE QUALCOMM/BROADCOM MERGER SECURITIES LITIGATION** | **Case No. 3:18-cv-01208-CAB-AHG** |

**EXPERT DECLARATION OF MATTHEW D. CAIN**

**May 11, 2020**

# Table of Contents

I.    Background and Qualifications ........................................................................ 2

II.   Overview of Plaintiffs' Allegations ............................................................... 3

III.  Assignment ................................................................................................. 12

IV.  Summary of Opinions ................................................................................. 13

V.   Qualcomm's Stock Price Declines Following the Corrective Disclosures Were Economically Related to and a Foreseeable Consequence of Defendants' Alleged Misrepresentations and Omissions ........................................................... 13

     A.   Theory of value-relevant information in a takeover setting .................... 13

     B.   Qualcomm's use of CFIUS as a hostile takeover defense ..................... 18

     C.   The outcome of Qualcomm's hostile takeover defense strategy ............. 21

        1.   Qualcomm's stock price declines following the March 5 and March 6 Corrective Disclosures were related to and a foreseeable consequence of Defendants' alleged misrepresentations and omissions .......................... 21

        2.   Qualcomm's stock price decline following the March 12 Corrective Disclosure was related to and a foreseeable consequence of Defendants' alleged misrepresentations and omissions .................................................. 26

VI.  Qualcomm's Stock Price Declines Following the Corrective Disclosures Were Statistically and Economically Significant ....................................................... 33

VII.  Event Study Results for March 5-6, 2018 ........................................................ 37

VIII. Event Study Results for March 13, 2018 ........................................................ 38

IX.  Economic Significance of Qualcomm's Stock Price Declines .......................... 39

X.   Conclusion ................................................................................................. 40

Appendix A. Curriculum Vitae of Matthew D. Cain ............................................... 41

Exhibit 1 ................................................................................................................ 46

Exhibit 2 ................................................................................................................ 47

Exhibit 3 ................................................................................................................ 48

Exhibit 4 ................................................................................................................ 49

## I.      Background and Qualifications

1.      I am a Senior Fellow at the Berkeley Center for Law and Business and a Senior Visiting Scholar at Berkeley Law School, University of California. I deliver guest lectures, participate in academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business. My research focuses on a variety of topics such as empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and shareholder activism. I previously held a fellowship with the Harvard Law School Program on Corporate Governance, where I participated in research seminars and related activities.

2.      I worked at the U.S. Securities and Exchange Commission ("SEC") between 2014 and 2018. During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations and litigation, including cases alleging accounting fraud, revenue recognition practices, and disclosure violations. I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics including securities violations, revenue recognition practices, and corporate governance issues. Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research, and I was awarded the Chairman's Award for Economic Research.

3.      Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame. I taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and I also conducted empirical research on various finance, legal, accounting, and economic topics. I have been engaged in academic research for over a decade and continue to publish in law reviews and peer-reviewed academic journals across these disciplines.

4.     Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007. Prior to those studies, I worked as an analyst in Debt Capital Markets at National City Bank, where I assisted companies in raising syndicated loans and private placements of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes. I received a B.S. in Finance from Grove City College in 2001.

5.     In addition to teaching at Notre Dame and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law. I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached as **Appendix A**.

6.     I have published research in leading finance, accounting, law, and economics journals including the *Journal of Financial Economics*, *Journal of Law and Economics*, *Journal of Accounting and Economics*, *Journal of Empirical Legal Studies*, and *Journal of Financial and Quantitative Analysis*. My curriculum vitae, attached as **Appendix A**, further details my publications and previous testimony.

## II.    Overview of Plaintiffs'[1] Allegations

7.     Qualcomm Incorporated ("Qualcomm" or the "Company") is incorporated in the state of Delaware with its primary offices in San Diego, California. Leading up to the Class Period,[2] Qualcomm described its business as follows:

> We are a global leader in the development and commercialization of foundational technologies and products used in mobile devices and other wireless products, including network equipment, broadband gateway equipment and consumer electronic devices. Our inventions helped power the growth in smartphones, which have connected billions of people. We are a pioneer in 3G (third generation) and

---

[1] "Plaintiffs" means Lead Plaintiff Gatubhai Mistry and named plaintiffs Gerald L. Koenig, Leonard Brenner, and Vanessa D. Washington.
[2] "Class Period" means January 29, 2018 through March 12, 2018, inclusive.

4G (fourth generation) wireless technologies, and are now a leader in 5G (fifth generation) wireless technologies to empower a new era of intelligent, connected devices. Our technologies and products are also used in industry segments beyond mobile, including automotive, IoT (Internet of Things), data center, networking, computing and machine learning, and allow millions of devices to connect with each other in new ways. We derive revenues principally from sales of integrated circuit products and licensing our intellectual property, including patents, software and other rights.

The foundational technologies we invent help power the modern mobile experience. We share these inventions broadly through our licensing program, ensuring wide ecosystem access to technologies at the core of mobile innovation, and through the sale of our wireless chipset platforms and other products, which accelerates consumer adoption of experiences empowered by these inventions. As a company, we collaborate across the ecosystem, including manufacturers, operators, developers, governments and industry standards organizations, to create a global environment that drives continued progress and growth.

We have a long history of driving innovation. We played a leading role in developing the inventions that serve as the foundation for 3G and 4G wireless technologies, which are expected to serve as the basis for 5G wireless technologies. This includes the CDMA (Code Division Multiple Access) and OFDMA (Orthogonal Frequency Division Multiple Access) families of technologies, with the latter encompassing LTE (Long Term Evolution), which, along with TDMA (Time Division Multiple Access), are the primary digital technologies currently used to transmit a wireless device user's voice or data over radio waves using a public cellular wireless network. We own significant intellectual property applicable to products that implement any version of CDMA and OFDMA, including patents, patent applications and trade secrets. Companies in the mobile communications industry generally recognize that any company seeking to develop, manufacture and/or sell subscriber units or infrastructure equipment that use CDMA-based and/or OFDMA-based technologies will require a license or other rights to use our patents.

We also develop and commercialize numerous other key technologies used in handsets and other wireless devices that contribute to end-user demand, and we own substantial intellectual property related to these technologies. Some of these inventions were contributed to and are being commercialized as industry standards, such as certain video and audio codec, wireless LAN (local area network), GPS (global positioning system) and positioning and Bluetooth. Other technologies widely used by wireless devices that we have developed are not related to any industry standards, such as operating systems, user interfaces, graphics and camera processing functionality, RF (radio frequency) and antenna design and application processor architectures. Our patents cover a wide range of technologies across the entire wireless system (including wireless devices and infrastructure equipment) and not just what is embodied in chipsets.

We are organized on the basis of products and services and have three reportable segments. We conduct business primarily through our QCT (Qualcomm CDMA Technologies) semiconductor business and our QTL (Qualcomm Technology Licensing) licensing business. QCT develops and supplies integrated circuits (also known as chips or chipsets) and system software based on CDMA, OFDMA and other technologies for use in mobile devices, wireless networks, devices used in the Internet of Things (IoT), broadband gateway equipment, consumer electronic

4

devices and automotive telematics and infotainment systems. QTL grants licenses to use portions of our intellectual property portfolio, which includes certain patent rights essential to and/or useful in the manufacture and sale of certain wireless products. Our QSI (Qualcomm Strategic Initiatives) reportable segment makes strategic investments. We also have nonreportable segments, including our mobile health, data center, small cell and other wireless technology and service initiatives.[3]

8.     Plaintiffs allege that by the fall of 2017, Qualcomm's stock price had been on a downward trajectory for several years and its investors were unhappy.[4] On November 3, 2017, multiple national media sources reported that Broadcom[5] was planning a bid for Qualcomm around $70 per share—an approximately 28% premium over Qualcomm's common stock price at the time.[6] In response to this news, Qualcomm's common stock price increased by nearly 13%, from a closing price of $54.84 on November 2, 2017, to a closing price of $61.81 on November 3, 2017.[7]

9.     On November 6, 2017, Broadcom made a formal proposal to acquire all outstanding shares of Qualcomm for $70 per share ($60 in cash; $10 in Broadcom shares).[8] On November 13, 2017, Qualcomm issued a press release indicating that its Board had met and unanimously voted to reject Broadcom's proposal.[9] Nevertheless, Plaintiffs allege that analysts and investors remained bullish on the deal.[10]

10.     On December 4, 2017, Broadcom officially launched a proxy fight for Qualcomm, announcing a slate of 11 director nominees to replace Qualcomm's Board—with the vote to take place at Qualcomm's annual meeting on March 6, 2018 (the "Annual Meeting"). On December

---

[3] Qualcomm SEC Form 10-K for the Fiscal Year Ended September 24, 2017, filed November 1, 2017, pp. 4-5.

[4] Second Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint"), ¶¶ 2-3.

[5] "Broadcom" means Broadcom Limited, a semiconductor company then-domiciled in Singapore, which trades under the ticker symbol AVGO.

[6] Complaint, ¶ 4.

[7] Complaint, ¶ 59.

[8] Complaint, ¶ 62.

[9] Complaint, ¶ 67.

[10] Complaint, ¶ 71.

22, 2017, Qualcomm officially announced that it would oppose Broadcom's proxy fight and a few weeks later, on January 5, 2018, the two companies filed competing proxy statements soliciting shareholder votes for their respective slates.[11]

11.     On January 29, 2018, Plaintiffs allege that, unbeknownst to investors, Defendants[12] undertook defensive measures in an attempt to prevent Broadcom's bid for Qualcomm. In particular, Defendants filed a secret notice with the Committee on Foreign Investment in the United States ("CFIUS"), arguing that Broadcom's bid raised serious national security concerns and should be stopped.[13] CFIUS is a federal, interagency committee with authority to review certain foreign investments in U.S. businesses to determine whether such transactions threaten to impair U.S. national security.[14] The Committee then makes recommendations regarding such transactions for the President's ultimate determination.[15] Over the next month, Defendants continued to covertly lobby CFIUS to kill Broadcom's bid, including by submitting additional information regarding their purported national security concerns.[16]

12.     Plaintiffs allege that during the Class Period, Defendants withheld this information regarding their secret CFIUS defensive measures from investors.[17] Moreover, Plaintiffs allege that while Defendants were lobbying behind the scenes to kill the deal, they repeatedly misrepresented

---

[11] Complaint, ¶¶ 85-86.
[12] "Defendants" means: (i) Qualcomm; (ii) Qualcomm's Chief Executive Officer Steven M. Mollenkopf ("Mollenkopf"); (iii) Qualcomm's former Executive Chairman and Chairman of Qualcomm's Board of Directors Dr. Paul E. Jacobs ("Jacobs"); (iv) Qualcomm's General Counsel Donald J. Rosenberg ("Rosenberg"); and (v) Qualcomm's Presiding Director of the Board Thomas W. Horton ("Horton"). *See* Complaint, p. 1.
[13] Complaint, ¶ 96.
[14] Complaint, ¶ 103.
[15] Complaint, ¶ 103.
[16] Complaint, ¶ 97.
[17] Complaint, § IV.I.

to investors that they were negotiating with Broadcom in good faith to reach a deal.[18] For example, on February 5, 2018, Broadcom increased its bid to $82 per share—a 50% premium over Qualcomm's pre-bid stock price—and made additional concessions to address Qualcomm's stated concerns.[19] Three days later, Qualcomm rejected Broadcom's improved offer, but misrepresented to shareholders that it was willing to constructively engage with Broadcom: "Qualcomm has offered to meet with Broadcom to see if it can address the serious deficiencies in value and certainty in its proposal."[20]

13.     Similarly, after a February 14, 2018 meeting between Qualcomm and Broadcom to discuss the improved proposal, Defendants again misrepresented to the market that the parties were making progress toward a negotiated deal, telling shareholders that "our Board found the meeting to be constructive," that "[w]hile the current Broadcom proposal is unacceptable, our Board is intensely focused on maximizing value for Qualcomm stockholders, whether through executing on its growth strategy or by selling the Company," and "[o]ur Board is open to further discussions with Broadcom to see if a proposal that appropriately reflects the true value of Qualcomm shares, and ensures an appropriate level of deal certainty, can be obtained."[21] Plaintiffs allege that these statements were misleading because "Qualcomm's shareholders had no idea that rather than trying to negotiate a deal, Defendants were instead actively working to ensure that a Broadcom deal could never happen."[22]

14.     On February 26, 2018, following a February 23, 2018 meeting between Qualcomm and Broadcom, Plaintiffs allege that "Defendants misrepresented to investors that the companies

---

[18] Complaint, § IV.I.
[19] Complaint, ¶ 128.
[20] Complaint, ¶ 136.
[21] Complaint, ¶ 212.
[22] Complaint, ¶ 19.

had made substantial progress addressing Qualcomm's regulatory concerns, and suggested that the only sticking point was price: '[t]he Qualcomm Board believes the meeting led to further progress toward a possible negotiated transaction on key issues other than price.' Defendants also represented that they would be providing Broadcom with edits to its proposed merger agreement and a non-disclosure agreement, stating that 'the Board encourages Broadcom to enter into mutual due diligence and price negotiations' 'with the goal of determining whether there is a mutually beneficial transaction to be done between our two companies.'"[23]

15.     Plaintiffs allege that these statements were misleading because: (i) "Defendants' statements misled investors to believe that Qualcomm was willing to engage constructively with Broadcom's offer, and that Broadcom's actions (or lack thereof) were the main reason a negotiated solution had not been reached, when behind the scenes it was working to ensure that the deal with Broadcom would never happen"; and (ii) "Defendants' statements that price was a major barrier to a negotiated transaction misled investors to believe that the Company was willing to engage at the right price when, in fact, it was actively attempting to kill the deal regardless of price."[24]

16.     Plaintiffs also allege that throughout the Class Period, Defendants made "vague statements to shareholders about potential regulatory delay, highlighting the antitrust risks associated with the deal while concealing the steps the Company had already taken to scuttle the transaction. For example, the very same day they filed their secret CFIUS notice, Qualcomm emphasized antitrust risks associated with the deal, telling investors that Broadcom's bid involved 'some questions about deal certainty and regulatory approval' and '[w]e believe that [regulatory approval] is probably going to take something in the range of 18 months or more even[.]' While

---

[23] Complaint, ¶ 159.
[24] Complaint, ¶ 229.

speaking directly to potential regulatory delay associated with the deal, however, Defendants purposefully withheld the fact that they had taken affirmative steps to ensure that the deal would never receive regulatory approval."[25] Plaintiffs allege that these statements were misleading because "[b]y generically referencing regulatory risks that could delay and alluding to antitrust concerns while withholding the fact that Qualcomm had taken affirmative steps to prevent regulatory approval by filing a unilateral voluntary notice with CFIUS before Broadcom could redomicile to the U.S., Defendants misled investors about the true risks associated with the deal."[26]

17.     Similarly, Plaintiffs allege that Defendants made statements "focusing attention on Broadcom's commitment to ensure deal closure" while at the same time "Defendants failed to disclose that they had already argued to regulators that the transaction inherently posed a threat to national security and therefore should never close, regardless of any steps Broadcom agreed to take."[27] For example, in a February 8, 2018 letter to Broadcom filed with the SEC, Defendants laid out the topics for discussion at their proposed meeting with Broadcom, which included, "'Is Broadcom willing to commit to take whatever actions are necessary to ensure the proposed transaction closes?' Defendants' letter explained that Broadcom's firm commitment to ensure regulatory approval "is extremely important to value preservation for our shareholders' and '[i]f you are not willing to agree to do whatever is necessary to ensure a transaction closes, we will need you to be extremely clear and specific about exactly what actions you would refuse to take, so that we can properly evaluate the risk to Qualcomm's shareholders.'"[28] Plaintiffs allege that Qualcomm's request that Broadcom "agree to do whatever is necessary to ensure a transaction

---

[25] Complaint, ¶ 16.
[26] Complaint, ¶ 200.
[27] Complaint, ¶ 17.
[28] Complaint, ¶ 17.

closes" or "be extremely clear and specific about exactly what actions you would refuse to take, so that we can properly evaluate the risk to Qualcomm's shareholders" was misleading given that Qualcomm itself was secretly taking action to ensure that the deal never closed. By failing to disclose the Company's actions to its shareholders, it deprived them of the opportunity to "properly evaluate the risks."[29]

18.     Plaintiffs allege that the relevant truth concealed by Defendants' misrepresentations and omissions began to be revealed to the market through a series of disclosures on March 5 and 6, 2018. First, through a series of disclosures on March 5, 2018, the market learned that Qualcomm had secretly submitted a voluntary notice to CFIUS on January 29, 2018, requesting that it review Broadcom's bid and arguing that it jeopardized national security.[30] The market also learned that CFIUS had decided to undertake the review that Defendants had requested and, as a result, had ordered Qualcomm to postpone its Annual meeting, including the vote on Broadcom's slate of nominees, to provide time for the review to proceed.[31]

19.     On March 6, 2018, "Qualcomm published a letter from the U.S. Department of Treasury that provided further details concerning Qualcomm's secret Class Period communications with CFIUS and made clear that CFIUS's decision was the direct result of the unilateral notice and follow-up information submitted by Qualcomm. For example, the letter disclosed that 'CFIUS's assessment thus far includes its review of the information submitted by Qualcomm in its unilateral voluntary notice on January 29, 2018, the parties' responses to questions posed about the potential transaction during the interim period, and the information provided in our multiple phone calls, emails, and meetings with representatives of both Qualcomm

---

[29] Complaint, ¶ 207.
[30] Complaint, ¶ 172.
[31] Complaint, ¶ 173.

and Broadcom.'"[32] Plaintiffs allege that "[i]n response to these disclosures, the Company's stock fell 4.02%, from a closing price of $64.74 on March 2, 2018, to a closing price of $62.14 on March 6, 2018."[33]

20.    Then, after trading hours on March 12, 2018, President Donald J. Trump ("President Trump") issued an executive order blocking Broadcom from acquiring Qualcomm.[34] Plaintiffs allege that market commentators directly connected President Trump's decision to block the deal to Defendants' undisclosed Class Period actions.[35] For example, "a March 17, 2018 Tech Crunch article concluded that the deal's blockage was a direct result of the Company's unilateral request to CFIUS: 'The board's original outreach to CFIUS precipitated the sequence of events that led to Trump's block this past week.'"[36]

21.    **Exhibit 1** reports Qualcomm's common stock price and trading volume (in millions of shares) over the Class Period. On March 5, 2018, Qualcomm's stock declined by $0.73 per share for a return of -1.13%; on March 6, 2018, Qualcomm's stock declined by $1.87 per share for a return of -2.92%; and on March 13, 2018, Qualcomm's stock declined by $3.11 per share for a return of -4.95%. **Exhibit 2** reports Qualcomm's common stock market capitalization in billions of $USD over the Class Period. In aggregate, Qualcomm's market capitalization declined by approximately $8.45 billion following the alleged corrective disclosures, an economically significant amount.

---

[32] Complaint, ¶ 26.
[33] Complaint, ¶ 26.
[34] Complaint, ¶ 27.
[35] Complaint, ¶ 27.
[36] Complaint, ¶ 330.

### III.    Assignment

22.    I have been retained by Counsel[37] for Plaintiffs in this matter, to evaluate the following:

a) Whether the price declines in Qualcomm's common stock following the alleged corrective disclosures on March 5, 2018, March 6, 2018, and March 12, 2018 (the "Corrective Disclosures"), were, from an economic perspective, related to and a foreseeable consequence of the alleged misstatements and omissions by Defendants at issue in this case; and

b) Whether the price declines in Qualcomm's common stock following the Corrective Disclosures were statistically and economically significant.

23.    For purposes of my analysis, I assume the truth of Plaintiffs' allegations that Defendants' misrepresentations and omissions at issue in this case were false and misleading when made, and that Defendants acted with the requisite mental state.

24.    In connection with my work, I have called upon the knowledge and experience gained during my professional career. My opinions are based on my experience and expertise in finance, mergers and acquisitions, hostile takeovers, corporate governance, and financial reporting, and are not intended to represent legal conclusions or opinions.

25.    I have reviewed publicly available information and documents produced in this matter to date. Materials that I have relied upon in preparing this declaration are cited in the footnotes to my declaration and listed in **Appendix B**. I reserve the right to amend this declaration based on additional information that may be obtained before my testimony.

---

[37] "Counsel" means Lead Counsel Robbins Geller Rudman & Dowd LLP and Kessler Topaz Meltzer & Check, LLP.

26.     I am being compensated at my standard rate of $750 per hour in this matter. My compensation in this matter is not in any way contingent or based on the content of my opinions or the outcome of this matter.

## IV.    Summary of Opinions

27.     Based on my experience and analysis of the materials I have reviewed in this matter, my opinions can be summarized as follows:

a)   Qualcomm's common stock price declines following the Corrective Disclosures were, from an economic perspective, related to and a foreseeable consequence of Defendants' alleged misrepresentations and omissions at issue in this case.

b)   Qualcomm's common stock price declines following the Corrective Disclosures were statistically significant. Furthermore, they were economically significant and represented aggregate abnormal equity market value losses of over $9 billion, which constituted over 9% of Qualcomm's common equity value.

28.     The following sections of my declaration describe each of my opinions and supporting analyses in greater detail.

## V.    Qualcomm's Stock Price Declines Following the Corrective Disclosures Were Economically Related to and a Foreseeable Consequence of Defendants' Alleged Misrepresentations and Omissions

### A.     Theory of value-relevant information in a takeover setting

29.     It is well-established that a takeover bid is important information to investors in the target company and significantly affects a target company's stock price. This is because the acquiring company in an acquisition or hostile takeover generally pays a significant premium, or a price above the market price, for a target company's shares. Bruner (2004) notes that "Target

firm shareholders enjoy returns that are significantly and materially positive."[38] The author summarizes the event study findings from 25 academic studies and concludes that they "reveal returns that are material and significant, despite variations in time period, type of deal (merger vs. tender offer), and observation period. In short, the typical M&A deal or successful hostile takeover delivers a premium return to target firm shareholders."[39] I have reported similar takeover premiums in my own research, with an average initial offer premium of 36.2% in the sample studied by Cain and Denis (2013).[40]

30.     After a takeover attempt has been announced but prior to deal completion, uncertainty exists regarding the probability that the transaction will be successfully completed. Thus, target shareholders face uncertainty over whether they will ultimately receive a premium over the company's stand-alone stock price.

31.     Thus, after a takeover offer for a target company has been announced, the principal factors influencing the target company's stock price are: (i) the offer price; (ii) the probability that the target will actually be acquired (or get derailed by a rejection from the target or a regulator); and (iii) the probability that the bid will be increased or a better bid will emerge.  With a credible bid on the table, "non-deal" information about the target company becomes less important. This is because if a cash offer is ultimately successful, investors will receive the bid price, rather than whatever future value would be achieved under incumbent management based on the target company's fundamentals. As a result, "non-deal" information is only relevant to the extent the outstanding bid is expected to fail (or could cause the deal to become less likely to close).

---

[38] Robert F. Bruner, APPLIED MERGERS & ACQUISITIONS, p. 36 (John Wiley & Sons, Inc.) (2004).
[39] *Id.*, at pp. 36-38.
[40] Matthew D. Cain and David J. Denis, *Information Production by Investment Banks: Evidence from Fairness Opinions*, 56 JOURNAL OF LAW & ECONOMICS, at p. 254 (2013).

32.    DeAngelo (1990) formalizes this logic:

[C]onsider the post-offer market price as a probability-weighted average of the values expected to accrue to target stockholders under different outcomes:

$$P_M = \pi_A P_A + (1 - \pi_A) P_S \qquad (1)$$

where:

$P_M$ = the open-market stock price after an offer is announced, but before it expires,

$\pi_A$ = the market-assessed probability the target will ultimately be acquired (by the current or another bidder),

$P_A$ = the market's expectation of the ultimate acquisition price conditional on the current bid, and

$P_S$ = the post-offer expiration market price expected to obtain if the target remains independent, which capitalizes target stockholders' expected values under all other perceived outcomes.[41]

33.    In other words, this equation states that after a takeover bid has been made for a target company, that company's stock price is a function of investors' expectations about the offer premium and the probability or likelihood that the takeover bid will be successfully completed. For that reason, while a takeover bid is outstanding, information that sheds light on the likelihood that a takeover bid will be successfully completed is highly important to investors in the target company. If a target company takes actions that lower the probability of deal completion, and thus lower the probability of receiving a takeover offer premium, then those actions would be expected to lower the stock price of the target company. Furthermore, if those actions are concealed from the investing public, the target company's stock price may become artificially inflated because investors are unable to properly assess the probability that the deal will be completed.

---

[41] Linda Elizabeth DeAngelo, *Equity Valuation and Corporate Control*, 65 THE ACCOUNTING REVIEW, at p. 97 (1990) (footnote omitted).

34.     One of the ways that hostile takeover targets can lower the probability of being acquired is through the use of hostile takeover defenses. These may be company-specific devices such as the issuance of a poison pill. Companies may also take advantage of the legal environment to leverage hostile takeover protections. These hostile takeover defenses can alter the likelihood of a target company being acquired, and as a result, the availability and use of these hostile takeover devices is important information to investors in the target company.

35.     Academic research likewise indicates that companies' valuations are impacted by their use of hostile takeover defenses (and their resulting susceptibility to a hostile takeover attempt). This is due to the fact that inefficient management can be replaced through hostile takeover of the firm, thus increasing the overall value of a poorly-run firm. Manne (1965) explains: "Share price, or that part reflecting managerial efficiency, also measures the potential capital gain inherent in the corporate stock. The lower the stock price, relative to what it could be with more efficient management, the more attractive the take-over becomes to those who believe that they can manage the company more efficiently. And the potential return from the successful take-over and revitalization of a poorly run company can be enormous."[42] Bebchuk, Coates, and Subramanian (2002) document that when managers resist hostile takeover attempts through a staggered board takeover defense strategy, companies are able to remain independent but at the expense of managerial entrenchment and ultimately lower value for shareholders: "Remaining independent makes shareholders worse off compared with the scenario in which the hostile bid is accepted. Furthermore, we find that [effective staggered boards] do not provide sufficient

---

[42] Henry G. Manne, *Mergers and the Market for Corporate Control*, 73 JOURNAL OF POLITICAL ECONOMY, at p. 113 (1965) (citations omitted).

countervailing benefits in terms of increased premiums and may even provide no such benefits at all."[43]

36.    I have also studied companies' use of the legal environment in the hostile takeover setting.[44] In this study I documented the beneficial role that hostile takeovers can provide in the market: "We find that firm value is positively associated with susceptibility to hostile takeovers...Shareholders thus appear to value the disciplinary market for corporate control, and the secular decline in hostile takeover rates in recent years could perpetuate agency problems related to entrenchment…To the extent that firms deploy similar defenses to thwart shareholder activism, this trend underscores the relation between takeover defenses and corporate governance."[45] I further concluded that "The external threat of takeover is an important corporate governance mechanism…"[46] and that my findings "are consistent with studies that show that legal environments in which managers are insulated from takeovers are associated with a negative impact on shareholder value."[47] As a result, firms may leverage the legal and regulatory environment to resist hostile takeovers, and these actions would be expected to have value-relevant impacts on shareholder value.

37.    In evaluating the importance of information in a merger and acquisition ("M&A") and hostile takeover setting, I draw on my professional experience as a capital markets analyst who assisted companies in raising financing for acquisitions, as a financial economist and advisor

---

[43] Lucian Arye Bebchuk, John C. Coates IV, and Guhan Subramanian, The Powerful Antitakeover Force of Staggered Boards: Theory, Evidence, and Policy, 54 *Stanford Law Review*, (2002), at p. 891.

[44] Matthew D. Cain, Stephen B. McKeon and Steven Davidoff Solomon, *Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers*, 124 JOURNAL OF FINANCIAL ECONOMICS, at pp. 464-85 (2017).

[45] *Id.*, at pp. 465-66.

[46] *Id.*, at p. 478.

[47] *Id.*, at p. 480.

at the SEC who evaluated companies' disclosures of information to investors, as an academic who has taught M&A courses and published peer-reviewed research on topics including M&A, hostile takeover defenses, and investors' reactions to new information, and as a financial economist who has testified on event studies and the impact of information on stock prices.

### B.    Qualcomm's use of CFIUS as a hostile takeover defense

38.    CFIUS is comprised of representatives from multiple governmental agencies in the U.S. and reviews mergers, acquisitions, and other transactions involving foreign companies for potential national security issues.[48] The committee has the power to delay transactions, demand concessions such as divestitures or spin-offs, and the ability to recommend that transactions be completely blocked through Presidential order.

39.    Historically, prior to the Broadcom-Qualcomm takeover battle, CFIUS was not typically viewed as a hostile takeover defense routinely available to firms. However, some researchers recognized the potential for CFIUS to be abused for this purpose. Schmidt (1993) explained:

> ABUSE OF EXON-FLORIO AS A HOSTILE TAKEOVER DEFENSE
>
> Targets of a hostile takeover by a foreign company have attempted to invoke Exon-Florio as a defense against the takeover, an action sometimes referred to as the "Pentagon Ploy." If successful in invoking Exon-Florio, the target will cause a minimum delay of thirty days and possibly up to ninety days if the CFIUS undertakes an investigation. Of course, if the President decides to block the takeover, the target will have succeeded definitively in defending against the acquisition.[49]

---

[48] *See* Complaint, § IV.H.1.
[49] Patrick L. Schmidt, *The Exon-Florio Statute: How it Affects Foreign Investors and Lenders in the United States*, 27 THE INTERNATIONAL LAWYER, at p. 803 (1993) (citation omitted).

40.    Graham and Marchick (2006) documented how in 1990, the Norton Company engaged in a political campaign to lobby members of Congress and manipulate the CFIUS process in the face of a hostile takeover threat:

> In 1990, only two years after Exon-Florio became law, 119 members of Congress wrote to the president asking for an investigation of the UK firm British Tire and Rubber's (BTR) proposed hostile acquisition of the Norton Company, based in Massachusetts. The letter stated that "we do not believe that any take over of Norton would be in our economic security or national security interest" (Karim 1995). These members of Congress, encouraged by Norton, suddenly changed their tune when a French company, Compagnie de Saint Gobain, offered Norton $15 more per share. Clearly, Norton manipulated the CFIUS process to its advantage, because no one raised any national security concerns over the French acquisition. It is hard to imagine how a British acquisition did not. There were no national security issues with the proposed British acquisition; Norton simply did not want to be acquired by BTR, and used a political campaign toward CFIUS to prevent it.[50]

41.    This research reveals that, while rare, some companies have the potential to "manipulate" and "abuse" the CFIUS process by lobbying members of Congress, the CFIUS review panel, and ultimately the President of the United States in order to leverage CFIUS as a hostile takeover defense strategy. Such a strategy would be expected to have an impact on the probability of deal completion, and thus the takeover premium to be received by target shareholders. As a result, this hostile takeover defense strategy would be important information to investors in a target company, as it would be expected to impact the value of the target company's stock price.

42.    In evaluating the importance of the information that Defendants allegedly misrepresented and omitted in this action, I was informed by my own professional experience as a capital markets analyst who assisted companies in raising financing for acquisitions, as a financial economist and advisor at the SEC who evaluated companies' disclosures of information

---

[50] Edward M. Graham and David M. Marchick, *U.S. National Security and Foreign Direct Investment*, INSTITUTE FOR INTERNATIONAL ECONOMICS, at p. 124 (2006).

to investors, as an academic who has taught M&A courses and published academic research studies on topics including M&A, hostile takeover defenses, and investors' reactions to new information, and as a financial economist who has testified on the connections among the information environment, new disclosures, and company stock prices.

43.     Based on this experience and my evaluation of the relevant materials, it is my opinion that Qualcomm utilized the CFIUS review process as a hostile takeover defense strategy. Firms may resist takeovers because the executives and directors are reluctant to lose their compensation if they are not retained post-merger. They may also be reluctant to initiate changes within their firms in order to improve productivity in the face of a takeover threat, despite the fact that their pursuit of their own welfare comes at the expense of shareholders. Bertrand and Mullainathan (2003) describe this type of managerial entrenchment: "Corporate governance mechanisms—such as takeover threats, large shareholders, or effective boards—may reduce this moral hazard problem. For example, if managers fear a hostile takeover and the resulting job loss, they may more closely pursue shareholder interests."[51]

44.     The existence or use of hostile takeover defenses is important information to target-company shareholders because they will affect the probability of deal completion and the expected value of the takeover premium being offered to the target shareholders. Hostile takeover defenses thus represent value-relevant information to investors. Information regarding Qualcomm's CFIUS hostile takeover defense thus would have been important to Qualcomm's investors at the time that Qualcomm first requested CFIUS review of Broadcom's proxy solicitation process in connection with its hostile bid.

---

[51] Marianne Bertrand and Sendhil Mullainathan, *Enjoying the Quiet Life? Corporate Governance and Managerial Preferences*, 111 JOURNAL OF POLITICAL ECONOMY, at p. 1044 (2003) (citations omitted).

**Ex. E**
**Page 34**

### C.      The outcome of Qualcomm's hostile takeover defense strategy

45.      In evaluating whether Qualcomm's common stock price declines following the Corrective Disclosures were, from an economic perspective, related to and a foreseeable consequence of Defendants' alleged misrepresentations and omissions, I reviewed news, company press releases, SEC filings by Qualcomm, and research analyst reports about Qualcomm and Broadcom to assess the linkage between the omitted information alleged in the Complaint, the alleged Corrective Disclosures, the outcome of the CFIUS review, and the Company's stock price declines.

### 1.      Qualcomm's stock price declines following the March 5 and March 6 Corrective Disclosures were related to and a foreseeable consequence of Defendants' alleged misrepresentations and omissions

46.      Information about Qualcomm's unilateral request for CFIUS review of the Broadcom bid became public over the course of the evening of March 4, 2018 through March 6, 2018. On the evening of March 4, 2018, Reuters reported that CFIUS had ordered Qualcomm to postpone its annual stockholders meeting by 30 days so that CFIUS could investigate Broadcom's bid for the Company.[52] Before trading hours on March 5, 2018, Broadcom issued a press release which disclosed that Qualcomm had "secretly filed a voluntary unilateral request for CFIUS review on January 29, 2018."[53] Then, during trading hours on the same day, Broadcom issued a second press release which disclosed: "Broadcom was informed on Sunday night that on January 29, 2018, Qualcomm secretly filed a voluntary request with CFIUS to initiate an investigation, resulting in a delay of Qualcomm's Annual Meeting 48 hours before it was to take

---

[52] BRIEF-US dept of Treasury says CFIUS issued order to Qualcomm to postpone stockholders meeting, *Reuters* (Mar. 4, 2018).

[53] Broadcom Disappointed Will of Qualcomm Stockholders to be Deferred, *PR Newswire*, Mar. 5, 2018.

place."[54] Late in the afternoon of March 5, 2018, a Qualcomm 8-K filing was posted on the SEC's Edgar website.[55] This 8-K contained the "Interim Order" from CFIUS, which disclosed that Qualcomm had provided a notice to CFIUS on January 29, 2018.

47.     On the evening of March 5, 2018, Qualcomm issued a press release on *PR Newswire* that it would delay its annual stockholders meeting until April 5, 2018, as a result of the CFIUS order.[56] On the morning of March 6, 2018, Qualcomm filed an 8-K with the SEC which contained a letter from the U.S. Department of Treasury dated March 5, 2018 (the "March 5 Letter"). This letter explained in detail the potential concerns that CFIUS had about Qualcomm's technology and discussed the next steps in the investigation period.   The letter also disclosed additional information about the communications that had taken place between Qualcomm and CFIUS:

> On January 29, 2018, Qualcomm Incorporated ("Qualcomm") filed a unilateral notice with the Committee on Foreign Investment in the United States ("CFIUS"), seeking review of Broadcom Limited's ("Broadcom") solicitation of proxies for the purposes of electing a majority of the directors of Qualcomm. On March 4, 2018, the U.S. Department of Treasury ("Treasury") filed an agency notice pursuant to 31 C.F.R. § 800.401(c), broadening the scope of review to cover the proposed hostile takeover of Qualcomm.
>
> During the time between Qualcomm's unilateral filing and Treasury's agency filing, CFIUS has been communicating with both parties to obtain additional information to inform its decision on the appropriate path forward in regards to this matter. It was during this time, and as a result of these communications and additional information, that CFIUS has come to believe that Broadcom's successful hostile takeover attempt of Qualcomm, including the related stock purchase, proxy contest for the election of six directors to Qualcomm's Board as proposed and selected by Broadcom, Proposed Agreement and Plan of Merger, and any other

---

[54] Broadcom Reiterates Qualcomm Did Not Inform Its Own Stockholders or Broadcom of Its Secret, Voluntary Unilateral Request Filed on January 29, 2018, *PR Newswire*, Mar. 5, 2018.

[55] Qualcomm Form 8-K filed Mar. 5, 2018, https://www.sec.gov/Archives/edgar/data/804328/000110465918014823/0001104659-18-014823-index.htm (last visited Apr. 16, 2020).

[56] "Qualcomm to Adjourn Annual Meeting of Stockholders to April 5, 2018 as a Result of an Order from CFIUS," *PR Newswire* (Mar. 5, 2018), https://www.prnewswire.com/news-releases/qualcomm-to-adjourn-annual-meeting-of-stockholders-to-april-5-2018-as-a-result-of-an-order-from-cfius-300608582.html.

potential merger between Broadcom and Qualcomm, could pose a risk to the national security of the United States.

CFIUS's assessment thus far includes its review of the information submitted by Qualcomm in its unilateral voluntary notice on January 29, 2018, the parties' responses to questions posed about the potential transaction during the interim period, and the information provided in our multiple phone calls, emails, and meetings with representatives of both Qualcomm and Broadcom.[57]

48.     Numerous media outlets provided coverage of these disclosures. I reviewed news stories, analyst reports, and academic studies to assess the extent to which the disclosure of Qualcomm's request that CFIUS review Broadcom's bid, as well as CFIUS's decision to undertake that review and delay Qualcomm's Annual Meeting, were, from an economic perspective, related to and a foreseeable consequence of the information that Defendants allegedly misrepresented and omitted.

49.     First, the revelation of Defendants' concealed efforts to block Broadcom's bid was directly related to and a foreseeable consequence of Defendants' concealment of those same efforts during the Class Period. The logical expected outcome of Qualcomm's unilateral request to CFIUS was that CFIUS would review the proxy solicitation and hostile takeover attempt by Broadcom. CFIUS even stated this in the opening of its letter to Qualcomm, followed by a summary of the communications between the Company and CFIUS in the ensuing weeks.

50.     Second, one of the reasons for Qualcomm's concealed voluntary notice to CFIUS was to persuade CFIUS to undertake a review of Broadcom's bid, with the hope that CFIUS and/or the President would ultimately block the deal. As a result, the disclosure that CFIUS was undertaking the review Defendants requested—and was delaying Qualcomm's Annual Meeting to facilitate that review—was, from an economic perspective, related to and a foreseeable

---

[57] Qualcomm Form 8-K filed Mar. 6, 2018, https://www.sec.gov/Archives/edgar/data/804328/000110465918015036/0001104659-18-015036-index.htm (last visited May 7, 2020).

consequence of the information misrepresented and concealed by Defendants during the Class Period. This conclusion is confirmed by CFIUS's letter to Qualcomm and Broadcom, which opened by citing the unilateral request by the Company to CFIUS and followed with a summary of the ensuing communications between Qualcomm and CFIUS as a precursor to the formal CFIUS review.

51.     In forming my opinion, I also reviewed news reports following the March 5 and 6, 2018 Corrective Disclosures, which suggested that the market understood that the Corrective Disclosures were related to Defendants' undisclosed Class Period actions. For example:

- In this instance, [CFIUS]... is taking a proactive role and investigating before an acquisition agreement has even been signed.... But Qualcomm, which is based in San Diego, pushed the government to intervene.[58]

- Experts said they couldn't recall another instance of the committee's intervening in a transaction that hadn't been completed, much less one that is as fluid and bitterly contested as this one.... Broadcom had sought to pave the way for its bid by changing its headquarters to the United States... [and that] Broadcom argued that its status as a soon-to-be-American company meant the Qualcomm deal should not be subject to review by [CFIUS].   Qualcomm nonetheless appealed to regulators to get involved.[59]

- Broadcom has criticized Qualcomm for spending too much on R&D when its licensing business could be endangered. Such could ultimately prove to be the case, but as the letter from CFIUS shows, Qualcomm's spending has at least bought some friends in the right places.[60]

- While it seems like a fortuitous bit of timing for Qualcomm, it may not have been pure luck. In the latest volley of angry statements between the two companies, Broadcom accused Qualcomm of instigating the review on its own. "Broadcom reiterates that Qualcomm failed to disclose to its own stockholders

---

[58] Alan Rappeport and Cecilia Kang, "U.S. Calls Broadcom's Bid for Qualcomm a National Security Risk," *The New York Times* (Mar. 6, 2018).

[59] Alan Rappeport, Cecilia Kang, and Chad Bray, "U.S. Stalls Takeover Bid By Broadcom Over Security," *The New York Times* (Mar. 6, 2018).

[60] Dan Gallagher, Qualcomm's Spending Buys the Right Friends, *The Wall Street Journal* (Mar. 7, 2018).

and to Broadcom that it secretly filed a voluntary unilateral request for CFIUS review on January 29, 2018," the company said in a statement.[61]

- As things play out, this latest gambit in Broadcom's hostile bid for Qualcomm could end up creating more votes to change directors and undermining the credibility of Qualcomm management with any new director who is ultimately elected. The problem is that this action undercuts Qualcomm's best argument to shareholders in the proxy contest: The $79 per Qualcomm share offered by Broadcom is inadequate, the current board has done a good job pressuring Broadcom to improve its terms and current directors are in the best position to negotiate a deal if Broadcom can be convinced to make a better offer. By appearing to encourage the extraordinary order from the Committee on Foreign Investment in the United States, known as CFIUS, to postpone the shareholder vote on directors, Qualcomm could be seen as attacking its own investors' voting rights. Among other things, that implies the company doesn't have confidence that its arguments will win the day.[62]

52.     In summary, when a company adopts a hostile takeover defense during a takeover battle, this defense would be expected to reduce the likelihood of deal success. Given the anticipated takeover premium available to the target company's shareholders, a hostile takeover defense strategy would thus represent value-relevant information to those shareholders. It is my professional opinion, informed through my own academic research, teaching experience, industry experience, government regulatory experience, and review of the materials described throughout this declaration, that Qualcomm's takeover defense strategy involving the unilateral request to CFIUS would represent value-relevant information to investors. This information would be expected to affect the probability of deal completion, the takeover premium being offered to Qualcomm's shareholders, and the likelihood of those shareholders receiving such premium. Thus, it was foreseeable that the disclosure of this information would cause Qualcomm's stock price to decline.

---

[61] Therese Poletti, "Qualcomm was losing in takeover battle with Broadcom, then the government stepped in; Opinion: Review just delays inevitable unrequited deal that may not be the best for Qualcomm," *MarketWatch* (Mar. 7, 2018).

[62] Ronald Barusch "Qualcomm's Appeal to CFIUS Risks Alienating Shareholders," *Dow Jones Institutional News* (Mar. 6, 2018).

53.     Moreover, one purpose and foreseeable consequence of Qualcomm's unilateral request for CFIUS review was that CFIUS would decide to undertake that review. In my professional opinion, this outcome was, from an economic perspective, both related to and a foreseeable consequence of the information that Defendants allegedly misrepresented and omitted during the Class Period. CFIUS's decision to undertake a review of Broadcom's bid would also be expected to affect the probability of deal completion and, thus, the likelihood of those shareholders receiving a share price premium. Thus, it was also foreseeable that the disclosure of this information would cause Qualcomm's stock price to decline.  Given that Broadcom was rapidly moving to redomicile in the United States at the time, CFIUS may not have retained jurisdiction to review the transaction had Qualcomm not preemptively acted to request a review. CFIUS typically reviews transactions that have already been agreed upon; however, if Broadcom had completed its redomiciling to the United States, CFIUS may not have had grounds to block the hostile bid since Broadcom would no longer be a "foreign entity." Thus, CFIUS may have declined to review the bid if Qualcomm had waited to request CFIUS review until after the completion of Broadcom's redomiciling. As a result, the revelation of the CFIUS review and Qualcomm's stock price declines on March 5-6, 2018, represented a direct economic consequence of Qualcomm's actions.

### 2.     Qualcomm's stock price decline following the March 12 Corrective Disclosure was related to and a foreseeable consequence of Defendants' alleged misrepresentations and omissions

54.     The President's blockage of Broadcom's bid for Qualcomm was made public after the market close on March 12, 2018.[63] Numerous media outlets provided coverage of this decision. I reviewed news stories, analyst reports, and academic studies to assess the extent to which the

---

[63] Complaint, ¶185.

President's blocking of the deal was, from an economic perspective, related to and a foreseeable consequence of the information that Defendants allegedly misrepresented and omitted.

55.   First, I note that this was not the first instance of CFIUS intervention during a hostile takeover attempt. As described in the previous section, anecdotal evidence indicates that companies have previously lobbied CFIUS, both directly and through members of Congress, to intervene and halt the attempts of hostile bidders during takeover contests. The logical endgame of these attempts would be the blockage of the hostile bidder by a CFIUS recommendation and ultimately a Presidential executive order. Thus, the President's blockage of the Broadcom bid for the Company was both related to and a foreseeable outcome of Qualcomm's unilateral request for CFIUS review of the hostile takeover attempt.

56.   Second, news reports following the deal's blockage indicate that Qualcomm had engaged in multiple political efforts in order to execute its hostile takeover defense strategy. For example, Bloomberg reported:

> As Broadcom's team scrambled to get up to speed in Washington, one thing became quickly apparent: Qualcomm had beaten them to it. Many of the people that the company tried to hire there were already working for Qualcomm, according to two people close to Broadcom's efforts. Another person familiar with the matter said that Tan [Broadcom's CEO] had refused to spend on lobbying until it was too late. Federal lobbying disclosures for 2017 showing that Qualcomm spent $8.3 million, or roughly 100 times the $85,000 Broadcom spent, appear to support this theory.[64]

57.   An article by Tech Crunch described these lobbying expenditures in light of the hostile takeover battle: "Broadcom was winning the battle with shareholders, so Qualcomm's board shifted to a terrain far more favorable to it: Washington bureaucrats…These weren't regulators; these were friends."[65] The article concluded that the deal's blockage was a direct result

---

[64] Ed Hammond and Ian King, "Mr. Tan Goes to Washington: The Undoing of a Tech Mega-Deal," *Bloomberg* (Mar. 15, 2018).

[65] Danny Crichton, "Qualcomm's war may be over, but the casualties are just starting to be calculated," *Tech Crunch* (Mar. 17, 2018).

of the Company's unilateral request to CFIUS: "The board's original outreach to CFIUS precipitated the sequence of events that led to Trump's block this past week."[66] I also identified several articles that disclosed efforts by multiple Congress members to pressure CFIUS and the White House in the weeks after Qualcomm's January 29, 2018 letter to CFIUS, including Duncan Hunter,[67] John Cornyn,[68] Scott Peters,[69] and Mike Gallagher—at least three of whom reportedly had received campaign donations from Qualcomm.[70]

58.     Other news articles reached the same conclusions. For example:

- Qualcomm's Jan. 29 filing to CFIUS helped trigger a chain of events that culminated in President Donald Trump's decision Monday to block the deal…The company also got help from sympathetic senators and representatives who pressed the administration.[71]

- All of this makes it look as if Qualcomm's longtime government ties and lobbying efforts played a role in scuttling the deal. That's particularly true since Qualcomm had requested a Cfius review of Broadcom's bid on Jan. 29, and some of the objections publicly voiced by the committee sound like Qualcomm talking points.[72]

- Broadcom has criticized Qualcomm for spending too much on R&D when its licensing business could be endangered. Such could ultimately prove to be the case, but as the letter from CFIUS shows, Qualcomm's spending has at least bought some friends in the right places.[73]

---

[66] *Id.*

[67] Ronald Orol, "Congressman Urges National Security Review of Any Broadcom -Qualcomm Deal," *The Deal* (Feb. 23, 2018).

[68] "EXCLUSIVE – JOHN CORNYN, NO. 2 U.S. SENATE REPUBLICAN, URGES CFIUS TO REVIEW BROADCOM'S BID FOR QUALCOMM BEFORE MARCH 6 PROXY VOTE – LETTER TO U.S. TREASURY SECRETARY," *Reuters* (Feb. 26, 2018).

[69] Mike Freeman, "Second local congressman raises security concerns over hostile bid for Qualcomm," *The San Diego Union-Tribune: Web Edition* (Feb. 28, 2018).

[70] MIL-OSI USA: "Gallagher Calls for CFIUS Review of Foreign Bid for Qualcomm," *ForeignAffairs* (Mar. 1, 2018).

[71] Ted Greenwald, Kate O'Keeffe and Tripp Mickle, "Qualcomm Pursued Unusual Strategy," *Wall Street Journal* (Mar. 14, 2018).

[72] Eric Jhonsa, "Qualcomm's PR and Lobbying Savvy May Have Helped It Fight Off Broadcom," *The Deal Pipeline* (Mar. 13, 2018).

[73] Dan Gallagher, "Qualcomm's Spending Buys the Right Friends; CFIUS letter backs company's arguments against Broadcom's takeover attempt," *Wall Street Journal* (Mar. 6, 2018).

- The effort fell apart this week when President Donald Trump blocked it on national security grounds at the behest of Qualcomm.[74]

- Qualcomm investors had raised concerns about the company's performance and how the board handled Broadcom's $117 billion takeover offer, especially following the revelation that Qualcomm had prompted the government review that led to the order from President Donald Trump blocking the deal.[75]

59.    I further noted that even though the media reported on the politicians' requests to CFIUS from late February through early March, these stories did not report on Qualcomm's unilateral request for CFIUS review prior to March 4, 2018. Thus, these media stories did not disclose the important information about Qualcomm's request to CFIUS that was later revealed through the alleged Corrective Disclosures. Investors would not have been able to gain this key insight from the media coverage of the politicians' requests for CFIUS involvement prior to March 4, 2018.

60.    As a third step, I reviewed several academic research studies that discussed the deal's CFIUS review and ultimate blockage. A study published by Gordon and Milhaupt (2019) concluded that "the rejection of the Broadcom-Qualcomm transaction, shows the distortion that may emerge in the effort to package all concerns about the strategic objectives of state-guided foreign actors in a national security box…In other words, China's shadow as [a national strategic buyer] loomed over a deal that involved no Chinese participants, causing a contortion of the CFIUS process."[76] A study published by Lederman (2020) directly characterized Qualcomm's actions and

---

[74] David Benoit, "Qualcomm Investors Urged to Vote for Broadcom Board Picks in Protest," *Dow Jones Newswires* (Mar. 15, 2018).

[75] David Benoit and Ted Greenwald, "Business News: Qualcomm Investors Register Protest --- Six board members get tepid support in holder vote following Broadcom ordeal," *Wall Street Journal* (Mar. 24, 2018).

[76] Jeffrey N. Gordon and Curtis J. Milhaupt, *China as a "National Strategic Buyer": Toward a Multilateral Regime for Cross-Border M&A*, 192 COLUMBIA BUSINESS LAW REVIEW, at p. 238 (2019) (citations omitted).

the CFIUS review as a hostile takeover defense: Qualcomm "was in effect turning national security review into an antitakeover device."[77]

61.     A study by Westbrook (2019) provided an extensive analysis of CFIUS review as the hostile takeover defense employed by Qualcomm. The author concluded that "CFIUS review gained widespread recognition as a kind of 'super poison pill' with Qualcomm's successful effort to fend off acquisition by Broadcom in 2018."[78] The author further explained:

> The actions of CFIUS and the President in connection with Broadcom's attempted Qualcomm acquisition, however, demonstrated an even more aggressive approach. The Broadcom block established that CFIUS reviews can be used for more than the government's defense-related foreign policy or national security purposes. The CFIUS process was clearly available to target companies as an antitakeover device in the global M&A marketplace.

> Without CFIUS, the Broadcom-Qualcomm situation was simple: two large high-technology companies, both publicly traded in the U.S. markets, engaged in the familiar M&A ritual of the hostile takeover attempt. Hostile takeovers and proxy fights have long been a part of the U.S. economy, and we have developed extensive legal doctrines to manage such struggles for control in ways that are both fair to the participants and in society's interest. The deployment of CFIUS review as an antitakeover device by Qualcomm constituted a new weapon in merger battles, and with the passage of FIRRMA that weapon became very powerful.[79]

62.     As a fourth step, I reviewed research analyst reports and news stories prior to March 12, 2018, for any indicators that Qualcomm's unilateral request for CFIUS review of the deal could result in a Presidential blockage of Broadcom. Several analyst reports and news stories indicated that it could. For example:

- While there has been constant back and forth between AVGO & QCOM, we think the CFIUS investigation and specifically details in the letter lower the probability of an AVGO/QCOM merger.[80]

---

[77] Isaac Lederman, *The Right Rights for the Right People? The Need for Judicial Protection of Foreign Investors*, 61 BOSTON COLLEGE LAW REVIEW, at p. 732 (2020).

[78] Amy Deen Westbrook, *Securing the Nation or Entrenching the Board? The Evolution of CFIUS Review of Corporate Acquisitions*, 102 MARQUETTE LAW REVIEW, at pp. 650, 677-78 (2019).

[79] *Id*., at pp. 677-78 (citations omitted).

[80] U.S. Research at a Glance, RBC Capital Markets (Mar. 7, 2018).

- As such, our base case is that either CFIUS will decline the approval or will require significant remedies that could force AVGO to walk.[81]

- The letter appears to put an end to Broadcom's chances of acquiring Qualcomm.[82]

- The move complicates an already contentious deal and increases the likelihood that Broadcom, which is based in Singapore, will end its pursuit of Qualcomm. Such an investigation is often a death knell for a corporate acquisition.[83]

63.     Despite these assessments, several reports expressed the viewpoint that Broadcom's bid remained viable following the March 5-6, 2018 Corrective Disclosures. For example:

- While we don't anticipate AVGO walking away from QCOM it does create a high hurdle. Our expectation is AVGO would spend the next 30 days addressing CFIUS concerns.[84]

- We believe the potential QCOM acquisition remains in play... We continue to see obvious financial/strategic merit in combining QCOM/AVGO's leading back-end and front-end handset portfolios. Recent reports (Bloomberg 3/5/18) indicate AVGO is on track to win a majority of QCOM's board seats in a shareholder vote delayed until 4/5/18, pending CFIUS' somewhat puzzling review.[85]

- In our upside scenario of $425, we see AVGO/QCOM combination....[86]

- Meanwhile, it seems unlikely CFIUS will prevent shareholders from voting for long.[87]

- Ultimately, this deal does not seem to merit the attention of CFIUS, especially with Broadcom's intention to base itself in the U.S., instead of Singapore. Both companies now have some breathing room, with Qualcomm's new annual meeting a month away. But it's also likely that it could lead to another month of he-said she-said statements. It would behoove the two companies to try to

---

[81] Broadcom: Are they really all about slashing R&D?, Macquarie Research (Mar. 6, 2018).

[82] Dan Gallagher, "Qualcomm's Spending Buys the Right Friends; CFIUS letter backs company's arguments against Broadcom's takeover attempt," *The Wall Street Journal* (Mar. 6, 2018).

[83] Alan Rappeport and Cecilia Kang, "U.S. Calls Broadcom's Bid for Qualcomm a National Security Risk," *The New York Times* (Mar. 6, 2018).

[84] U.S. Research at a Glance, RBC Capital Markets (Mar. 7, 2018).

[85] Broadcom Ltd., Oppenheimer (Mar. 8, 2018).

[86] Broadcom Limited, RBC Capital Markets (Mar. 5, 2018).

[87] Ronald Barusch, Dealpolitik: "Qualcomm's Appeal to CFIUS Risks Alienating Shareholders," *Dow Jones Institutional News* (Mar. 6, 2018).

mend their differences over the next month, because if this deal is as inevitable as it seems, it would be better to start out as partners instead of enemies slinging mud.[88]

64.     These analyst reports and news stories indicated that, prior to March 12, 2018, market participants viewed the deal's blockage as a potential and foreseeable consequence of Qualcomm's request for CFIUS review. Moreover, the outcome of the CFIUS review was not a foregone conclusion as of March 5-6, 2018, as the market provided varying assessments of the hostile bid's remaining viability at that point in time. Only after the President's executive order blocking the bid on March 12, 2018, were Qualcomm's shareholders able to fully know that the Company's unilateral request to CFIUS had resulted in the deal's blockage.

65.     Based on my review, it is my opinion that the President's blocking of Broadcom's bid for Qualcomm resulted from the CFIUS review and that this end result was a foreseeable consequence of Qualcomm's unilateral request to CFIUS for review of the transaction. My review provided consistent evidence that the logical endgame of Qualcomm's unilateral request for CFIUS review could include blockage of Broadcom's hostile takeover bid by the President. Thus, the bid's blockage was clearly connected to Qualcomm's actions. Moreover, given that an order blocking Broadcom's bid would significantly impact the likelihood of deal completion and effectively end Qualcomm shareholders' hopes of receiving any deal premium from the Broadcom bid, it was foreseeable that the disclosure of this information would cause Qualcomm's stock price to decline.

66.     In summary, I conclude that the Company's common stock price declines following the alleged Corrective Disclosures were, from an economic perspective, related to and foreseeable based on the information that Defendants allegedly misrepresented and omitted.

---

[88] Therese Poletti, "Qualcomm was losing in takeover battle with Broadcom, then the government stepped in," *MarketWatch* (Mar. 7, 2018).

## VI.   Qualcomm's Stock Price Declines Following the Corrective Disclosures Were Statistically and Economically Significant

67.    I was asked to assess how the disclosures of information about Qualcomm's unilateral request to CFIUS and the CFIUS review impacted Qualcomm's stock price. An event study is an established and well-accepted statistical method for measuring the effect of the disclosure of new information on the price of a company's publicly-traded securities. New information may include, among other things, company press releases, SEC filings, earnings reports, news, and research analyst reports. In conducting an event study for Qualcomm's stock prices, I have assumed that the market for the Company's stock is efficient. During the course of my analysis, I have not seen any evidence to indicate otherwise.

68.    A generally accepted method for performing an event study is to create a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices. Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to company-specific news. Finally, as part of an event study method, an economist tests whether the deviation from expected price movements (i.e., the abnormal return) is sufficiently large compared to the usual volatility in the Company stock price return such that simple random movement can be rejected as the cause.

69.    Here, I performed an event study to evaluate whether Qualcomm's common stock responded to information disclosed on March 5-6, 2018 and March 12, 2018, following the alleged Corrective Disclosures. To conduct the event study, I deployed the methodologies described above

that are well-established in academic literature and routinely applied in the context of securities fraud litigation.

70.     In an effort to isolate the impact of Company-specific news on Qualcomm's stock price during the Class Period, I performed regression analyses to measure the relationship between Qualcomm's stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in Qualcomm's industry. By modeling how Qualcomm's stock price returns moved relative to an overall market index and an industry index, I could also measure its response to Company-specific news.

71.     For each trading day analyzed, I constructed a regression model using data from the 120-day period ending November 2, 2017 (the "Estimation Window"), the day before the first news of Broadcom's intent to bid for Qualcomm was leaked to the market. It is common practice to employ a 120-day Estimation Window and to estimate the event study parameters prior to public news about an M&A or hostile takeover in order to avoid contamination of stock returns by this information.[89] To study the relationship between Qualcomm's stock price returns and overall market factors, I used the S&P 500 (the "Market Index"), which includes 500 leading companies and captures approximately 80% coverage of available market capitalization." The Market Index

---

[89] Mark L. Mitchell and Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, 49 THE BUSINESS LAWYER, at p. 568 ("The market model is estimated with regression analysis. The estimation period for this market model equation typically ranges from 100 to 300 trading days preceding the event under study."); A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 JOURNAL OF ECONOMIC LITERATURE, at p. 15 (1997) ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.")

is commonly used by economists as a representation of the overall market. To study the relationship between Qualcomm's stock price returns and changes in industry-wide factors that would be expected to impact all stock in Qualcomm's particular industry, I constructed an industry index (the "Industry Index"). To construct the Industry Index, I used companies that were identified by Qualcomm as industry peers in its Form 10-K filings throughout the Class Period.[90]

72.     I established the relationship between the daily return of the Company stock, the daily return on the Market Index, and the daily return on the Industry Index over the Estimation Window.[91] The event study model revealed a positive relation between the Company's daily returns and those of the overall stock market and industry.[92] In other words, movements of the Market Index and Industry Index help explain movements in Qualcomm's stock price. This allowed me to predict the expected daily return of the Company on a date, once I controlled for that day's market and industry returns. I then subtracted the predicted return from the actual return to get the "abnormal" return, which represented the component of the return that is not attributable to market-wide or industry-wide movements. If the new information revealed on the alleged Corrective Disclosure date had a statistically significant abnormal return and there was no other

---

[90] The equal-weighted Industry Index is comprised of Cirrus Logic, Cypress Semiconductor Corporation, Intel, Marvell Technology, Maxim Integrated Products, Microchip Technology Inc., NVidia, Qorvo Inc., Sequans Communications S.A., and Skyworks Solutions Inc. The remaining listed 10-K competitors—Broadcom Limited and NXP Semiconductors N.V., among others— were excluded because the pending merger negotiations between each firm and Qualcomm could create spurious return correlations during the Estimation Window and the alleged Class Period.

[91] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. *See* A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 JOURNAL OF ECONOMIC LITERATURE, at p. 15 (1997) ("For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event."); *see also* Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, *Good News, Bad News, Volatility, and Betas*, 50 JOURNAL OF FINANCE, at p. 1597 (1995).

[92] The estimated model was -0.00066569 + 1.23216 * S&P 500 Return + 0.16691 * Industry Return.

important company-specific news released on that date, I infer that the stock price movement was caused by the newly-available public information. I can then conclude that the alleged Corrective Disclosures provided new information in the market that was important to investors, causing them to change their valuation of the Company's stock.

73.     The event study model revealed a positive relation between the Company's daily returns and those of the overall stock market and industry.[93] Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in the Company stock price return. An important statistic from a regression analysis is the standard deviation of the errors, which measures the degree of imprecision in the predictions from my regression model. In other words, the standard deviation of errors provides a metric for how much "randomness" remains in the price movement of Qualcomm's common stock, after controlling for the Market Index and the Industry Index. On an example date, February 2, 2018, for instance, the model predicted that absent any new value-relevant firm-specific information, the price of Qualcomm common stock would decrease by 2.74% because the Market Index decreased by 2.11% and the peer Industry Index decreased by 0.41%.  However, I do not expect this model to predict returns exactly due to the inherent randomness observed in stock price returns. On February 2, 2018, I observed an actual return of negative 1.09%. The abnormal return I observe on this day is positive 1.65% (the difference between the actual rate of -1.09% and the expected rate of -2.74%). I then rely on the standard deviation of errors to determine whether this abnormal return is sufficiently large that I can reject random movement as an explanation.

74.     I next calculated the t-statistic, which is the test that economists use to determine whether randomness can be rejected as the explanation for an abnormal price movement. The

---

[93] Calculations in this paragraph are rounded and thus approximate.

t-statistic measures the number of standard deviations between the actual observation and the predicted movement. In my example, the abnormal return of 1.65% is associated with a t-statistic of 1.34, or 1.34 standard deviations. The t-statistic is calculated by dividing the abnormal return of 1.65% by the standard deviation of the errors of 0.0122594. Probability theory suggests that under the standard assumption that abnormal returns will be normally distributed with a mean of zero in the absence of new value-relevant company-specific news, based purely on randomness, using a 95% confidence level and a sufficiently large sample size, the abnormal return should have a t-statistic greater than 1.96 (or less than -1.96) only 5% of the time.[94] In other words, there is a 95% chance that, barring some non-random explanation, the actual observed return will fall within 1.96 standard deviations of the predicted return.

75.    Having a t-statistic of 1.34, the abnormal return is not statistically significant at the 95% confidence level, and I cannot reject randomness as the cause of the abnormal price movement on February 2, 2018 with greater than 95% confidence. Conversely, if the observed abnormal return had a t-statistic of an absolute magnitude greater than 1.96 and new value-relevant Company-specific information were observed, I would reject randomness as the explanation with 95% confidence and infer that new company-specific information released during that time caused the stock price movement.

## VII.    Event Study Results for March 5-6, 2018

76.    **Exhibit 3** reports the event study results for March 5, 2018, and March 6, 2018, when Plaintiffs allege that the relevant truth concealed by Defendants' misrepresentations and omissions began to be partially revealed to the market. The abnormal return on March 5, 2018,

---

[94] David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," LITIGATION SERVICES HANDBOOK, THE ROLE OF THE FINANCIAL EXPERT, Ch. 19, (3rd ed. 2001). The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.

was -2.49% and was statistically significant at the 95% level. The abnormal dollar change in stock price was -$1.61 on March 5, 2018. The abnormal return on March 6, 2018, was -3.46% and was statistically significant at the 99% level. The abnormal dollar change in stock price was -$2.21 on March 6, 2018. As these abnormal price movements are statistically significant at or above the 90% confidence level, I can reject randomness as the cause of the abnormal movements in stock price and can infer that Company-specific information released around that date was the ultimate cause of the observed price decline.

77.     As I discussed in the preceding sections, Plaintiffs allege that information that revealed the relevant truth concealed by Defendants' misrepresentations and omissions became public through a series of Corrective Disclosures over the two-day period of March 5-6, 2018. As a result, I have also analyzed whether the abnormal return in Qualcomm's stock price over the full two-day window was statistically significant. The abnormal return on March 5-6, 2018, was -5.87% and was statistically significant at the 99% level. The abnormal dollar change in stock price was -$1.61 on March 5, 2018, and -$2.21 on March 6, 2018, which sums to a stock price drop of -$3.83 over the two days.[95] As these abnormal price movements are statistically significant at or above the 90% confidence level, I can reject randomness as the cause of the abnormal movements in stock price and can infer that Company-specific information released around those dates was the ultimate cause of the observed price decline.

## VIII.   Event Study Results for March 13, 2018

78.     **Exhibit 4** reports the event study results for March 13, 2018, the return day following the alleged Corrective Disclosure on March 12, 2018. The abnormal return on March 13, 2018, was -3.82% and was statistically significant at the 99% level. The abnormal dollar change

---

[95] The sum differs slightly due to rounding.

in Qualcomm's stock price on this date was -$2.40. As this abnormal price movement was statistically significant at or above the 90% confidence level, I can reject randomness as the cause of the abnormal movement in Qualcomm's stock price and can infer that the new Company-specific information released around that date was the ultimate cause of the observed price decline.

## IX.    Economic Significance of Qualcomm's Stock Price Declines

79.    Qualcomm's stock price declines on March 5, 6, and 13 (2018), were all statistically significant. Abnormal returns and stock price declines of this amount would be expected to also be economically significant for a large company like Qualcomm that has: (i) a multi-billion-dollar equity market capitalization; (ii) trades in a liquid market; and (iii) has significant daily trading volume. Companies of this nature tend to have lower daily volatility and returns; therefore, even a single-digit stock price decline would represent a significant reduction in shareholder value. These abnormal stock price declines across the three alleged corrective disclosure dates add up to an abnormal stock drop of -$6.23 per share. They also represent a total abnormal return sum of -9.78% (or -9.47% compounded). In terms of common equity market capitalization, the abnormal stock price decline over the three trading days equated to a loss of $9.22 billion,[96] an economically sizeable amount.

80.    My event study analysis also supports my opinion concerning the value-relevance of information regarding Broadcom's hostile takeover bid for Qualcomm. News of Broadcom's intention to bid $70 per share for Qualcomm leaked publicly on November 3, 2017. My event study concluded that following this news, Qualcomm's stock price had an abnormal return of 12.32% on November 3, 2017, which was statistically significant at the 99% level. This amounted to an abnormal dollar change in stock price of $6.76 per share. In terms of common equity market

---

[96] Based on 1.48 billion shares outstanding.

capitalization, Qualcomm's abnormal stock price increase after this positive news equated to a gain of approximately $9.96 billion.[97]

## X.    Conclusion

81.    In conclusion, I find that: (i) Qualcomm's common stock price declines following the Corrective Disclosures were, from an economic perspective, related to and foreseeable based on the alleged misrepresented and omitted information; and (ii) Qualcomm's stock price declined by statistically significant and economically meaningful amounts following the Corrective Disclosures on March 5, March 6, and March 12, 2018.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 11, 2020

Matthew D. Cain

---

[97] Based on 1.474 billion shares outstanding.

**Appendix A. Curriculum Vitae of Matthew D. Cain**

## Matthew D. Cain, Ph.D.                                           May 2020

E-mail: mdcain@outlook.com                                    matt.cain@berkeley.edu
Mobile: 574-485-8065                                          Berkeley, CA  94720
U.S. Citizen                                                  Homepage        SSRN

### Education

Ph.D., Finance, August 2007                    Purdue University, West Lafayette, IN
B.S., Finance, May 2001                         Grove City College, Grove City, PA

### Professional and Academic Experience

*Senior Fellow*, Berkeley Center for Law and Business; *Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-Present

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

### Publications

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review*, forthcoming.

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis*, forthcoming.

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).


**Presentations**

Arizona State University College of Law, 2020
U.C. Berkeley School of Law, 2019; 2018
Vanderbilt University Law School, 2019
Berkeley Center for Law and Business, 2018
Cornerstone Research, 2018
Cornell University, 2016; 2015
Oxera, London, 2016
Institute for Law and Economics, University of Pennsylvania, 2015
U.C. Berkeley M&A Roundtable, New York, 2015
American Bar Association, Business Law, Private Equity M&A Subcommittee meeting, 2015
Virginia Commonwealth University, 2015
American Finance Association, annual meeting, 2015
Argentum Centre for Private Equity Symposium, Bergen, Norway, 2014
U.S. Securities and Exchange Commission, 2014
American Law and Economics Association, University of Chicago, 2014
The Brattle Group, 2013
U.S. Securities and Exchange Commission, 2013
Institute for Law and Economics, University of Pennsylvania, 2013
All Indiana Conference, 2013; 2010; 2009

American Law and Economics Association, Stanford Law School, 2012
George Washington University Law School, 2012
American Finance Association, annual meeting, 2012
Ohio State, 2011
Ohio University, 2011
Conference on Empirical Legal Studies, Yale Law School, 2010
Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden, 2010
Purdue Alumni Conference, 2010
American Finance Association, annual meeting, 2008
Indiana University, 2008
Penn State, 2008
University of Arizona, 2008
University of Colorado, 2008
University of Florida, 2008
University of North Carolina at Chapel Hill, 2008
University of Notre Dame, 2008
University of Oregon, 2008
University of Pittsburgh, 2008
Virginia Tech, 2008
Financial Management Association, annual meeting, 2007
University of Georgia, 2007
University of Kentucky, 2007
Western Finance Association, annual meeting, 2006


**Journal Referee**:  *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*


**Teaching Experience**

UC Berkeley School of Law
   LAW 251.52: Economics of Corporate and Securities Litigation, Fall: 2020 (*Expected*)


University of Notre Dame, Mendoza College of Business
   FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013
   FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013


Purdue University, Krannert School of Management
   MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008
   MGMT 610: Financial Management I (MBA Core), Fall: 2007

**Expert Witness Experience**

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

**Exhibit 1**



Qualcomm Common Stock Price & Volume
1/29/2018 - 3/29/2018

Class Period: 1/29/2018 - 3/12/2018

Alleged Corrective Disclosures
and Raw Price Decline:
1) 3/5/2018:      -$0.73   (-1.13%)
2) 3/6/2018:      -$1.87   (-2.92%)
3) 3/13/2018:     -$3.11   (-4.95%)

Volume     Closing Price     Alleged Corrective Disclosures

Sources: Complaint & S&P Capital IQ.

**Exhibit 2**



### Qualcomm Common Stock Market Capitalization
### 1/29/2018-3/29/2018

Sources: Complaint, Qualcomm Incorporated SEC filings, and S&P Capital IQ.

**Exhibit 3**

## Event Study Statistics for Qualcomm Common Stock on the Alleged Corrective Disclosures March 5 & 6, 2018

| Date | Closing Price | Volume (Millions) | Raw Return | Abn. Return | Abn. Dollar Change | t-Stat | p-Value | Sig Level |
|---|---|---|---|---|---|---|---|---|
| 3/5/2018 | $64.01 | 15.45 | -1.13% | -2.49% | -$1.61 | -2.03 | 0.04 | ** |
| 3/6/2018 | $62.14 | 23.45 | -2.92% | -3.46% | -$2.21 | -2.82 | 0.01 | *** |
| 3/5/2018- 3/6/2018 (Compounded) | | | | -5.87% | -$3.83 | -3.38 | 0.00 | *** |

Sources: Complaint, S&P Capital IQ & Factiva.

Note:
*** Denotes statistical significance at the 99% confidence level or greater; ** denotes statistical significance at the 95% confidence level or greater; * denotes statistical significance at the 90% level or greater.

48

**Exhibit 4**

# Event Study Statistics for Qualcomm Common Stock on the Alleged Corrective Disclosure March 13, 2018

| Date | Closing Price | Volume (millions) | Raw Return | Abn. Return | Abn. Dollar Change | t-Stat | p-Value | Sig Level |
|------|------|------|------|------|------|------|------|------|
| 3/13/2018 | $59.70 | 38.6 | -4.95% | -3.82% | -$2.40 | -3.12 | 0.00 | *** |

Sources: Complaint, S&P Capital IQ & Factiva.

Note:
*** Denotes statistical significance at the 99% confidence level or greater; ** denotes statistical significance at the 95% confidence level or greater; * denotes statistical significance at the 90% level or greater.

49